IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


PAUL F. SIKORA,                          }
                                         }
            Plaintiff,                   }
                                         }          Civil Action No.  12-1860
vs.                                      }
                                         }          Judge Hornak
UPMC a/k/a UPMC HEALTH SYSTEM            }
and the UPMC HEALTH SYSTEM and           }
AFFILIATES NON-QUALIFIED                 }
SUPPLEMENTAL BENEFIT PLAN,               }
                                         }
            Defendants.                  }


**BRIEF IN SUPPORT OF DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Defendants file this Brief in support of their motion for partial summary judgment on the

issue of whether the defendant plan is a "top hat" plan.

## I.      STATEMENT OF THE CASE

This case was commenced on December 21, 2012 by a Complaint with four claims for

relief, three of which arise under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 101, *et seq.*  The fourth count is for breach of contract, apparently

asserting a claim based upon Pennsylvania contract law.  (Complaint ¶¶ 25 to 51).

Plaintiff alleges that he was an employee of UPMC from April 1983 until December 2,

2011 (Complaint ¶7), and a participant in the defendant UPMC Health System and Affiliates

Non-Qualified Supplemental Benefit Plan ("the Plan"), a copy of which is annexed to the

Complaint as Exhibit A, from 2008 until he resigned at the end of 2011. (Complaint ¶¶ 3, 10).

The Preamble of the Plan[1] recites that it is intended to comply with the non-qualified deferred compensation plan requirements of Internal Revenue Code §457(f) and provides by its terms that it is intended to be unfunded and maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees, such that it is a so-called "top hat" plan exempt from the substantive provisions of ERISA. (Plan §§2.01, 7.03) 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1).

Plaintiff alleges that, after termination of employment, he sought benefits under the Plan, which the Plan denied. (Complaint ¶¶ 16-21). In a July 23, 2012 letter, Greg Peaslee, a designee of the Plan Administrator, upheld this denial and denied plaintiff's appeal. (Complaint ¶23, Exhibit C). The reason given for the denial was that the plaintiff had refused to enter into a Post Retirement Service Agreement, a condition of eligibility under the Plan. (*Id.*) This lawsuit followed.

Plaintiff seeks, among other forms of relief, a judgment for the amounts allegedly owed to him and a declaration that the plan does not qualify as a top hat plan.

Top hat plans are exempt from the provisions of ERISA on which plaintiff's claims in Counts I, II and IV are based. 29 U.S.C. §§ 1051(2); 1081(a)(3); 1101(a)(1); 29 C.F.R. § 2520.104-23. *In re IT Group, Inc.,* 448 F.3d 661, 664-65 (3d Cir. 2006); *Goldstein v. Johnson & Johnson,* 251 F.3d 433, 442 (3d Cir. 2001); *In re New Valley Corp.*, 89 F.3d 143, 148-149 (3d Cir. 1996) (describing "the near-complete exemption of top hat plans from ERISA's substantive requirements and noting that "top hat plants are covered only by ERISA's enforcement provisions," *i.e.* Part 5 of Title I). The parties have agreed, therefore, to limit discovery to the issue of whether the Plan is a top hat plan and to seek a resolution of that issue on a motion for

---

[1] The Plan document and amendments are attached as Exhibit 2 to the Declaration of Greg Peaslee ("Peaslee Decl."). It will be cited in this Brief as "Plan §_."

summary judgment. It is defendant's contention that a finding that the Plan is a top hat plan will be dispositive of the case.

## II.     STATEMENT OF MATERIAL FACTS

Defendant UPMC is a non-stock, non-profit Pennsylvania corporation which owns and operates hospitals, other health care facilities, a health insurance provider and other entities related to the provision of health care and related research. Peaslee Decl. ¶ 1. Codefendant, the UPMC and Affiliates Non-Qualified Supplemental Benefit Plan ("the Plan"), was adopted by the Compensation Committee of the Board of Directors ("the Committee"), effective January 1, 2002. The Plan and all amendments through the end of 2011 are attached to Greg Peaslee's Declaration as Exhibit 2. *Id.* ¶ 4.

*The Plan*

The Plan is a "non-qualified deferred compensation plan" under Section 457(f) of the Internal Revenue Code. The participating employers in the Plan are UPMC's direct and remote subsidiaries that are tax-exempt organizations. (UPMC and its participating subsidiaries are referred to hereafter as "UPMC"). *Id.* ¶ 6.

The Plan is administered by the Committee. Plan § 7.01 The Committee has responsibility for the operation and administration of the Plan, and to direct the distribution of Plan benefits. Plan § 7.02. Section 7.02 of the Plan Document provides that the Committee may delegate to another person or persons power and authority to make routine decisions and perform ministerial tasks arising in the ordinary course of business. Plan § 7.02. Gregory K. Peaslee, who is a Plan participant, and who is UPMC's Executive Vice President and Chief Administrative Officer served as the delegate of the Committee under this provision since the

inception of the Plan.  Peaslee Decl. ¶ 9.  The Plan can be amended only by action of the Board of Directors of UPMC.  Plan § 8.01.[2]

As stated in the Preamble to the Plan, its purpose is to enhance the retirement security of a select group of highly compensated key executives employed by UPMC and certain UPMC-affiliated entities, in part by restoring benefits to executives who are subject to limitations imposed by certain provisions of the Internal Revenue Code.  Those limitations include the annual compensation cap for qualified retirement plans under 29 U.S.C. § 401(a)(17), which for 2011 applied to individuals earning over $245,000, and the annual limit for contributions for 457(b) plans, which for 2011 was $16,500.  Plan p. 1; Benefits Summary p. 1.[3]

Section 2.01 of the Plan states that eligibility to participate in the Plan is limited to certain classes of executives, subject to Section 9.04, which provides as follows:

> Notwithstanding any other provisions of this Plan to the contrary, if the Committee determines that any Participant may not qualify as a "management or highly compensated employee" within the meaning of [ERISA] … the Committee may determine, in its sole discretion, that such Participant shall cease to be eligible to participate in this Plan.

When the Plan was adopted, eligibility was limited to Executives referred to as Class A, B or C Executives.  This was changed by amendment in March 2008 so that participation became limited to executives who participate at specified levels in the Management Incentive Compensation Plan.  Peaslee Dep. 74, Exh. 4E.  Executives whose

---

[2] Where, as in this instance, the Plan provides that it can be amended by the Company, that means by action of the Board of Directors of the Company.  *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 81-82 (1995)  Amendments to the Plan were proposed by Greg Peaslee and presented to the Board for ratification on an annual basis.  Peaslee Deposition ("Dep.") at 30-32.

[3] In December 2008, a Plan Benefits Overview was circulated to most of the participants, including the plaintiff, by email.  That summary explains the purpose of the plan, how benefits ar determined, vesting of benefit, tax treatment and the fact that the benefits are assets of the employers until such time as they are distributed.  Peaslee Dep. 79-82, Exh. 5. This Benefits Summary will be cited as "Benefits Summary, p. ___"

Management Incentive targets are less than 20% of base salary are not eligible to participate in the Plan.  Peaslee Dep. 101.

On November 15, 2002, UPMC filed a "Statement of Employee Benefit Plans" with the Pension and Welfare Benefit Administration of the United States Department of Labor, pursuant to the reporting and filing requirements applicable to top hat plans, 29 C.F.R. § 2520.104-23, which statement is deemed to satisfy the reporting and disclosure requirements of part 1 of ERISA.  Peaslee Decl. ¶ 3

When the Plan was adopted in 2002,  there were six Participating Related Entities, as shown on Appendix B.  Over the years, as UPMC has added tax exempt entities, the practice has been to consider these entities as Participating Related Entities, although the Committee did not remain current with amendments to Appendix B.  All tax-exempt affiliates are and have been Participating Related Entities.  Peaslee Decl. ¶ 13.  As of December 2011, there were 37 tax exempt participating employers.  See Peaslee Dep. Exh. 6

### Plaintiff's Participation in the Plan

Paul Sikora became a participant in the Plan effective March 1, 2008 and remained a participant until his resignation on December 2, 2011.  Complaint ¶¶ 7, 10.  During this period of time, he was a Vice President in the Information Technology Group of UPMC.  His 2008 compensation, excluding long term incentive compensation, was $315,995.  Peaslee Decl. Exh. 5

### The Plan is Unfunded

Section 7.03 of the Plan provides that all amounts deferred under the Plan shall remain the property of the contributing employer "and shall be subject to the claims of that particular employer's general creditors."  Contributions to the participants' accounts are made to a "Rabbi

Trust" which was until recently administered by Fidelity Management Trust Company, and currently by BNY Mellon.  Peaslee Decl. ¶ 10, Exh. 4.

The Trust Agreement provides that  "Any assets held by the Trust will be subject to the claims of the Sponsor's general creditors under federal and state law in the event of the Sponsor's insolvency..."        Peaslee Decl., Exh. 4 at § 3(b), §13(d) ("All times during the continuance of this Trust, the principal and income of the Trust shall be subject to claims of general creditors of the Sponsor under federal and state law…").  Also, Section 5(d) of the Trust Agreement, captioned "Unfunded Status of Plan," provides that "no Participant will have any preferential claim to or beneficial ownership interest in any asset or investment held in the Trust, and the rights of any Participant under the applicable Plan and this Agreement are solely those of a general unsecured creditor of the Sponsor with regard to the benefits of the Participant under the Plan."  *Id*. § 5(d).

Participants are not taxed on the compensation that is deferred under the Plan until after the participant has vested.  A participant becomes fifty percent vested when age plus service equals 65 and fully vested at normal retirement age or when age plus service equals 75.  Peaslee Decl. ¶ 10; Benefits Summary p. 2.

### *Participation is Limited to Management*

Eligible employees are selected to participate by the Committee. Plan § 2.1.  Each year, Greg Peaslee recommends to the Committee the participants and the amounts and types of deferred payments that they should receive.  The Committee then makes the decision based upon Mr. Peaslee's recommendation.  Peaslee Decl. ¶ 12  The Committee's selection of the participants and benefit awards are reflected each year in Amendments to the Plan.  Peaslee Decl. Exh. 2 and Amendments.

Participation is limited to executives who are members of management. Non-management employees are not considered, even if they are highly compensated. For example, physicians are not eligible to participate, unless they also hold a management position. Although there are physicians who are more highly paid than some Plan participants, there are no members of management who are more highly paid that any participant but who are not participants in the Plan. Peaslee Dep. 79. Among the management employees who have been selected as participants, the Committee has selected only those at the highest level of UPMC's executive team. The primary consideration has been the individual's influence within the organization and his or her ability to impact the performance of the organization. Peaslee Decl. ¶ 15.

The following are the titles of the participants during the 2007 to 2011 time frame:

CEO, UPMC

Executive Vice President

Sr. VP, Clinical Operations

EVP & Pres., Comm & Int'l Srvcs

VP, H.R. Operations & Services

VP, Technical Services

VP, Quality Management

VP, ISD & President, TDC

VP, Employee Relations

VP, Corp Construct & Real Est

VP Comp & Comm Tech Srvc

VP Behav Hlth Srv & Pres, WPIC

Vice President, Finance

SVP, Chief Med and Sci Officer

SVP, Bus. Dev & Ch Leg Off Ins

Sr. VP, Treas & Chief Inv Off

Sr. VP, Corp Rel & Reg Program

Sr. VP, Chief of Staff

Sr. VP, Chief HR & Adm Svr Off

Sr. VP & Chief Legal Officer

Sr. VP & Chief Finan Officer

Sr. VP & Chief Commun Officer

Sr VP & President, SBI

President, UPMC St. Margaret

President, UPMCPresby/Shadys

President, UPMC Northwest

President, UPMC McKeesport

President, UPMC Magee

President, UPMC Horizon

President, UPMC East

President, UPMC Bedford

President, UPMC Mercy

President, CPS

President CHP

President CCB

Pres. & Counsel Captive Insurance

Executive VP, Cancer Services

Ex VP, Comm Svr, Intl Comm Sv

EVP & Pres. Phys Svr

EVP & Pres, Hosp & Comm Svr Di

CMIO, UPMC

CIO, Physician Services Div

CIO, Hosp & Comm Serv Div

Chief Supply Chain Officer

Chief Quality Officer

Chief Nursing Officer

Chief Nurse Executive

Chief Medical Officer

Chief Information Officer

Chief Financial Officer - ICSD

Chief Financial Officer

Chief Diversity Officer

Chief Audit & Compliance Officer

CFO Academic and Comm Hosp

CEO CHP/ Pres. CHP Foundation

Associate Chief Legal Officer

Sr. Associate to the President

President, UPMC Rehab Network

VP, Gov't Relations/Comm Health

CMO, UPMC

Exec. Vice Pres., SBI

Vice President, Human Resources

Vice President, IT Infrastructure

Vice President, Com, Ben, HRIS

Sr. Assoc Col & VP, Emp Rel

VP, IT Transformation

Sr. Vice President and Treasurer

Sr. VP, HR, Const. & Property

Senior Advisor

Senior Associate to the President

Sr. Assoc. Counsel, Dir. Risk Mgmt.

President, UPMC Passavant

Sr. Vice President and COO

VP, Women & Infant Hlth & Pres

Vice President, Operations Chief Op. Officer, DSI

EVP & Pres. Phys Svr. & CMO

Treasurer

SVP, N. Hosp Div. & Pres., UPMC Passavant

CIO, UPMC Presbyterian & Shadyside

President, Children's Hospital

Sr Staff Associate

Sr Assoc Col VP, Hosp Crp Div

Sr Assoc Col & VP, Risk Mgmt

Senior Consultant

Peaslee Decl. Exh. 5

### *The Relative Number of Participants is Small Compared to the Workforce*

From 2007 through 2011 (the last five years of Plaintiff's employment), the total number of Plan participants in each year ranged from a low of 15 to a high of 68.   Peaslee Decl. ¶ 16, Exh. 5.   During this period, the total number of employees employed by the participating employers, the total number of participants in the Plan for that year and the percentage of employees who participated in the Plan for each year are as follows:

| Year | Number of Employees | Number of Active Participants | Percentage of Work- force Participating |
|------|---------------------|-------------------------------|------------------------------------------|
| 2007 | 37,965 | 15 | .04 % |
| 2008 | 41,969 | 43 | .10 % |
| 2009 | 41,452 | 52 | .13 % |
| 2010 | 43,280 | 55 | .13 % |
| 2011 | 48,731 | 68 | .14 % |

Peaslee Decl. ¶ 17, Exh. 6.  Over this five-year period, the highest percentage of the workforce participating in the plan was less than two-tenths of one percent.

### *The Participants are Highly Paid*

In 2007, the lowest paid Plan participant's compensation was $299,994 and the three highest averaged $753,056.  In 2008, the lowest paid participant had compensation of $80,000[4] and the 9 highest averaged $810,064.  In 2009, the lowest paid participant had compensation of $202,707 and the highest 10 averaged $982,532.  In 2010, the lowest paid participant had

---

[4] This person was Jeffrey Romoff, the Chief Executive Officer of UPMC.  He became eligible to participate in December 2007, so that only one month of his compensation qualified and is included on the chart.  Mr. Romoff had been employed by a management company before becoming employed by a UPMC-owned entity.

compensation of $208,480 and the highest 11 participants averaged $948,658.  In 2011, the lowest was $227,997 and the highest 12 averaged $918,388.  Peaslee Decl. ¶ 18, Exh. 5.

The average annual income for all employees as compared to the average annual compensation (excluding long-term incentive compensation) of the Plan participants in each of the years 2007 to 2011 was as follows:

| Year | Average All Employees | Average All Participants. |
|------|----------------------|---------------------------|
| 2007 | $50,627 | $565,236 |
| 2008 | $52,250 | $446,903. |
| 2009 | $54,434 | $505,332 |
| 2010 | $55,474 | $462,759 |
| 2011 | $57,013 | $477,096 |

Peaslee Decl. ¶19, Exh. 7.

The salaries of the participants are included in the average of all employees, meaning that the difference is greater than shown.  Also, the compensation of the participants does not include the very substantial long-term incentive compensation payments that only the highest-level employees receive.  This means that the compensation differences between the participants and the non-participants is significantly greater even than shown on this table.   Peaslee Decl. ¶ 20.

### *The Participants have the Ability to Influence Their Benefits by Negotiation*

There is no formal process by which participants can influence their benefits under the Plan or influence changes to the terms of the Plan.  However, inasmuch as all participants are highly placed executives, they have the ability to negotiate their employment terms and conditions, and that would include their incentive compensation level and their deferred compensation under the terms of the Plan.  Peaslee Dep. 72.  It is their value to the organization that puts them in a position to influence their compensation, if not by negotiation, but the loss to the enterprise if they were to leave.  Peaslee Decl. ¶ 21; Peaslee Dep. 46-49

The salary for the CEO was established by the Committee. The salaries of the direct reports to the CEO were also set by the Committee on the recommendation of the CEO. The salaries for the next group of executives under the CEO's staff were established by discussions between Mr. Peaslee and the staff member whose reports were under consideration. The salary decisions were informed by annual market surveys to determine what similar executives in similarly-sized organizations were getting paid. Peaslee Dep. 56-58. Any executive could appeal, and some have appealed, his or her compensation to a higher level, although there is not a formal appeal process in place. *Id.* The amount of one's salary affects the level of benefits under the Plan. *Id*. 65-66.

### III. ARGUMENT

The defendant has the burden of proving that the Plan is a top hat plan. *Solis v. Koresko,* 884 F. Supp. 2d 261, 283 (E.D. Pa. 2012). A top hat plan is a pension plan that is: (1) unfunded; and (2) maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1).

### A. *The Plan is Unfunded*

The Court of Appeals for the Third Circuit, following decisions by other circuit courts of appeal, has held that a Plan which holds its assets in a Rabbi trust that is subject to the claims of general creditors and whose participants are not taxed on the deferred compensation when it is earned, is an unfunded plan. *In re IT Group*, 448 F.3d 661, 668-69 (3d Cir. 2006).

In the present case, the Plan's assets are held in a "Rabbi Trust" in which they are subject to the claims of the general creditors of the employers participating in the Plan. Participants are

not taxed on the deferred compensation when it is earned.  *In re IT Group* is, therefore, controlling and requires a finding that the defendant Plan is an unfunded plan.

### 2.    *The Plan Satisfies the "Select Group" Requirement*

The record evidence confirms that the Plan also satisfies the second element of ERISA's top hat exemption:  that the Plan be maintained "primarily for the purpose of providing deferred compensation to a select group of management or highly compensated employees."  29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1); 29 C.F.R. § 2520.104-23.[5]

In determining whether an ERISA plan qualifies as a top hat plan, a number of circuit courts have required consideration of qualitative and quantitative factors such as (1) the percentage of the total workforce eligible to participate in the plan (quantitative), (2) the nature of their employment duties (qualitative), (3) the compensation disparity between top hat plan members and non-members (qualitative), and (4) the actual language of the plan agreement (qualitative). *See Alexander v. Brigham and Women's Physician Org., Inc*., 513 F.3d 37, 43–47 (1st Cir. 2008); *Bakri v. Venture Mfg. Co*., 473 F.3d 677, 678 (6th Cir. 2007); *Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283, 288–290 (2d Cir. 2000).  The Court of Appeals for the Third Circuit has articulated a simpler standard:  The "select group" requirement has "both quantitative and qualitative restrictions.  In number, the plan must cover relatively few employees.  In character, the plan must cover only high level employees."  *In re New Valley*, 89 F.3d 143, 148 (3d Cir. 1996).

The statutory text requires only that a top hat plan be maintained "primarily" for the purpose of providing deferred compensation for a select group.  Therefore, in evaluating whether

_____

[5] Plaintiff does not dispute that the primary purpose of the Plan is to provide "deferred compensation."  *See, e.g.,* Plaintiff's Response to Defendants' Motion to Dismiss Complaint (Docket No. 13) at 4-6.

the "select group" requirement is satisfied "it is the configuration of the group as a whole that controls," and "not every member of the select group need belong to the upper tier of management or fit within the highest stratum of compensation." *Alexander*, *supra*, 513 F.3d at 48; *see also Demery v. Extebank Deferred Compensation Plan B*, 216 F.3d 283, 289 (2d Cir. 1999) (explaining "we do not find plaintiff's focus on the two or three members who were arguably not 'highly compensated' or a 'select group of management' to be dispositive.").

### a.     The Plan Covers "relatively few employees"

In evaluating whether a plan covers "relatively few employees," courts examine the percentage of the workforce who participate in the plan. *See*, *e.g.*, *Pane v. RCA Corp.*, 868 F.2d 631, 637 (3d Cir. 1989)(plan covering one-tenth of one percent of the employees was maintained for a "select group."; *Alexander*, *supra*, 513 F.3d at 43-44.  Although no bright-line cutoff has been established, many courts have held that plans with participation rates far higher those at issue here satisfy this requirement.

For example, in *Demery*, the Second Circuit held that a plan offered to 15.34% of employees employees was sufficiently "select." 216 F.3d at 288-89.  In *Alexander*, the First Circuit held that the plan at issue was "select" where it was maintained for 8.7% of the workforce. 513 F.3d at 43-44.  *See also Belka v. Rowe Furniture Corp.*, 571 F. Supp. 1249, 1251 (D. Md. 1983) (holding that a plan covered a select group where 4.6% of the work force was covered); DOL Op. Letter 75–64 (Aug. 1, 1975) (holding that a plan covered a select group where 4% of active employees were covered); *Callan v. Merrill Lynch & Co., Inc.*, No. 09-566, 2010 WL 3452371, at *10 (S.D. Cal. Aug. 20, 2010) ("Although there is no bright-line rule on what constitutes a `select group of management of highly compensated employees, plans that

limit participation to 15% or less of the workforce have consistently been treated as top hat plans.").

Here, during the entire period of the plaintiff's participation, the percentage of participants in the Plan relative to the work force of the participating employers never exceeded two-tenths of one per cent. That is surely "relatively few employees" under the precedents cited and simply by application of common sense. It is, therefore, a Plan maintained for a "select group."

### b. The Participants are Management or Highly Compensated Employees

The statutory text makes it clear that, with respect to the qualitative element of the "select group" requirement, the top hat exemption applies to plans maintained primarily for a select group of *either* management *or* highly compensated employees. *See* 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). Thus, a top hat plan need satisfy only one of those two criteria. *Fishman v. Zurich American Insurance Co.*, 539 F. Supp. 2d 1036, 1041 (N.D. Ill. 2008) ("Qualification as a top-hat plan does not require all plan participants to be highly compensated—instead the plan must be maintained for a select group that may be made up of management or highly compensated employees. Thus proving that any (or all) of the Plan participants are not highly compensated is not determinative.") The Plan at issue in this case, however, is comprised of participants who are *both* highly paid and management.

The Plan document confirms that the Plan is intended for the benefit of highly compensated employees, and only such employees are eligible for selection and participation. In fact, the express purpose of the Plan is to provide supplemental deferred compensation to "highly compensated key executives" who are subject to the certain tax code limitations applicable only

to highly compensated employees, including the annual compensation cap for qualified retirement plans under 29 U.S.C. § 401(a)(17).  Plan, Preamble

The Plan further provides that if the Committee determines that any participant may not qualify as "highly compensated" under the relevant provisions of ERISA, the Committee may determine that the participant shall cease to be eligible to participate.  Plan § 9.04.

The evidence regarding the actual compensation of Plan participants leaves no doubt that they are "highly compensated."  For example, during the period 2007-2011, the average compensation of Plan participants was a *half million dollars* in each year.  Many Plan participants had compensation well above that number.  While some participants, of course, had compensation less than the average, in each year from 2007-2011 the *lowest* compensation of *any* plan participant was *over* $200,000, with the annual compensation for the vast majority of Plan participants well above $300,000.[6]

In absolute terms, therefore, at all relevant times Plan participants have been highly compensated.  *See*, *e.g.*, *Alexander*, 513 F.3d at 46 (issue of whether relevant universe of employees is highly compensated is "open-and-shut" in both absolute and relative terms where average compensation of participants was roughly $440,000).

Similarly, the record evidence leaves no doubt that at all relevant times the group of Plan participants has been "highly compensated" in relative terms, when compared to the overall workforce of participating employers.  The case law holds that plan participants as a group are highly compensated where the relative difference between their pay and that of the rest of the workforce is more than two-fold.  *See, e.g., Demery*, 216 F.3d at 289 (average salary of plan

---

[6] It bears repeating that the annual compensation numbers we have presented have not included the long-term incentive compensation payments each of the Participants received every year. The lowest level Participant had a target incentive of 20% of salary for his or her long-term compensation.  Peaslee Dep. 101.

participants "more than double" average salary of all employees); *Alexander*, 513 F.3d at 46 (relative difference of five times "nowhere near the gray area"); *Callan, supra,* 2010 WL 3452371, at *11 (relative difference of two times demonstrates plan participants highly compensated).

With the UPMC Plan, the average participant's compensation exceeds the average compensation of all employees by a factor of approximately 10 in every year during which plaintiff participated in the Plan, a figure that is "nowhere near the gray area" and which clearly demonstrates that at all relevant times Plan participants have been "highly compensated" within the meaning of ERISA's top hat exemption. *See Alexander*, 513 F.3d at 46.

The Plan was, therefore, maintained primarily for the benefit of highly paid employees.

It was also maintained for the benefit of a group consisting entirely of management employees.

The Plan document limits participation to certain classes of Executives, and even among that group to a subset of "key executives selected by the Committee." Plan § 2.01. The primary factors in selecting executives for participation in the Plan are the individual's influence within the organization and ability to impact performance of the organization. Peaslee Decl. ¶ 15.

A review of the job titles of all Plan participants during the years 2007-2011 confirms that the universe of participants was comprised of, and limited to, the highest levels of management. Participants included Presidents, Vice-Presidents, various Chiefs (such as Chief Executive Officer, Chief Financial Officer, Chief Information Officer, Chief Medical Officer, etc.), and other key executives. *See* listing of job titles, *supra,* page 8.

The selective nature of the Plan is illustrated by a consideration of the UPMC Management Incentive Plan, a listing of whose participants was discussed at Mr. Peaslee's

deposition.  *See* Peaslee Dep. 96-101, Exh. 9.  There were more than 160 members of management who were entitled to Management Incentive payments under this Plan for the year 2011.  *Id.*  Exh. 9.  Only 68 members of that group qualified for participation in the Plan.  The Plan limits the definition of "eligible executives" who may be considered to executives who are entitled to incentive compensation at the 20% target level and above.  Even among senior management levels, therefore, participants are a "select" group.

Where, as here, a plan is maintained primarily for high-level, highly valued managerial employees, the plan satisfies the select group requirement.  In *Demery*, for example, the Second Circuit held that the deferred compensation plan at issue satisfied the select group requirement, despite the plaintiff's claims that plan participants were not "key executives."  In rejecting that argument, the Second Circuit explained that the plan was maintained for a select group of management where the plan was limited to "highly valued managerial employees," even where some held the titles of assistant vice president and branch manager.  216 F.3d at 289.

As noted above, *see* cases cited *supra* at page 13, some courts also consider as a qualitative factor the language of the Plan document.  We have reviewed, in the context of discussing the other qualitative factors, the language of the Plan document, which manifestly is intended to satisfy the statutory requirements for a top-hat Plan.  Defendants note in addition that, shortly after the Plan was adopted, a "Statement of Employee Benefit Plans" was filed with the Department of Labor, which is a filing applicable only to top hat plans.  29 C.F.R. § 2520.104-23.  That filing constitutes notice of an intent to administer the Plan as a top hat plan.  Peaslee Decl. ¶ 7, Exh. 3.

### c. The Plaintiff's "Bargaining Power" Factor Is not a Relevant Consideration, but Even If it Were, the Plan Participants Satisfy that Factor

Notwithstanding that the undisputed record evidence confirms that the Plan satisfies both statutory elements of ERISA's top hat exemption, Plaintiff undoubtedly will contend that this is not a top hat plan because the participants did not have sufficient influence over the terms and operation of the Plan. In fact, given the lopsided evidence favoring top hat plan status under the statutory criteria for a top hat plan, this argument is likely to be the *only* string in the plaintiff's bow.

To begin with, the statutory definition of a top hat plan is simple. As explained by the Court of Appeals for the Third Circuit, to be a top hat plan: "In number, the plan must cover relatively few employees. In character, the plan must cover only high level employees." *In re New Valley*, *supra*, at 148. That is the only test put forward by the Court of Appeals, and it, like the statute itself, lacks any inquiry about the ability of the participants to influence the Plan.

The genesis of the "bargaining power" red herring[7] is a Department of Labor Opinion Letter that explained the rationale for Congress' exemption of top hat plans from the substantive protections of ERISA. Here is what was said:

> It is the view of the Department that in providing relief for "top-hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I.

DOL Opinion Letter 90-14A (May 8, 1990). This language does not purport to be describing criteria for determining if a plan is top hat.

---

[7] In England, to put the hounds off the scent of the fox, it was the custom to drag a red herring across the trail and off into the woods.

The Court of Appeals for the Third Circuit has quoted from the Opinion Letter, but only in the context of stating the rationale for a top hat plan exemption, not as a part of the test for determining if a plan is top hat. *Kemmerer v. ICI Americas, Inc.*, 70 F.3d 281, 288 (3d Cir. 1995); *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir. 2001); *Fields v. Thompson Printing Co., Inc.*, 363 F.3d 259, 274 (3d Cir. 2004); *Gallione v. Flaherty*, 70 F.3d 724 (2d Cir. 1995). In none of these cases was there any issue over whether the subject plan was a top hat plan, and the Court of Appeals did not cite the "substantially influence" language for any purpose other than to state the rationale for the exemption of such plans.

The only Court of Appeals to consider whether the executives' bargaining power should be a criterion in deciding if a plan is top hat was the First Circuit, which flatly rejected using this as a factor. *Alexander v. Brigham and Women's Physicians Organization, Inc.*, 513 F.3d 37, 46-48 (1st Cir. 2008)

As the First Circuit explained in *Alexander*, the argument that "bargaining power" is required to satisfy the top hat exemption is flawed and unpersuasive for several reasons. First, the court explained that the plain text of the statute does not contain any indication whatsoever that Congress's intent was to include a bargaining power requirement:

> Once again, we look first to the text of the top-hat provision. In that proviso, Congress nowhere mentioned bargaining power. Indeed, the statutory language contains no indication that Congress contemplated that courts would consider employees' ability to bargain over the terms of their deferred compensation plans, either individually or collectively, when measuring the bona fides of a select group and determining the applicability of the top-hat provision.

*Id.* at 46-47.

Second, the court in *Alexander* explained that DOL Opinion Letter 90-14A, from which this argument is derived, simply does not compel or support the conclusion that a showing of

bargaining power is required.  *Id.* at 47.  In particular, the court explained that the DOL Opinion

Letter "speaks only to Congress's rationale for enacting the top-hat provision.  It does not present

itself as an interpretation of the provision's requirements, nor does it make any mention of the

need for or propriety of demanding that employers demonstrate their employees' ability to

negotiate the terms of deferred compensation plans."  *Id.*

       Third, the First Circuit explained that there should be no such bargaining power

requirement even where the specific claim is that plan participants collectively, rather than

individually, must possess bargaining power:

> The two main reasons underpinning our holding that there is no
> requirement of individual bargaining power to qualify for the top-hat
> provision . . . militate just as strongly against importing a requirement of
> collective bargaining power into the top-hat provision.  Although
> Congress's rationale for fashioning the exemption was that the members
> of a "select group of management or highly compensated employees"
> could fend for themselves, the statute, by its terms, does not purport to
> require proof of power of any sort.  In such circumstances, it would be
> highly unorthodox to convert a rationale (like the one set forth in the DOL
> opinion letter) into a statutory test.

*Id.* at 48.

       Other courts have come to the same conclusion as *Alexander*.  *Fishman v. Zurich*

*American Insurance Co.*, 539 F. Supp. 2d 1036, 1041 n. 3 (N.D. Ill. 2008) (rejecting bargaining

power requirement as unsupported in the statute or legislative history); *In re Colonial*

*BancGroup, Inc.*, 436 B.R. 695, 708 (M.D. Ala. 2010) (same); *Cramer v. Appalachia Regional*

*Healthcare, Inc.*, 2012 WL 5332471 *4  (W.D. Ky. Oct. 29, 2012)(same).  *See also Moore v.*

*Acme Corrugated Box Co.*, No. 97-2150, 1998 WL 404362 at *11 (E.D. Pa. July 6, 1998), *aff'd*,

182 F.3d 904 (3d Cir. 1999) (Table)( the court held that the top hat exemption applied, even

where the plaintiff "… did not exercise a high degree of bargaining power in negotiating the terms of the plan.")[8]

The reasoning of the *Alexander* decision is sound and consonant with the test set forth by the Third Circuit in *New Valley Corp.* and should be followed by this Court.

Even were bargaining power an element of the test for determining if a Plan is a top hat plan, moreover, it is clear that the executive-participants in the Plan in fact do occupy the very kinds of positions to which the Department of Labor had reference, when it said "by virtue of their position or compensation level, [they] have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan …" As Mr. Peaslee testified, any one of the participants had the ability to discuss their compensation with him, with the CEO or even with the Board. Peaslee Dep. at 46-50. In fact, he said, some have done so. *Id*. Mr. Peaslee himself makes the recommendations for all plan amendments to the Committee, including the amendments disclosing who the participants would be and their benefits. He is a participant who clearly has "bargaining power." The CEO, Jeffrey Romoff, is also a participant, and as Mr. Peaslee's superior, undoubtedly has "bargaining power." Obviously, therefore, at least some participants have a direct and substantial role in determining, not just affecting, the terms and operation of the Plan.

What is important is that all of the participants could, "by virtue of their positions" have the *ability* to substantially influence the plan operation. It does not take a business consultant to know that it is critical to an enterprise like UPMC to assure that executives that run major

---

[8] Defendants note the recent opinion in *Tolbert v. RBC Capital Markets Corp.*, 2015 WL 2138200 at *8 (April 28, 2015) in which the Court discussed this issue at some length without coming to a definitive conclusion, except that bargaining power could be considered as part of the selectivity or qualitative factor.

hospitals and business units are satisfied with their compensation—they have the ability to affect the terms of the Plan for exactly that reason. It is the ability to make a difference in the success of the business that the Department of Labor contemplated when it spoke, not about actually negotiating one's benefits, but about being in a position that gives one "the ability to affect" one's benefits.

Even if this Court decides to engraft a "bargaining power" element onto the test for a top hat plan, therefore, the subject Plan is a top hat Plan because its participants are the very people who run the large and diverse enterprise that is UPMC.

### III.    CONCLUSION

Based on the foregoing, defendants respectfully request that this Court grant summary judgment in their favor and against the plaintiff finding that the Plan is and was, during the Plaintiff's tenure as a participant, a top hat plan.

Respectfully submitted,

_____s/John J. Myers_____
John J. Myers
Pa. ID 23596
Eckert Seamans Cherin & Mellott LLC
44th Floor, 600 Grant Street
Pittsburgh, PA 15219
412-566-5900
jmyers@eckertseamans.com

Attorneys for Defendants, UPMC and UPMC
Health System and Affiliates Non-Qualified
Supplemental Benefit Plan

Dated: September 15, 2015