**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAUL F. SIKORA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 2:12-cv-01860-MRH |
| | ) | |
| UPMC, a Pennsylvania non-stock | ) | |
| non-profit corporation, a/k/a | ) | |
| UPMC Health System, and the | ) | |
| UPMC Health System and AFFILIATES | ) | |
| NON-QUALIFIED SUPPLEMENTAL | ) | |
| BENEFIT PLAN | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Michael E. Hoover
DIEFENDERFER HOOVER McKENNA & WOOD, LLP
310 Grant Street, Suite 1420
Pittsburgh, PA  15219-2201
Telephone: (412) 471-1100
Facsimile: (412)471-5125
Email:  mhoover@verizon.net

Attorneys for Plaintiff, Paul F. Sikora

1

# TABLE OF CONTENTS

**Page**

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Applicable Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

General Facts Relevant to "Top Hat" Affirmative Defense Procedural . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    The Facts Presented by UPMC Fail to Establish the Required
Elements of a "Select Group" so as to Qualify as a "Top Hat Plan" **. . . . . . . . .** **7**

    A. Those Eligible to Participate in the Plan Did Not Have
the Required Ability or Bargaining Power to Affect or
Substantially Influence, Through Negotiation or Otherwise,
the Design and Operation of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B. Defendants Have Not Asserted and Have Therefore Waived
the Argument that DOL Opinion Letter 90-14A was an
impermissible construction of ERISA . . . . . . . . . . . . . . . . . . . . . . . . 15

    C. Neither Gregory K. Peaslee's Activities nor Jeffrey Romoff's
Position of CEO Satisfy the "Bargaining Power" Requirement
of a "Top Hat" Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    D. Plan Participants Had No Ability to Monitor or Enforce
Their Contractual Rights Under the Plan . . . . . . . . . . . . . . . . . . . . . . . 20

    E. The Subject Plan Extended Coverage Beyond a Select Group
of Management or Highly Compensated Employees . . . . . . . . . . . . . 21

        i. UPMC has placed no evidence in the Record establishing
that an employee's eligibility to participate in Plan was based
upon his or her managerial status . . . . . . . . . . . . . . . . . . . . . . . . 23

        ii. Defendants have not placed in the Record evidence establishing
that an employee's eligibility to participate in Plan was based
upon his or her compensation level . . . . . . . . . . . . . . . . . . . . . . . 26

i

F.  UPMC has Failed to Produce Evidence to Establish
    that the Plan Meets the Quantitative Element     . . . . . . . . . . . . . . . . . .     27

    i.   UPMC has not placed in the Record evidence establishing
         the number of employees that were eligible
         to participate in Plan (the Numerator)     . . . . . . . . . . . . . . . . . . . .     28

    ii.  UPMC has not placed in the Record evidence establishing
         the number of employees employed by the Employer
         as defined in the Plan Document (the Denominator)     . . . . . . . . . . . . .     28

    iii. Eligibility to Participate in the Plan was Open Ended     . . . . . . . . . . . . .     30


Conclusion     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     31

# TABLE OF AUTHORITIES

**Pages**

## CASES

*Alexander v. Brigham and Women's Physicians Org.*,
513 F. 3d 37 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 13, 16

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3rd Cir. 1996) . .      3

*Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007) . . . . . . .   12, 17

*Carrabba* 38 F.Supp.2d 468 (N.D. Tex., 1999) *aff'd per curiam*
252 F.3d 721 (5th Cir. 2001) *cert. denied* 534 U.S. 995 (2001) . . . . 3, 8, 9, 12, 16, 22, 28, 31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)      . . . . . . . . . . . . .      2

*Chellis v. Fleet Capital Corp.*,
2006 U.S. Dist. LEXIS 95837 (N.D. Ga., 2006) . . . . . . . . . .      16, 27

*Chevron v. Natural Resources Council*, 467 U.S. 837 (1984) . . . . . .      13, 16

*Demery v. Extebank Deferred Comp. Plan (b)*,
216 F.3d 283 (2nd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . .      8, 12, 17

*Duggan v. Hobbs*, 99 F.3d 307 (9th Cir. 1996) . . . . . . . . . . . . . . . .      2, 8, 12, 17

*EPA v. EME Homer City Generation, L.P.*,
572 U.S. ___; 134 S. Ct. 1584 (2014) . . . . . . . . . . . . . . . . . .      15-16

*Field v. Thompson Printing Co. Inc.*, 363 F.3d 259 (3rd Cir. 2004) . .      20

*Gallione v. Flaherty*, 70 F.3d 724 (2nd Cir. 1995)      . . . . . . . . . . . . .      12, 16, 17, 19, 20

*Goldstein v. Johnson & Johnson*, 251 F.3d 433 (3rd Cir. 2001) . . . . .      11, 13

*Guiragoss v. Khoury*, 444 F.Supp 2d 649 (E.D. Va. 2006) . . . . . . .      16, 22, 28, 31

*Heimeshoff v. Hartford Life & Accident Ins. Co.*,
134 S. Ct. 604 (2013)      . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      20

*Hollingshead v. Burford Equip. Co.*,
747 F.Supp. 1421 (M.D. Ala. 1990)      . . . . . . . . . . . . . . . . . .      22, 31

*Holloman v. Mail-Well Corp*, 443 F.3d 832 (11th Cir. 2006) . . . . . . .      12, 17

*In re IT Group, Inc.*, 448 F.3d 661 (3rd Cir. 2006) . . . . . . . . . . . . . . .      12, 16

**Pages**

**CASES (Continued)**

*In re New Valley Corp.*, 89 F.3d 143 (3rd Cir. 1996) . . . . . . . . . . . .   3, 8

*Kemmerer v. ICI Americas Inc.,* 70 F.3d 281 (3rd Cir. 1995) . . . . . .   6, 11, 17, 20

*King v. Burwell,* 135 S. Ct. 2480 (2015);
    2015 U.S. LEXIS 4248 (2015)   . . . . . . . . . . . . . . . . . . . . . .   15

*Kross v. Western Elec. Co., Inc.*, 701 F.2d 1238 (7th Cir. 1983)  . . .   9

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*Nachman Corp. v. Pension Benefit Guar. Corp.,*
    466 U.S. 359 (1980)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

*Skidmore v. Swift & Co., 323 U.S. 134 (1944)*   . . . . . . . . . . . . . .   16

*Spacek v. The Maritime Ass'n.*, 134 F.3d 283 (5th Cir. 1998)  . . . . .   8, 12, 17

*Starr v. JCI Data Processing, Inc.,* 757 F.Supp 390 (D.N.J. 1991) .   22

*United States v. Mead Corp.*, 533 U.S. 576, 587 (2001) . . . . . . . . .   16

*U.S. v. Rizk*, 660 F.3d 1125 (9th Cir., 2011)   . . . . . . . . . . . . . . . . .   29

**ERISA SECTIONS**

Section 2 [29 U.S.C. §1001]   . . . . . . . . . . . . . . . . . . . . . . . . .   1, 31

Section 3 [29 U.S.C. § 1002 (2)(B)]. . . . . . . . . . . . . . . . . . . . . . .   4

Section 201 (2) [29 U.S.C. §1051 (2)]   . . . . . . . . . . . . . . . . . . .   1, 2, 7

Section 301 [29 U.S.C. § 1083 (a)(3)]   . . . . . . . . . . . . . . . . . . .   2

Section 401 [29 U.S.C. § 1101 (a)(1)]   . . . . . . . . . . . . . . . . . . .   2, 7

**RULES**                                                **Pages**

56(c) Fed.R.Civ.P.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

1005 Fed.R.Evid.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

1006 Fed.R.Evid.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24, 29


**OTHER AUTHORITY**

*U.S. Department of Labor (DOL) Opin. Letter 85-37A*   . . . . . .   27

*U.S. Department of Labor (DOL) Opin. Letter 90-14A*   . . . . . .  2, 11, 12, 13, 15, 16, 21-22

H.R. Rep. 93-533 (1973)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

S. Rep. 93-127 (1973)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10, 15

RESTATEMENT (SECOND) OF CONTRACTS § 2 cmt. E (1981) .   20

IRS Code § 414 (q)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

## PRELIMINARY STATEMENT

Defendants', UPMC's and the UPMC Health System and Affiliates Non-Qualified Supplemental Benefit Plan's (the "*Plan*")(collectively "*UPMC*" or "*Defendants*"), Motion for Partial Summary Judgment should be denied and Plaintiff's, Paul F. Sikora's ("*Sikora*") Cross-Motion for Partial Summary Judgment should be granted as UPMC has failed to produce conclusive evidence of undisputed facts establishing all of the elements  of their affirmative defense that the Plan qualifies as a "top hat" plan. UPMC alleges, and has the burden of proving, that the Plan qualifies as a "top hat" plan in that the participants in the Plan (the "*Participants*") constituted "a select group of management or highly compensated employees", and therefore, pursuant to Section 201 (2) of The Employee Retirement Income Security Act of 1974 ("*ERISA*") [29 U.S.C. §1051 (2)], the Plan is exempt from certain substantive requirements of ERISA.

ERISA, enacted in 1974, is a remedial statute that was intended and designed by Congress to safeguard the interests of employees and their beneficiaries by guarding against historical abuses by owners and high-level management in the administration of benefit plans.  A central purpose of Congress in enacting ERISA was to assure that if a worker was promised a pension benefit upon retirement and he or she fulfilled whatever conditions were required for vesting, that he or she actually received the promised benefit.  ERISA § 2 (29 U.S.C. § 1001); *Nachman Corp. v. Pension Benefit Guar. Corp.*, 466 U.S. 359 (1980).  However, Congress recognized that certain deferred compensation ERISA plans established by owners and/or top executives solely for their own benefit did not require the substantive rights and protections afforded by ERISA because such owners and top executives who designed and oversaw the operation and administration of those deferred compensation plans would have no reason to

1

assert such rights against, or require such protections from, themselves. *Duggan v. Hobbs*, 99 F.3d 307, at 310 (9th Cir. 1996)(citing *DOL Opin. Letter 90-14A*). Such plans dubbed "top hat" plans were therefore exempted from ERISA's minimum participation, vesting, and funding standards, benefit accrual requirements, and fiduciary responsibility regulations. *See* ERISA § 201 (2) [29 U.S.C. § 1051 (2)]; ERISA § 301 [29 U.S.C. § 1083 (a)(3)]; and ERISA § 401 [29 U.S.C. § 1101 (a)(1)].

A central element of UPMC's argument is that the U.S. Department of Labor's pronouncement in *DOL Opin. Letter 90-14A* that to qualify as a "top hat" plan, the participants in the plan must have "the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of (the) plan" is illegitimate and therefore such ability by plan participants is not a required element of a "top hat" plan.

Sikora contends that the Plan does not qualify as a "top hat" plan, and, therefore, his accrued and fully vested deferred compensation benefits under the Plan were wrongfully forfeited and withheld by UPMC in violation of ERISA, as amended (29 U.S.C. §§ 1001-1461).

## APPLICABLE LEGAL STANDARDS

The issues before the Court relate to UPMC's "top hat" affirmative defense.  Under Rule 56(c) Fed.R.Civ.P., summary judgment should be entered against a party that fails to make a showing through evidence that is conclusive sufficient to establish the existence of all elements essential to that party's case, and on which the party bears the burden of proof.  If a party fails to meet its burden of proof, there can be "no genuine issue of material fact" since a failing of proof concerning any essential element of a party's case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  In connection with an adjudication of a motion for summary judgment, the facts asserted by the nonmoving party, if supported by

2

affidavits or other evidentiary material, must be regarded as true; and the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080-1081 (3rd Cir. 1996).

The statutory standard of proof that UPMC is required to meet relative to their "top hat" affirmative defense is that the Plan was at all times "maintained for the purpose of providing deferred compensation for a select group of management or highly compensated employees". This definition of a top hat plan has been described as a narrow one. *See In re New Valley Corp.*, 89 F.3d 143, 148 (3rd Cir. 1996).  In making a determination as to whether or not a deferred compensation plan meets the requirements of  a top hat plan, a court must take into account that "ERISA is a remedial statute to be liberally construed in favor of employee benefit fund participants", and that "exemptions from ERISA coverage should be confined to their narrow purpose". *Carrabba* 38 F.Supp.2d 468, at 477 (N.D. Tex., 1999) *aff'd per curiam* 252 F.3d 721 (5th Cir. 2001) *cert. denied* 534 U.S. 995 (2001); S. Rep. 93-127, at 13 (1973).

### GENERAL FACTS RELEVANT TO "TOP HAT" AFFIRMATIVE DEFENSE

Sikora was an employee of UPMC from April, 1983, until December 2, 2011 (Sikora Affd. ¶ 2).   At a meeting of the Compensation Committee (the "*Committee*") of the Board of Directors of UPMC (the "*UPMC Board*") held on March 19, 2002, the Committee agreed to consider the establishment of a new defined contribution deferred compensation plan for senior managers at UPMC and directed Gregory K. Peaslee, the Senior Vice-President, Human Resources at UPMC, with the assistance of Steve Kujawski, an outside compensation consultant to UPMC, and UPMC's outside legal counsel, to prepare and present final recommendations for Committee approval at the Committee's next meeting.  The Committee directed that such plan be

designed "to incorporate mechanisms to reward selected Committee approved outstanding performance as well as address issues relating to hiring compensation adjustments (i.e. bringing in a senior manager from the outside and matching market based compensation)". (Plaintiff's Exh. 2A).  Mr. Peaslee and Mr. Kujawski did as directed and on July 24, 2002, they presented to the Committee the UPMC Health System and Affiliates Non-Qualified Supplemental Benefit Plan document (the "*Plan Document*")(Plaintiff's Exh. 4; Peaslee Decl. Exh. 2 - pages 1-24), which had been drafted by UPMC's outside counsel. (Peaslee dep. 28).  The Committee ratified and approved the Plan to be effective retroactively to January 1, 2002, and the Committee directed Mr. Peaslee to take the necessary actions to implement the Plan. (Plaintiff's Exhs. 2AA). It is undisputed that the Plan is an employee pension benefit plan established to provide for a deferral of income covered by ERISA [S*ee* 29 U.S.C. § 1002 (2)(B)].

Initially, the Committee selected and approved eight (8) UPMC management employees to be participants in the Plan as listed in Appendix A to the Plan Document (the "*Initial Participants*")(*See* Plaintiff's Exh. 4 -  Appendix A; Peaslee Decl. Exh. 2 - page 25).  Sikora, who in 2002 held the position of Division Director & Enterprise Technology Architect (Defendants' Ans. to Req. for Admission #22 – 2nd Set) was not among the Initial Participants. Other than the carrying out of the directives of the Committee by Mr. Peaslee, as set forth above, the Initial Participants played no role in the design or implementation of the Plan or the way in which the Plan was operated, i.e. administered. (Peaslee dep. 28-29).  No Participant ever served as a member of the UPMC Board or the Committee; and Participants at no time had a vote in the election of members of the UPMC Board or the appointment of members of the UPMC Board to serve on the Committee (Defendants' Ans. to Req. for Admission # 18 – 2nd Set; Req. for Admission #s 3 and 4 – 5th Set).

4

Following adoption of the Plan on July 24, 2002, and up through December 2, 2011, the Committee adopted Eight (8) Amendments to the Plan and a ninth (IRS) Code 409 A Compliance Amendment (Plaintiff's Exhs. 4A through 4I; Peaslee Decl. Exh. 2). As part of the Fifth Amendment to the Plan, as of January 1, 2008, the Committee increased the number of Participants from 13 to 49 (Plaintiff's Exh. 4F; Peaslee Decl. Exh. 2).  Sikora, whose title had been changed to VP IT Transformation & IT Infrastructure Services three (3) years earlier in August, 2005 (Defendants' Ans. to Req. for Admission #22 – 2nd Set)[1], was one of the 36 newly approved Participants (Plaintiff's Exh. 4F - page 6; Peaslee Decl. Exh. 2).  Subsequent increases in the number of UPMC employees participating in the Plan occurred each year from 2009 through 2011 when the number of Participants was 68. (Plaintiff's Exhs. 4G, 4H, 4I, and 7; Peaslee Decl. ¶16, Exh. 2).

Other than Mr. Peaslee's performance of routine and ministerial tasks delegated to him by the Committee pursuant to §7.02 of the Plan Document[2], no Participant at any time played any role in the design, content, or implementation of any of the amendments to the Plan nor were they given any opportunity to comment or provide input relative to the design, content, or implementation of any of the amendments to the Plan or the affect that such amendments would have on the operation of the Plan. (Peaslee dep. 29-32; Sikora Affd. ¶¶ 7, 8, 9, and 10).

---

[1] Although Sikora's title was changed in August, 2005, his job duties, the person to whom he reported, the UPMC employees that reported to him, his interaction with UPMC management personnel, and his access to information relating to UPMC operations and finances all remained the same as they had been since before 2002 when the Plan was established (Sikora Affd. ¶12).

[2] §7.02 of the Plan Document provides that a person delegated to make routine decisions and perform ministerial tasks "may not take any action that will . . . result in a material or significant change in the benefits, rights and features under the Plan. (Plaintiff's Exh. 4; Peaslee Decl. Exh. 2 - page 16).

Sometime after he was approved by the Committee to be a Participant in the Plan, Sikora was notified of such. Prior to receiving such notification, Sikora did not know that the Plan existed. Upon being notified of his approval by the Committee, Sikora was provided only with a copy of the original Plan Document (Plaintiff's Exh. 4; Peaslee Decl. Exh. 2 - pages 1-24). Sikora was at no time provided with an oral or written description or a copy of any of the six (6) amendments to the Plan that had been approved by the Committee up until that point in time (Plaintiff's Exhs. 4A through 4F; Peaslee Decl. Exh. 2). Sikora also was never provided with an oral description or a copy of any of the three (3) amendments to the Plan that were subsequently approved by the Committee prior to December 2, 2011 (Plaintiff's Exhs. 4G, 4H and 4I; Peaslee Decl. Exh. 2)(Sikora Affd. ¶¶ 5, 6, and 7). The only communication that Sikora ever recalls receiving relative to the Plan was on August 2, 2011, when he received the 2011 Benefits Overview document and a cover e-mail from John Galley, Vice-President – HR Operations and Services at UPMC ("**Mr. Galley**")(Plaintiff's Exh. 6). Sikora at no time received any other notice of any amendment to the Plan even though such notification was contractually required by §8.01 of the Plan Document.[3] (Sikora Affd. ¶ 7).

Sikora voluntarily retired from his employment with UPMC on December 2, 2011. Thereafter, by letter dated December 13, 2011, from Gregory D. Stoner, Senior Director, Employee Benefits at UPMC, Sikora was notified that all of his benefits under the Plan were forfeited due to the fact that Sikora was not vested in any portion of such benefits (Sikora Affd. ¶ 17; Plaintiff's Exh. 20). Sikora proceeded to make a timely application for a lump sum distribution of the balance of the retirement benefits in his Account that were accrued and due

---

[3] An ERISA pension plan is a unilateral contract which creates a vested right in those employees who accept the terms thereof by continuing in employment for the requisite time period. *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 287 (3rd Cir. 1995).

and owing to Sikora as a 100% vested participant in the Plan.  Sikora at no time received a

written decision from the Committee as contractually required pursuant to §7.07 (b) of the Plan

Document.  Having not received an initial written decision from the Committee, on or about

March 29, 2012, Sikora made a timely request for redetermination by the Committee as provided

for in §7.07 (c) of the Plan Document. By letter dated July 23, 2012 [Exhibit C to the Complaint

(Doc. # 1)], Sikora was notified by Gregory K. Peaslee, Senior Vice-President & Chief Human

Resources and Administrative Services Officer at UPMC, who was then and there acting as the

authorized designee of the Committee, that the final decision of the Committee was that all rights

and benefits due Sikora under the Plan had been forfeited due to the fact that Sikora had not

entered into a written Post Retirement Service Agreement [Exhibit D to the Complaint (Doc. #

1)], which Post Retirement Service Agreement document had never been presented to Sikora

until sent to Sikora by Mr. Galley via e-mail attachment on April 10, 2012 (Sikora Affd. ¶18,

Plaintiff's Exh. 18).  UPMC presented no evidence that prior to April 10, 2012, Sikora had ever

seen a copy of, or been requested to sign, any version of such Post Retirement Service

Agreement document. (Entire Record).

## ARGUMENT

### THE FACTS PRESENTED BY UPMC FAIL TO ESTABLISH THE REQUIRED ELEMENTS OF A "SELECT GROUP" SO AS TO QUALIFY AS A "TOP HAT PLAN"

UPMC asserts that Sikora forfeited and is not due any retirement benefits under the Plan.

This assertion is based upon UPMC's position that the vesting and nonforfeiture provisions of

ERISA do not apply to the Plan because the Plan qualifies as a "top hat" plan. A "top hat" plan is

defined in Sections 201 and 401 of ERISA [29 U.S.C. §§ 1051 (2) and 1101 (a)(1)] as "a plan

which is unfunded and is maintained by an employer primarily for the purpose of providing

deferred compensation for a select group of management or highly compensated employees.".

The dispute as to the top hat plan status of the Plan centers on whether UPMC can sustain their burden of proof that the UPMC employees that were eligible to participate in the Plan constituted a "select group of management or highly compensated employees" within the meaning of Sections 201 and 401 of ERISA.  It is undisputed that a determination as to whether or not those eligible to participate in a plan constitute "a select group" requires "more than a mere statistical analysis" but rather turns on qualitative as well as quantitative dimensions. *See New Valley Corp.*, supra 89 F.3d at 148; *Alexander v. Brigham and Women's Physicians Org.*, 513 F. 3d 37, 46 (1st Cir. 2008); *Demery v. Extebank Deferred Comp. Plan (b)*, 216 F.3d 283, 288 (2nd Cir. 2000); *Duggan v. Hobbs*, supra, 99 F.3d at 312 [*See also* page 12 of 22 of UPMC's Brief (Doc # 54)].

   The quantitative element requires that the plan must cover relatively few employees. *New Valley Corp.*, supra, 89 F.3d at 148.  The qualitative element requires that employees eligible to be top hat plan participants be high-ranking management personnel[4] who by virtue of their position or compensation level "are better equipped than ordinary pension plan participants to protect their interests in the employee benefits bargaining process". *Carrabba,* supra, 38 F.Supp.2d at 477 [quoting *Spacek v. The Maritime Ass'n*, 134 F.3d 283, 296 n.12 (5th Cir. 1998)]; *Duggan v. Hobbs*, supra, 99 F.3d at 312-313.  These elements make the definition of a top hat plan "a narrow one" such that top hat plans form a "rare sub-species of ERISA plans. *New Valley Corp.*, supra, 89 F.3d at 148. In determining whether or not a plan qualifies as a top hat plan, a court must be cognizant of, and take into account, that "ERISA is a remedial statute to be liberally construed in favor of employee benefit fund participants", and that "exemptions from

---

[4] The legislative history of ERISA indicates that Congress contemplated that "high-ranking management personnel" would mean "top executives". *See* H.R. Rep. 93-533, at 13 (1973).

ERISA coverage should be confined to their narrow purpose". *Carrabba*, supra, 38 F.Supp.2d at 477; *Kross v. Western Elec. Co., Inc.*, 701 F.2d 1238, 1242 (7th Cir. 1983).

As to the question of whether or not the Plan is a "top hat" plan, UPMC's argument is that to qualify as a "top hat" ERISA plan a plan need only have relatively few participants who are all management or highly compensated employees; and that the ability of the plan participants to affect or substantially influence, through negotiation or otherwise, the design and operation of the Plan is not a required element of a "top hat" plan.  As set forth below:

   A.    the applicable legal authority runs counter to UPMC's argument; and,

   B.    UPMC has failed to establish through conclusive evidence any of the required qualitative and quantitative elements of a "select group" so as to qualify the Plan as a "top hat" plan.

**A. Those Eligible to Participate in the Plan Did Not Have the Required Ability or Bargaining Power to Affect or Substantially Influence, Through Negotiation or Otherwise, the Design and Operation of the Plan**

The Plan Document as amended (Plaintiff's Exhs. 4, and 4A through 4I; Peaslee Decl. Exh. 2) provides, and UPMC has admitted, that only the UPMC Board and the Committee, and not the Participants, had the ability to affect or substantially influence the terms, design, or operation of the Plan.  In a verified response to an interrogatory on the subject, UPMC responded as follows:

   12.   Please identify each and every participant in the Plan who had the ability to affect or substantially influence, through negotiation or otherwise, the terms or design of the Plan, the operation of the Plan, and/or the benefits to be provided by the Plan, and set forth a detailed description of the influence that was so exerted, the identity of the participants in the Plan that exerted such influence, and the dates that such participants in the plan exerted such influence.

9

**ANSWER:**

>    Section 8.01 (of the Plan Document) provides that only the Principal Employer, which is the UPMC Health System, has the authority to amend the Plan.  It follows, therefore, that the Board of Directors of UPMC, and not participants in the Plan, have the sole authority to affect a change in the terms and design of the Plan, and the benefits to be provided by the Plan. . .

[Defendants Ans. to Interrogatory # 12 - 1st Set; Pages 4 and 5 of 8 of Defendants' Brief in Opposition to Plaintiff's Third Motion to Compel Discovery (Doc # 40)].  UPMC now attempts to overcome this fatal admission by asserting that:

- the ability or bargaining power to negotiate the design and operation of the plan is not a required element of a "top hat" plan;

- the fact that Gregory K. Peaslee had the ability to make recommendations to the Committee re amendments to the Plan and plan participants constituted the required "bargaining power"; and,

- Jeffrey Romoff simply because of his position as CEO of UPMC had the required "bargaining power".[5]

    Contrary to UPMC's assertions, the U.S. Department of Labor (the "***DOL***"), to which Congress delegated authority to implement, administer, and enforce ERISA [*See* S. Rep. 93-127, at 1, 12, 25-26 (1973)], has pronounced that in order to satisfy the qualitative element of the "select group" top-hat plan requirement, it must be established that plan participants have the ability or bargaining power to affect or substantially influence, through negotiation or otherwise, the design and operation of the plan. The DOL explained the rationale behind this pronouncement and its interpretation of the top hat exemption provisions of ERISA as follows:

---

[5] Jeffrey Romoff, who was at all times from January 1, 2002, to date the CEO of UPMC, did not become a Participant in the Plan until December, 2008, when he was listed in Appendix A of the Fifth Amendment to the Plan as approved by the Committee to be a Participant retroactively effective to January 1, 2008. (Plaintiff's Exh. 4F; Peaslee Decl. Exh. 2).

> It is the view of the Department that in providing relief for "top hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of the their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of (ERISA).

*DOL ERISA Op. Ltr. 90-14A at 2.*

Such Department of Labor Opinion Letter further stated:

> It also is the Department's position that the term "primarily" as used in the phrase "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" . . . refers to the purpose of the plan [i.e. the (deferred compensation) benefits provided] and not the participant composition of the plan. Therefore, a plan which extends coverage beyond "a select group of management or highly compensated employees" would not constitute a "top hat" plan for purposes of Parts 2, 3, and 4 of Title I of ERISA.

*DOL ERISA Op. Ltr. 90-14A at 2, n.1.*

UPMC asserts, or at a minimum implies, that the Third Circuit Court has not adopted or approved the above DOL pronouncement that the ability to negotiate as a crucial element of a top hat plan. This is not true. The Third Circuit Court has on three (3) separate occasions over a span of eleven (11) years joined the other Circuit Courts listed below that have uniformly held that the ability or bargaining power to affect or substantially influence, through negotiation or otherwise, the design and operation of the plan is a required element of a "top hat" plan. First, in *Kemmerer v. ICI Americas, Inc.*, 70 F.3d 281 (3rd Cir. 1995), the Third Circuit Court stated:

> "Congress exempted top hat plans from ERISA's vesting requirements in large part because it recognized that high level executives retain sufficient bargaining power to negotiate particular terms and rights under the plan and therefore do not need ERISA's substantive rights and protections." 70 F.3d at 288.

Then, in *Goldstein v. Johnson & Johnson*, 251 F.3d 433 (3rd Cir. 2001), the Third Circuit Court specifically cited *DOL ERISA Op. Ltr. 90-14A* stating:

"(Top hat) plans are intended to compensate only highly-paid executives, and the Department of Labor has expressed the view that such employees are in a strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees." 251 F.3d at 442.

Then on a third occasion in *In re IT Group, Inc.*, 448 F.3d 661 (3rd Cir. 2006), the Third Circuit Court again specifically cited *DOL ERISA Op. Ltr. 90-14A* and stated:

"The Department of Labor has explained that Congress exempted "top hat" plans from ERISA's substantive protections because it believed that, unlike other employees, management and highly compensated employees have sufficient bargaining power to negotiate favorable deferred compensation plans and are capable of taking the risks attendant to such plans into account." 448 F.3d at 664, n.1.

UPMC cites the First Circuit Court case of *Alexander v. Brigham and Women's Physicians Org.*, 513 F. 3d 37 (1st Cir. 2008) as the primary authority for their argument that the ability or bargaining power to affect or substantially influence, through negotiation or otherwise, the design and operation of the plan is not a required element of a "top hat" plan.  However, in *Alexander*, the First Circuit Court joined the Second, Third (cases cited above), Fifth, Sixth, Ninth, and Eleventh Circuit Courts in adopting the ability to negotiate as set forth in *DOL ERISA Op. Ltr. 90-14A* as a required element of a top hat plan [*See Demery v. Extebank Deferred Comp. Plan (b)*, supra, 216 F.3d at 287-290 (2nd Cir. 2000) 9the ability of participants to negotiate is an important element of a top hat plan); *Gallione v. Flaherty*, 70 F.3d 724, 728-729 (2nd Cir. 1995); *Carrabba*, supra, 38 F.Supp.2d at 477 (*aff'd* 5th Cir. 2001); *Spacek v. The Maritime Ass'n*, supra, 134 F.3d at 296 n.12 (5th Cir. 1998); *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007)(cited and quoted by this Court in this case on page 6 of the transcript of the July 17, 2013, on the record ruling on UPMC's Motion to Dismiss); *Duggan v. Hobbs*, supra, 99 F.3d at 310-311 (9th Cir. 1996); *Holloman v. Mail-Well Corp*, 443 F.3d 832 (11th Cir. 2006)(high-level employees are in a strong bargaining position relative to their employers and thus do not require the substantive ERISA protections that are necessary for other employees - citing *Goldstein*,

12

supra)]. Contrary to UPMC's arguments, the First Circuit Court in *Alexander* did not, as UPMC alleges, reject the "ability or bargaining power to affect or substantially influence, through negotiation or otherwise, the design and operation of the plan" requirement for top hat plans as set forth by the DOL in *DOL ERISA Op. Ltr. 90-14A.*[6]  Instead, the First Circuit Court in *Alexander* adopted such DOL requirement, stating:

> "The origins of the top-hat plan provision lie in Congress's insight that high-echelon employees, unlike their rank-and-file counterparts, are capable of protecting their own interests [citing *Gallione*, 70 F.3d 724, 727 (2d Cir. 1995) and *DOL ERISA Op. Ltr. 90-14A*].  Presuming that employees of this stature can fend for themselves, Congress relaxed some of ERISA's prophylactic obligations." 513 F.3d at 43.

> "We have no quarrel with (*DOL ERISA Op. Ltr. 90-14A's*) persuasiveness as a gloss on Congress's intentions in enacting the top-hat provision" 513 F.3d at 47.

What the First Circuit Court did do in *Alexander* was refuse to interpret *DOL ERISA Op. Ltr. 90-14A* as requiring that every single member of the "select group" possess individually the ability or bargaining power to affect or substantially influence, through negotiation or otherwise, the design and operation of the plan. *Id.* 513 F.3d at 47-48.  But that is not what Sikora is arguing in the within case.  Instead, what Sikora is arguing is that with respect to the Plan all or a substantial number of the Participants did not possess such required ability or bargaining power and UPMC has produced no evidence to the contrary.

The First Circuit Court in *Alexander* found that the plan at issue in fact complied with the bargaining power requirement set forth in *DOL ERISA Op. Ltr. 90-14A*  because participants in such plan: (1) were voting members of the corporation and therefore "standard corporate

---

[6]  Even if it wanted to, the First Circuit Court could not ignore the principal of deference and substitute its own interpretation of a statutory provision for a reasonable interpretation put forth by a governmental agency (the DOL), especially in light of the First Circuit Court's statement that the ERISA statute and the legislative history were silent as to the requirements for a "select group" (*See* page 19 of Defendants' Brief (Doc # 54); *Alexander*, 513 F. 3d at 46-47). *See Chevron v. Natural Resources Council*, 467 U.S. 837, 844, 862, 865 (1984).

governance and decision making mechanisms stood available to them; (2) were members of the board of directors of the corporation and the board of directors could amend the plan; and (3) had requested an amendment to the plan and such amendment was adopted. *Id.* 513 F.3d at 41. Contrary to such factual findings on which the First Circuit Court based its ruling in *Alexander*, in the within case UPMC has admitted or the evidence in the record establishes that:

A. As provided by the terms of § 8.01 of the Plan Document, the Committee, and not the Participants, had the sole authority to affect a change in the terms and design of the Plan, and the benefits to be provided [Defendants Ans. to Interrogatory # 12 - 1st Set; Pages 4 and 5 of Defendants' Brief in Opposition to Plaintiff's Third Motion to Compel Discovery (Doc # 40)];

B. No Participant (including Messrs. Romoff and Peaslee) had a vote in the election of members of the UPMC Board or the appointment of UPMC Board members to serve on the Committee (Defendants' Ans. to Req. for Admission #s 3 and 4 –5th Set);

C. No Participant (including Messrs. Romoff and Peaslee) ever served as a UPMC Board Member or as a member of the Committee (Defendants' Ans. to Interrogatory # 8 - 1st Set and Req. for Admission # 18 - 2nd Set);

D. there is no evidence of any amendment to the plan having been requested by the Participants or any evidence of any communications between the Participants and the Committee (Sikora Affd. ¶10; Peaslee dep.  52-53; Defendants' Ans. to Doc. Req. #s 5, 21, and 22 - 1st Set; Doc. Req. #s 3, 5, 6, and 7 and Req. for Admission # 19 - 2nd Set; Doc. Req. #s 7 and 8 -  4th Set;

E. No Participant other than Mr. Peaslee had any involvement in the original formulation or design of the Plan (Plaintiff's Exhs. 2A and 2AA) and the Initial Participants were not notified that the Plan was under consideration by the Committee or given an opportunity to submit comments to the original Plan Document (Peaslee dep. 26-28, 31, 32; Sikora Affd. ¶9;  Defendants' Ans. to Doc. Req. #s 21 and 22 and Req. for Admission #s 9 and 10 - 4th Set; and Doc. Req. #2 and Req. for Admission # 5 - 5th Set; Plaintiff's Exh. 11 - page 2 (¶5)]; and,

F. No Participant other than Mr. Peaslee had any involvement in the formulation or design of any amendments to the Plan and Plan Participants were not notified that any amendments were under consideration by the Committee or given an opportunity to submit comments to any proposed amendment (Peaslee dep. 30-33, 86; Sikora Affd.

¶7; Defendants' Ans. to Doc. Req. #5- 1st Set; Req. for Admission #s 4, 5, 6, 7, 9, 10, 11, and 12 - 2nd Set; and Req. for Admission # 5 - 3rd Set)..

**B.  UPMC Has Not Asserted and Have Therefore Waived the Argument that DOL Opinion Letter 90-14A was an impermissible construction of ERISA**

Further to the weight of authority to be afforded DOL Opinion Letter 90-14A is

the fact that UPMC has at no time asserted, and cannot assert, that:

- the phraseology "select group of management or highly compensated employees" is unambiguous;

- the DOL did not have the necessary authority to construe ambiguous provisions of ERISA as it did in DOL Opinion Letter 90-14A, i.e. the administration and interpretation of ERISA had not been delegated by Congress to the DOL [*To the contrary, see* S. Rep. 93-127, at 1, 12, 25-26 (1973)];

- the DOL's reading and construction of the "top hat" exemption provisions of ERISA as set forth in DOL Opinion Letter 90-14A is either (1) contradictory to the unambiguously expressed intent of Congress; or (2) that such interpretation is unreasonable or inconsistent with the policy concerns that motivated the enactment of ERISA or the overall statutory scheme of ERISA; or,

- in the 25 years since its issuance, Congress has at any time indicated its disapproval of the DOL's construction of the top hat exemption provisions of ERISA as reflected in DOL Opinion Letter 90-14A;

as the United States Supreme Court has held would be required for UPMC to overcome

an executive agency's construction of statutory language.  *See King v. Burwell*, 135 S. Ct.

2480 (2015); *2015 U.S. LEXIS 4248 (2015); EPA v. EME Homer City Generation, L.P.*,

572 U.S. ___; 134 S. Ct. 1584, 1603 (2014)[7]; *Chevron, supra*; *See also United States v. Mead Corp.*, 533 U.S. 576, 587 (2001)("An agency's interpretation may merit some deference, whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires").

## C. Neither Gregory K. Peaslee's Activities nor Jeffrey Romoff's Position of CEO Satisfy the "Bargaining Power" Requirement of a "Top Hat" Plan

UPMC asserts that because Participants had the ability to discuss their compensation with him, Mr. Romoff or the UPMC Board, and because Mr. Peaslee in his capacity as the Chief Human Resources Officer of UPMC made recommendations for plan amendments and new participants to the Committee, and because Jeffrey Romoff, the CEO of UPMC, was a Participant beginning as of January 1, 2008, the "bargaining power" requirement of a "top hat" plan is satisfied. Courts have previously held that such assertions do not establish that a significant number of participants had the required bargaining power. *See Carrabba*, supra 38 F. Supp. at 471, 476, and 478 [plan held not to be a "top hat" plan where executive committee administering plan followed recommendations of personnel department as to employees who would be invited to participate in the plan (38 F.Supp. at 471) and there was no evidence to suggest that any significant number of plan participants individually (38 F.Supp. at 478), with

---

[7] The holding of the United States Supreme Court in *EME Homer City Generation* contradicts the holdings or dicta of lower courts that agency interpretations command deference only to the extent that the possess the power to persuade, but the point is moot as multiple Courts of Appeals, including the First Circuit Court in *Alexander*, and multiple District Courts have either cited DOL Opinion Letter 90-14A as authoritative or expressly held that DOL Opinion Letter 90-14A does possess the power to persuade and is entitled to *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) deference [*See IT Group, Inc.*, 448 F.3d at 664, n.1 (3rd Cir. 2006); *Alexander*, 513 F. 3d at 47 (1st Cir. 2008); *Carrabba*, 38 F.Supp. 2d at 479 (N.D. Tex., 1999) *aff'd per curiam* 252 F.3d 721 (5th Cir. 2001); *Gallione*, 70 F. 3d at 729 (2nd Cir. 1995); *Guiragoss*, 444 F.Supp.2d at 658-659 and n.11 (E.D. Va., 2006); *Chellis v. Fleet Capital Corp.*, 2006 U.S. Dist. LEXIS 95837 (N.D. Ga., 2006).

the possible exception of a few executive officers of the employer who were participants in the plan, had the bargaining power to influence the benefits or other terms of the plan (38 F.Supp. at 476)].[8]

UPMC's assertion that Participants had the required "bargaining power" by virtue of their "ability to negotiate elements of their total compensation package" (Defendants' Ans. to Interrogatory # 12 - 1st Set) or the apparent revised assertion that Participants had "the ability to discuss their compensation with (Mr. Peaslee)" [Defendants' Brief - page 21 of 22 (Doc # 54)] are both irrelevant and unsupported by the evidence of record.  Such assertions are irrelevant because *DOL ERISA Op. Ltr. 90-14A* and the various Circuit Courts that have unanimously adopted the DOL's "bargaining power" construction of the "top hat" provisions of ERISA [*See Gallione,* supra (cited by *Demery,* supra)*; Spacek, supra; Bakri,* supra, 473 F.3d at 678-679*; Duggan, supra; Holloman, supra; Kemmerer, supra*] require that the "bargaining power" must relate to "the design and operation of the plan" rather than to "compensation".  Even so, UPMC could not produce a single document evidencing a communication from Sikora or any Participant to Mr. Peaslee, Mr. Romoff, or the Committee relating either to his or her compensation or the terms or design of the Plan, the operation of the Plan, or the benefits to be provided by the Plan or the ability of Plaintiff or any other Participant to negotiate same (Defendants' Ans. to Doc. Req. #s 5, 21, and 22 - 1st Set; Doc. Req. #s 3, 5, 6, and 7; Doc. Req. #s 7 and 8 -  4th Set; and Req. for Admission # 19- 2nd Set; Peaslee dep. 52-53).  Not one e-mail, not one letter, not one memo, not one meeting note, and not one electronic or hard copy document of any other kind (Entire Record).

---

[8] Participants were prevented from acting cohesively because the Committee and its delegates took affirmative steps to prevent the Participants from knowing the identities of other Participants. (Defendants' Ans. to Req. for Admission # 7 - 3rd Set).

As to the establishment of Participant compensation, what the evidence of record does show is that for Sikora and an unspecified number of other Participants, his or her annual base salary increases were not the subject of negotiation, but rather tied to his or her performance rating (Peaslee dep. 59-60; Plaintiff's Exh. 12C); and that employees whose base salary increases are determined based upon his or her performance rating would properly be described as mid or lower level management (Peaslee dep. 106-107).[9]  Further evidence of a lack of compensation bargaining power is the fact that Sikora's compensation went down following his becoming a Participant in the Plan in 2008 (*See* Defendants' Statement of Material Facts ¶¶ 11-13).

Evidence that a substantial number of Participants had no bargaining power with respect to the Plan also includes the fact that of the five (5) types of benefits that the Plan provided (*See* §§ 3.01 through 3.06 of the Plan Document as amended - Plaintiff's Exhs. 4, 4A, 4D, 4G, 4I, 14, and 15; Peaslee Decl. Exh. 2), only nine (9) of the fifty-seven (57) 2011 Plan Participants (15.8 %) received all five (5) types of benefits contributions to his or her account while thirty-nine (39) of the fifty-seven (57) 2011 Plan Participants (68.4 %) received only the lower level of one (1) type of benefit [the Supplemental Deferral (*See* §3.05 of Plaintiff's Exhs. 4, 4I, and 15; Peaslee Decl. Exh. 2) [*See* Spreadsheet - Plaintiff's Exh. 13; Eighth Plan Amendment (Plaintiff's Exh. 4I) - Appendix A; Peaslee Decl. Exh. 2).  It would only be logical that a participant having the ability to affect or substantially influence the terms of their benefit plan would have the ability to unconditionally secure for himself or herself all of the various forms of benefits available under the Plan.  The only evidence that UPMC has proffered to support their assertion that Participants could affect his or her benefits is Mr. Peaslee's testimony that Participants who

---

[9] The manner and methodology by which salary increases were tied to performance ratings is specifically described in Sikora Affd. ¶13 and Plaintiff's Exh. 11 - page 3 (¶8), and illustrated in Plaintiff's Exhs. 12A, 12B, and 12C.

were not receiving a particular form of benefit had the informal, unwritten ability to ask for such benefit (Peaslee dep. 46, 71-72).[10]   Contrary to Mr. Peaslee's testimony, the Plan Document, as amended, provided for no such benefit request or appeal process or procedure (Plaintiff's Exhs. 4 and 4A through 4I; Peaslee Decl. Exh. 2); and Mr. Peaslee admitted that there was nothing in writing informing Participants of their ability to request a form of benefit that they were not receiving or their ability to appeal a denial of such a request (Peaslee dep. 49).

Even Mr. Peaslee, as the one (1) and only delegate of the Committee as provided in §7.02 of the Plan Document (Plaintiff's Exh. 4; Peaslee Decl. Exh. 2 - page 16)(Defendants' Ans. to Interrogatory # 9 - 1st Set) did not have the required bargaining power.  Such section provided that a delegate of the Committee would only have "the power and authority to make routine decisions and perform ministerial task arising in the ordinary course of business, *provided such (delegate) may not take action that will . . . result in a material and significant change in the benefits, rights, and features of the Plan*" (emphasis added).  Mr. Peaslee's power and authority as a delegate of the Committee to make routine decisions and perform ministerial tasks was apparently also specifically limited to "the authority to review and decide appeals" with respect to Benefit Claims as provided in §7.07 of the Plan Document (Plaintiff's Exh. 4; Peaslee Decl. Exh. 2 - pages 18 and 19)(*See* Defendants' Ans. to Interrogatory # 9 - 1st Set), which are the only appeals of any kind that are provided for in the Plan Document.

---

[10] Participants did not even have the ability to ask for the Retention Incentive Contribution form of benefit provided for in §3.08 of the Plan Document, as amended effective January 1, 2011 (Plaintiff's Exh. 4I - page 3).  According to UPMC's designated representative, the only way a Retention Incentive Contribution benefit could be obtained by a Participant not receiving such benefit would be for such Participant to make himself or herself more valuable to the organization (UPMC)(Peaslee dep. 75-77).

**D.  Plan Participants Had No Ability to Monitor or Enforce Their Contractual Rights Under the Plan.**

The basic premise underlying the top hat exemption is that the plan participants have the ability to protect their own interests.  The Third Circuit Court has expressly noted that it would be difficult to imagine individuals having sufficient bargaining power to negotiate particular terms and rights under a plan when they were only able to obtain terms and rights that were nothing more than illusory and unenforceable promises.[11] *Kemmerer*, supra, 70 F.3d at 288; *Gallione*, supra, 70 F.3d at 729.  With respect to the unilateral contract provisions set forth in the Plan Document, as amended, the evidence in the record establishes that: (1) the Committee and the Principal Employer regularly and impudently failed to adhere to, and in some cases effectively deleted, specific and unambiguous provisions set forth in the Plan Document, as amended, without any notice to, or involvement of any kind by the Participants;  and (2) the Participants had no ability to uncover such breaches or to enforce the terms of the unilateral contract as set forth in the Plan Document, as amended.[12] Some examples of this are:

- §2.02 of the Plan Document (Plaintiff's Exh. 4 - page 6) provided that once selected, a Participant remained a Participant in the Plan provided the Participant remained employed by the Principal Employer (the UPMC Health System) or a Related Entity, but the Committee took the position that the selection of a Participant was in effect for only one (1) year and that each Participant had to be approved by the Committee to participate in the Plan each year [Peaslee dep. 103-104; Plaintiff's Exh. 17 (Doc # 31 - page 2 of 8 -note 1)].

---

[11] A promise is illusory when it creates no obligation whatsoever on the part of the purported promisor. *See* RESTATEMENT (SECOND) OF CONTRACTS § 2 cmt. E (1981).

[12] The United States Supreme Court has recently reiterated the legal precedent that focus upon the written terms of an ERISA plan is the linchpin of the complex pension system established by ERISA, and that once a plan is established, administrators have a duty to see that the plan is "maintained pursuant to [the terms of that] written instrument" and courts are obligated to enforce contracts as they are made.  *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604 (2013); *See also Field v. Thompson Printing Co. Inc.*, 363 F.3d 259 (3rd Cir. 2004).

- §8.01 of the Plan Document (Plaintiff's Exh. 4; Peaslee Decl. Exh. 2 - page 20) provided that "the Principal Employer (the UPMC Health System) **shall notify** each Plan Participant **in writing** of any Plan amendment", but UPMC has produced no evidence the Participants were at any time notified that any of the nine (9) amendments to the Plan that were adopted by the Committee (Plaintiff's Exhs. 4A through 4I; Peaslee Decl. Exh. 2) had been proposed, were being considered, or had been adopted by the Committee.[13] [Defendants' Ans. to Doc. Req. #s 5, 14, 15, and 16, and Req. for Admission #s 9 and 10 - 1st Set; Req. for Admission #s 4, 5, 6, 7, 9, 10, 11, 12 and 19 - 2nd Set; Req. for Admission #s 5 and 7 - 3rd Set; Doc. Req. #s 21 and 22 - 4th Set.

- §3.01 of the Plan Document, as amended [Plaintiff's Exhs. 4, 4A, 4D, and 4G (as summarized in Plaintiff's Exh. 14)] provided that a Matching Contribution form of benefit **shall** be made to the Account of the Participant who is employed by [the Principal Employer (the UPMC Health System) or a Related Entity] as of March 1 of the Plan Year, but according to the Defendants' designated representative, UPMC and the Committee did not consider such section to be part of the Plan (emphasis added)(Peaslee dep. 70-71).

- §3.02 of the Plan Document provided that a Cash Balance Contribution form of benefit **shall** be made to the Account of the Participant who is employed by [the Principal Employer (the UPMC Health System) or a Related Entity] as of March 1 of the Plan Year, but according to the Defendants' designated representative, UPMC and the Committee did not consider such section to be part of the Plan (emphasis added) (Peaslee dep. 66-67, 71).

### E.  The Subject Plan Extended Coverage Beyond a Select Group of Management or Highly Compensated Employees

The "select group" issue at hand is not whether the participants in the Plan can simply be characterized as management employees as UPMC asserts.  Instead, the issue is whether the plan was administered in a manner designed to provide benefits only to individuals who by virtue of their management position or compensation level had the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of the Plan. *DOL Opinion*

---

[13] The only document produced by UPMC which UPMC alleges evidences a notification to Participants of a Plan amendment is a single e-mail sent on Monday, December 22, 2008 (Plaintiff's Exh. 5) relating to the Fifth Amendment to the Plan (Plaintiff's Exh. 4F) adopted by the Committee at its meeting held on December 2, 2008 (Plaintiff's Exh. 2F), but such e-mail document does not set forth, and UPMC has at no time produced any evidence to establish, the identity of the individual(s) to whom such December 22, 2008 e-mail was sent (Peaslee dep. 79-83).

*Letter 90-14A*. In order to meet this top hat plan requirement, participation in the plan must be based upon an employees' managerial status or compensation level. *See Guiragoss v. Khoury*, 444 F.Supp 2d 649, 661 (E.D. Va. 2006)[If plan participation is not based on an employee's managerial status or compensation level, then the plan is not a top hat plan regardless of the percentage of workforce participation)(citing *Starr v. JCI Data Processing, Inc.*, 757 F.Supp 390, 394 (D.N.J. 1991)]. The mere fact that the Plan was intended to reward key employees, as the Minutes of March 19, 2002 meeting of the Committee (Plaintiff's Exh. 2A) reflect, does not satisfy the degree of selectivity that is required. *See Carrabba*, supra, 38 F.Supp. 2d at 477 (plan intended to provide benefits to key employees viewed by company officials to be important to the operations and activities of the company did not meet the degree of selectivity required to qualify as a top hat plan); *Guiragoss*, supra, 444 F.Supp.2d at 663 [plan intended to reward "key" employees does not meet the degree of selectivity required by (the top hat provisions of) ERISA]; *Hollingshead v. Burford Equip. Co.*, 747 F.Supp. 1421, 1429 (M.D. Ala. 1990)[plan designed to reward "key employees" (determined based upon time of service, contribution to the company, and loyalty) receiving salaries on the high side of the salary spectrum held not to be a top hat plan].

UPMC has admitted, and the data produced during discovery as outlined below clearly evidences, that an employee did not become a Participant in the Plan upon attaining any specified managerial status or compensation level. (*See* Plaintiff's Exh. 11 - Item # 1 on page 1; Defendants' Ans. to Req. for Admission #s 3 through 8 - 4th Set; Req. for Admission #s 1 and 2 - 5th Set).

      **i.   UPMC has placed no evidence in the Record establishing that an employee's eligibility to participate in Plan was based upon his or her managerial status.**

Throughout the "top hat" phase of discovery, UPMC has repeatedly played a "shell game" in responding to Plaintiff's multiple discovery requests seeking information and documentation evidencing the identity by name or job title of the UPMC employees that were eligible to participate in the plan pursuant to the provisions of §2.01 of the Plan Document, as amended (Plaintiff's Exh. 10) or to set forth the job duties or compensation of such eligible employees (Defendants' Ans. to Interrogatory #s 1, 2, and 3 and Doc. Req. #s 7, 8, and 9 - 1st Set; Interrogatory #s 1, 2, 3 and Doc. Req. #s 1, 2, and 3 - 4th Set; and Interrogatory #s 2, 3, and 4 - 5th Set).  In response to Plaintiff's 1st Discovery Request, UPMC did not produce a list of employees eligible to be selected to participate in the Plan, but rather only produced a list by title of employees of UPMC who had in fact been selected by the Committee to participate in the Plan (43 for 2009, 52 for 2010, and 56 for 2011)[Exh. 1 to Defendants' Answers to Plaintiff's 1st Discovery Request (Plaintiff's Exh. 1)].  In response to Interrogatory #s 2, 3, and 4 of Plaintiff's 5th Discovery Request, the language of which interrogatories specifically referenced the various subsections, and mirrored the language, of §2.01 of the Plan Document, as amended, entitled "Eligibility for Participation" (*See* Plaintiff's Exhs. 10, and 4, 4E, 4F, and 4I; Peaslee Decl. Exh. 2), UPMC produced a listing for each of the years 2008 through 2011 by job title of UPMC employees showing the percentage incentive level and total compensation for each employee. (Attachment 1 to Defendants' Answers to Plaintiff's 5th Discovery Request).[14]  However, Defendants' designated representative testified, and counsel for UPMC asserted, that Attachment 1 to Defendants' Answers to Plaintiff's 5th Discovery Request was not in fact a listing of employees eligible to participate in the Plan but rather a listing of participants a separate plan,

---

[14] The list for the 2011 Plan Year was marked as Plaintiff's Exh. 9 at the deposition of Defendants' designated representative).

the UPMC Management Incentive Plan, which is not the subject of the within lawsuit (Peaslee dep. 95-96, 97-100).  Given this testimony by Defendants' designated representative, there is no evidence in the record identifying by name, job title, compensation, or job duties[15] of the pool of UPMC management employees that were eligible for selection by the Committee to be a participant in the Plan pursuant to §2.02 of the Plan Document or otherwise.

Plaintiff has assembled and placed in the record per Rule 1006 Fed.R.Evid. a summary of information for the 2011 Plan Year [as defined in §1.01 (s) of the Plan Document] contained in Exhibits 1 and 2 to Defendants' Answers to Plaintiff's 1st Discovery Request (Plaintiff's Exhs. 1 and 2), Appendix A to Defendants' Supplemental Answers to Plaintiff's 2nd Discovery Request, Attachment 1 to Defendants' Answers to Plaintiff's 5th Discovery Request (Plaintiff's Exh. 9), Schedule J, Part II (pages 306 to 315) of UPMC's Return of Organization Exempt From Income Tax (IRS form 990) for the fiscal year ending June 30, 2011 (Plaintiff's Exh. 19)(*See* Rule 1005 Fed.R.Evid), or available on UPMC's web site "www.UPMC.org" (the "*Assembled Information*").[16] The Assembled Information (Plaintiff's Exh. 18) illustrates that participation in the Plan was not based upon an employees' managerial status in that:

- The job titles of UPMC employees who were not selected by the Committee to be Participants were equal to or greater than employees who were selected by the Committee to be Participants.  Examples of the 2011 job titles of UPMC employees who were not selected by the Committee as set forth in Plaintiff's Exh. 18 are:

---

[15] UPMC has at not produced, and the record contains no information or documentation to evidence the job duties or job functions of any UPMC employee; but instead has asserted that an employee's job duties and job functions are fully and adequately described by the employee's job title  and that an employee's status within the hierarchy of UPMC management can also be discerned solely by the individual's title. (Defendants' Ans. to Interrogatory # 1 – 2nd Set).

[16] The information and data hereafter delineated relates to the 2011 plan year (Sikora's final year in the Plan prior to his retirement), but it appears that the information and data for the 2011 plan year is fairly representative of the information and data for the 2008, 2009, and 2010 plan years as well (*See* Plaintiff's Exh. 1).

    1) President - four (4)[17]
    2) Chief Information Officer – nine (9)
    3) Chief Financial Officer - six (6)
    4) Chief Medical Officer
    5) Chief Nursing Officer – ten (10)
    6) Chief Operating Officer – three (3)
    7) Chief Clinical Officer
    8) Chief Government Program/Contract Officer
    9) Chief Business Development Officer
    10) Senior Vice-President & Chief Legal Officer
    11) Senior Vice-President & Chief Communications Officer
    12) Senior Vice-President, Administrative Services & Physician Relations
    13) Senior Vice-President & Chief Clinical Officer
    14) Vice-President – fifty-eight (58)

- 2011 Participants included UPMC employees with non-management titles such as:

    1) Senior Consultant
    2) Senior Staff Associate – two (2)

- UPMC employees at the percentage incentive levels set forth in §2.02, as amended and in effect for the 2011 Plan Year included various UPMC employees with non-management titles such as:

    1) Faculty – four (4)
    2) Physician – two (2)
    3) Investments – two (2)
    4) Physician Informaticist III
    5) Senior Staff Associate – three (3)
    6) Associate Counsel – four (4)
    7) Administrator
    8) Stg (sic)(the meaning of which is unknown)

- of the 68 employees who were Participants during the 2011 Plan Year (Peaslee Decl. ¶ 17), only 10 are listed as being among the "UPMC Leadership" on UPMC's web site (Plaintiff's Exh. 16)

---

[17] The number next to a job title indicates the number of applicable employees listed in Defendants' discovery responses as having such job title.

The above and other evidence of record set forth herein uncloaks UPMC's strategy of mislabeling or mischaracterizing middle or lower management employees eligible to participate in the Plan as "executives" in a vain attempt to move them into the ranks of "select management".

> **ii. Defendants have not placed in the Record evidence establishing that an employee's eligibility to participate in Plan was based upon his or her compensation level.**

UPMC asserts that the employees eligible to participate in the Plan were "highly compensated" because they were all in the "Top Paid Group" (*See* Defendants' Ans. to Interrogatory # 13 - 1st Set) or met the definition of "highly compensated employee" as defined in IRS Code Section 414 (q).  Such assertion fails on two (2) grounds.  First, the preamble to final regulations issued under IRS Code Section 414 (q) ["414 (q)"] expressly state that such section will not be determinative with respect to the "select group of highly compensated employees" issue and the use of 414 (q) in such a determination "would be inconsistent with the tax and retirement policy objectives of encouraging employers to maintain tax-qualified plans that provide meaningful benefits to rank-and-file employees".  The basis for this was that both the IRS and the DOL were concerned that if the bar for inclusion in top hat plans was set as low as the 414 (q) definition of a highly compensated employee, employers would maintain pension plans only for employees at that compensation level or higher and no one else and thereby avoid all of the pension protections afforded to employees by ERISA.  Second, as detailed, supra, UPMC has only provided compensation information for the Participants in the Plan.  UPMC has failed and refused to provide, and there is no evidence in the record setting forth, the compensation of the UPMC management employees that were eligible for selection by the Committee to be a participant in the Plan pursuant to §2.02 of the Plan Document, or otherwise,

but were not approved by the Committee to participate in the Plan.   The Assembled Information

(Plaintiff's Exh. 18) also illustrates that participation in the Plan was not based upon an

employee's compensation in that:

- Assuming that in 2011 UPMC employed a number of physicians similar to the 3,565 physicians employed by UPMC on September, 2014, and that all physicians had a 2011 base salary greater than $153,999.96, there were at 3,868 non-participant employees that had a 2011 base salary greater than the lowest paid Plan Participant

- in 2011, the total compensation of the lowest paid Plan Participant ($208,480) was $5,766,982 less than the total compensation of the highest paid Plan Participant ($5,975,462)

- in 2011, the total compensation of the lowest paid Plan Participant ($208,480) was $4,696,192.12 less than the total compensation of the highest paid non-participant employee ($4,904,672)

- in 2011, the total compensation of the top 6 or 10% highest paid Plan Participants was ≥ $1,342,045 and the total compensation of the bottom 6 or 10% lowest paid Plan Participants was ≤ $253,996, a disparity of $1,088,049 or greater.

These statistical observations are relevant because the DOL has determined that the range

of salaries of the employees eligible to participate must not be too broad (*See* DOL Opinion

Letter 85-37A)(*See also Chellis*, supra, 2006 U.S. Dist. LEXIS 95837, at 10 (disparity of

$786,623.68 between the salary of highest paid participant and the salary of lowest paid

participant establish that plan did not include only highly compensated participants).

**F. Defendants have Failed to Produce Evidence to Establish that the Plan Meets the Quantitative Element**

UPMC contends that the Plan meets the required quantitative element of a top hat plan

because the number of employees approved by the Committee to be Participants was a small

percentage of the UPMC Health System workforce. Whether or not a plan meets the required

quantitative element of a top hat plan involves a mathematical calculation expressed as a

fraction. The numerator of the fraction is the number of employees that are **eligible** to participate in the Plan and the denominator is the total number of employees employed by the employer.

> **i.** **Defendants have not placed in the Record evidence establishing the number of employees that were eligible to participate in Plan (the Numerator)**

In evaluating whether or not an ERISA plan satisfies the quantitative element of the "select group" requirement of a "top hat" plan, the relevant inquiry is NOT the number of employees who are participants in the plan but rather it is necessary to look at the number of employees who are **eligible** to participate in the plan. *Carraba*, supra, 38 F.Supp at 475 (record did not reflect number of employees who were eligible to participate in plan); *Guiragoss*, supra, 444 F.Supp. 2d at 661 [if all employees are eligible to participate, the plan cannot qualify as a top hat plan, notwithstanding the number of employees that actually (participate)].

In response to numerous discovery requests, UPMC at all times failed and refused to provide any information as to, and the record contains no evidence establishing, the number of UPMC executive employees that were **eligible** to participate in the Plan (the Numerator) pursuant to the provisions of §2.01 of the Plan, as amended (Plaintiff's Exh. 10)(*See* Defendants' Ans. to Interrogatory #s 1, 2, and 3, and Doc. Req. #s 7, 8, and 9 - 1st Set; Interrogatory #s 1, 2, 3, and 6, and Doc. Req. #s 1, 2, 3, and 6 - 4th Set; Interrogatory #s 2, 3, and 4 - 5th Set). Because the record contains no evidence from which the number of employees that were **eligible** to participate in the Plan (the Numerator) can be established, the UPMC has failed to meet their burden of proof in regard to same.

> **ii.** **Defendants have not placed in the Record evidence establishing the number of employees employed by the Employer as defined in the Plan Document (the Denominator)**

§1.01 (k) of the Plan Document defines "Employer" as "the Principal Employer [the UPMC Health System per §1.01 (u) of the Plan Document] and any (P)articipating Related

28

Entities, determined in accordance with Section 8.03 (of the Plan Document) and listed in

Appendix B.   §8.03 provides that "Participating Related Entities shall be listed in Appendix B,

which is attached hereto and which may be changed from time to time as necessary".   The most

recent Appendix B produced by Defendants is dated January 1, 2004 (Plaintiff's Exh. 4A - last

page) and lists only seven (7) Participating Related Entities, two (2) of which have since merged

into one (1) entity (UPMC Presbyterian and UPMC Shadyside) and one (1) of which has closed

(UPMC Braddock).   None of the other subsequent Plan Amendments (Plaintiff's Exhs. 4B

through 4I; Peaslee Decl. Exh. 2) and none of the Minutes of subsequent meetings of the

Committee (Plaintiff's Exhs. 2C through 2I) reflect the addition of any other UPMC entities as

Participating Related Entities.   Contrary to the express provisions of the Plan Document, UPMC

has represented that "Over the years, as UPMC has added tax exempt entities as Participating

Related Entities, although the Committee did not remain current with amendments to Appendix

B" [UPMC Brief - page 5 of 22 (Doc # 54)]; and that the Participating Related Entities in 2011

were all of the tax exempt entities that had an employee participating in the Plan during such

year (Peaslee dep. 91-93, Plaintiff's Exh. 8).   However, the record contains no evidence as to the

tax exempt status of any entity nor does the record contain any evidence as to which UPMC

entity employed which Participants.[18] Because of these deficiencies, the record does not contain

evidence from which the total number of employees of the "Employer" (the Denominator) can be

established and UPMC has failed to meet its burden of proof in regard to same.

---

[18] To the extent that UPMC asserts that the document marked as Plaintiff's Exh. 8 or Exh. 1. to
Defendants' Answers to Plaintiff's 4th Discovery Request is a summary as provided in Rule 1006
Fed.R.Evid., the underlying supporting documentation is not part of the record and was never
made available to Sikora or his counsel to permit them to check the accuracy of such summary.
*See U.S. v. Rizk*, 660 F.3d 1125,1130 (9th Cir., 2011).

### iii.     Eligibility to Participate in the Plan was Open Ended

Another reason the Plan fails to satisfy the quantitative "top hat" test is that the pool of UPMC employees from which the Committee could select Participants was "open ended". Under the original terms of the Plan as adopted by the Compensation Committee in 2002, to be eligible to be selected by the Committee for participation in the Plan, an employee had to be an "Executive Class A, Executive Class B, or an Executive Class C employee" (*See* § 2.01 of the Plan Document - Plaintiff's Exhs. 4 and 10).  Then, pursuant to various amendments, §2.01 of the Plan Document was amended by the Committee so as to change the description of the employees eligible for Participation in the Plan "a (sic) executive employee at a 10% annual/10% long term or higher incentive level" [*See* § 2.01 (a)], "a (sic) executive employee at a 30% annual/60% long term or higher incentive level **or such other employee designated by the Committee or its delegate as eligible** for Executive 30/60 Incentive Class Supplement Deferrals" (emphasis added)[*See* § 2.01 (b)], or "an executive employee at a 20% annual/20% long term incentive level or a 25% annual/25% long term incentive level **or such other employee designated by the Committee or its delegate as eligible** for Executive 20/20 and 25/25 Incentive Class Supplement Deferrals" (emphasis added)[*See* § 2.01 (c)](*See* Plaintiff's Exhs. 4E, 4F, and 10). The Plan document, as amended, contains no language or provision definitively modifying or limiting the open ended and undefined "such other employee" language.  UPMC references the language of §9.04 of the Plan Document as limiting the open ended "or such other employee designated by the Committee" language, but  under §9.04, a participant who is not a management or highly compensated employee is not automatically ineligible to participate in the Plan, but rather his or her continued participation, like everything else about the Plan, is at the

sole and exclusive discretion of the Committee.[19]   The absence of any provision in the Plan

Document limiting the "or such other employee designated by the Committee" language is

critical because if the employees who the Committee can approve to participate is without

limitation, the plan cannot qualify as a top hat plan notwithstanding the number of employees

that are actually selected for participation. *See Carrabba*, supra, 38 F.Supp. 2d at 473 (N.D. Tex.

1999); *Hollingshead*, supra, 747 F.Supp. at 1430 (all employees were effectively eligible for

consideration by board of directors for participation in plan therefore plan not a top hat plan).


**CONCLUSION**

UPMC has done to Mr. Sikora exactly what ERISA was designed to eliminate - to deny

him his promised deferred compensation benefit upon retirement after he fulfilled the conditions

necessary to become fully vested. ERISA § 2 (29 U.S.C. § 1001).  UPMC now attempts to justify

their denial of benefits to Mr. Sikora and other similarly situated UPMC middle management

employees by asserting that the Plan is a "top hat" plan when there is no evidence that a

significant number of the 68 Plan Participants in 2011 had any ability or bargaining power to

influence his or her benefits under, or other terms of, the Plan.  To the contrary: (1) UPMC has

admitted that the Committee, and not the Plan Participants, had the sole and exclusive power and

ability to adopt, interpret, alter, operate, and administer the Plan; (2) UPMC has admitted that no

Plan Participant was ever a member of the UPMC Board or the Committee and Plan Participants

had no vote in the election of members of the UPMC Board or the appointment of UPMC Board

members to serve on the Committee; and, UPMC produced no evidence of any interaction or

---

[19] Merely inserting ERISA top hat language or reference in Plan Document is insufficient if the actual plan as operated does not satisfy top hat requirements. *Guiragoss*, supra, 444 F.Supp. 2d at 659.

communication of any kind between Plan Participants and the UPMC Board or the Committee relative to the Plan.  These facts, as well as the other facts as articulated above, disqualify the Plan as a "top hat" plan.  UPMC has not sustained, and cannot sustain, their burden of proof as to their "top hat" plan affirmative defense and the Court should declare that the Plan does not meet the requirements of "top hat" plan. UPMC cannot, and should not, be permitted to use a bogus top hat plan designation so as to shield it from its statutory liability for the payment of retirement benefits due and owing to fully vested middle management Plan Participants like Mr. Sikora.


Respectfully submitted,


Dated: October 14, 2015          /s/ Michael E. Hoover
                                 Michael E. Hoover
                                 PA27574
                                 DIEFENDERFER HOOVER McKENNA & WOOD, LLP
                                 310 Grant Street, Suite 1420
                                 Pittsburgh, PA  15219-2201
                                 Tel # (412) 471-1100 Fax # (412)471-5125
                                 mhoover@verizon.net

                                 Counsel for Plaintiff, Paul F. Sikora