IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


PAUL F. SIKORA,                          }
                                         }
            Plaintiff,                   }
                                         }        Civil Action No.  12-1860
vs.                                      }
                                         }        Judge Hornak
UPMC a/k/a UPMC HEALTH SYSTEM            }
and the UPMC HEALTH SYSTEM and           }
AFFILIATES NON-QUALIFIED                 }
SUPPLEMENTAL BENEFIT PLAN,               }
                                         }
            Defendants.                  }


## DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

        Plaintiff has filed a Brief in Opposition to the defendants' Motion for Summary Judgment

and has also filed a Cross-Motion for Summary Judgment.  The following brief is filed as a reply

to the plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment and in

opposition to plaintiff's cross-motion for summary judgment.[1]

        The issue is whether the defendant UPMC Health System and Affiliates Non-qualified

Supplemental Benefit Plan ("the Plan") is a top hat plan, which means whether it is unfunded

and maintained primarily for the purpose of providing deferred compensation for a select group

of management or highly compensated employees.  29 U.S.C. §§ 1051(2), 1081(a)(3), and

1101(a)(1).

_____

[1] Defendants assume that the Court's 25-page limit will apply since this is both a Reply Brief and an Opposition to Plaintiff's Cross-Motion.  Plaintiff's Brief was 38-pages and his response to defendants' six-page Concise Statement of Material Facts was 25 pages, so it would be difficult for defendants' to reply fully in 15 pages.

Before addressing plaintiff's arguments in opposition, defendants wish to correct a misstatement of the law in their opening brief. Citing a district court decision, defendants accepted that it is their burden to prove that the Plan is a top hat plan. (Opening Brief at 11). However, that statement is contrary to controlling case law. In *Pane v. RCA Corp.*, 868 F.2d 631 (3d Cir. 1989), the Court of Appeals squarely held that a top hat plan is not an exemption from liability such that it is an affirmative defense:

> Pane urges, however, that the district court should not have applied section 401(a)(1) standards because RCA did not plead that section as an affirmative defense. He contends that since section 401(a)(1) provides for an exemption from ERISA provisions otherwise applicable, it must be an affirmative defense, waived if not pleaded. *We reject this contention. Section 401(a)(1) does not provide for an exemption from liability under section 502(a). It merely provides the legal standard by which RCA's section 502(a) liability is to be determined*.

868 F.2d at 637 (emphasis added). This holding of the Court of Appeals clearly means that the plaintiff in this case has the burden of proving that 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1)[2] do not apply to the Plan.

Plaintiff has admitted that he was employed at a Vice President level and earned annual compensation, excluding long-term incentive pay, that averaged $300,000 during the four years that he was a participant in the Plan. Plaintiff's Response to Statement of Material Facts ("Reply to Stafax") ¶¶ 11-14. Plaintiff has conceded that the Plan is unfunded. Reply to Stafax ¶¶ 16-17. Plaintiff also has conceded that the Plan is a deferred compensation plan. *Id*. ¶ 2. The point of divergence, therefore, is whether the Plan is maintained "for a select group of management or highly compensated employees."

The principal differences between the parties on this point are over the role that the ability to influence Plan design and operation should play in determining if the Plan is a top hat

---

[2] Section 401 (a), the section at issue in *Pane*.

plan, and the extent to which the participants in the Plan have any influence in this regard.  This will be addressed later in the Brief.  Initially, defendants will address the unavailing attempts of the plaintiff to create the appearance of a dispute of material facts.

## A.     There are No Material Facts in Dispute

As a preliminary matter, Plaintiff has argued that statements made in the Declaration filed by Greg Peaslee cannot be considered in support of defendant's Motion for Summary Judgment, citing *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 149-51 (2000) and *Hill v. City of Scranton*, 411 F.3d 118, 129 (3d Cir. 2005).  This argument cannot be accepted in light of more recent controlling authority disavowing the language on which plaintiff relies.  *Lauren W. ex rel Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007) ("The fact is that in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness."); *Davis v. National RR. Passenger Corp*., 733 F. Supp.2d 474, 489 n.6  (D. Del. 2010); *Snooks v. Duquesne Light Co*., 2008 WL 351685 at *1 n.4  (W.D. Pa. Feb. 6, 2008), *rev'd on other grounds* 314 Fed. Appx. 499 (3d Cir. 2009).[3]  Consequently, unless statements in the deposition or in the Declarations of Greg Peaslee or John Galley[4] are "inherently implausible," they must be accepted as true on a motion for summary judgment, unless controverted by competent evidence in one of the ways permitted by Rule 56(c)(1).

### 1.    *The participating employers are the UPMC tax-exempt affiliates. (Stafax 5, 19)*

Plaintiff purports to dispute the identity of the employers who are Participating Related Entities in the Plan, as set forth in Defendants' Concise Statement of Material Facts ("Defendant's Stafax") at ¶¶ 5 and 19.  These were identified in Greg Peaslee's Declaration as

---

[3] It should be noted that Rule 56(c)(4) expressly provides for affidavits "used to support … a motion."
[4] Defendants have filed a Declaration of John Galley as an attachment to this Brief.

being all tax-exempt subsidiaries of UPMC which, as of December 2011, numbered thirty-seven employer entities. Peaslee Declaration ¶¶ 13, 17, Exh. 6. Plaintiff denies this statement, but does not point to any testimony or other evidence to support his denial. (Reply to Stafax ¶ 19). Instead, he simply argues that Appendix B to the Plan lists only seven Entities participating as of June 1, 2004.[5] This was explained by Mr. Peaslee in his Declaration: "Over the years, as UPMC has added tax exempt entities, the practice has been to consider these entities as Participating Related Entities, even though we did not keep up with amendments to Appendix B. All tax-exempt affiliates are and have been Participating Related Entities." Plaintiff has not pointed to any evidence to controvert this testimony by Mr. Peaslee, and the record supports his testimony, in that the participant lists include, for example, the Presidents of such additional entities as UPMC Bedford, UPMC Horizon, UPMC Northwest, UPMC McKeesport, Community Care Behavioral Health, UPMC East, Children's Hospital of Pittsburgh of UPMC, and UPMC St. Margaret. (Plaintiff's Appendix Exh. 7).

Plaintiff has not raised a disputed issue of fact on this point.

2. *Extent of Greg Peaslee's Involvement in Operation of the Plan. (Stafax 7, 18)*

Plaintiff has attempted to minimize Mr. Peaslee's involvement in the operation of the Plan.[6] Plaintiff denied ¶¶ 7 and 18 of Defendants' Stafax, which state that Mr. Peaslee would propose amendments and the participants and amounts and types of deferred payments annually to the Committee and the Committee would ratify his proposals. Plaintiff offers no contrary evidence. Instead, plaintiff erroneously claims that there is no evidence in the record to support

---

[5] Plaintiff cites to Peaslee Dep. Exh. 4A, but has not filed this document. It appears in Defendants' Appendix at Tab 2 as Appendix B to the First Amendment to the Plan, dated January 1, 2004.
[6] Mr. Peaslee was the architect of the Plan, so there is no dispute that he was its designer. (Peaslee Decl. ¶¶ 1-2).

this fact. (Reply to Stafax ¶7, 18).[7]  However, there is the unequivocal testimony in Mr.

Peaslee's deposition and in his Declaration about how Plan amendments have been made and the

participants have been selected. (Dep. at 30-32; Peaslee Decl. ¶ 12).  Mr. Peaslee's testimony is

supported by the excerpts from the Committee Minutes, which annually approve Mr. Peaslee's

reports.  *See, e.g.,* Plaintiff's Exh. 2E (2007), 2EE (2008), 2F (2008), 2FF (2009), 2G (2009),

2GG (2010), 2H (2010), 2HH (2011) and 2I (2011).

Plaintiff has not created an issue of fact as to the involvement of Mr. Peaslee, in

consultation with other Business Unit leaders, in the operation of the Plan.

### 3.   *Purpose of the Plan. (Stafax ¶ 8)*

Plaintiff denied that the purpose of the Plan was as stated in the Plan document and

benefits summaries. (Defendant's Stafax ¶ 8).  Again, plaintiff does not point to evidence stating

a contrary purpose, but instead discusses the supposed law on what constitutes a select group of

employees. (Reply to Stafax ¶ 8).  Plaintiff also purports to dispute that he ever received the

December 8, 2008 email and 2009 Benefits Overview.  (*Id*.).  However, his Affidavit does not

deny receipt, but states that he does not recall receiving the email and the attachment. (Sikora

Aff. ¶ 19).[8]  John Galley has filed a Declaration, attached to this Brief as Exhibit 1, attesting that

he personally sent emails of the type that are in the record as Plaintiff's Exhibit 5 and the

attached benefits summary, to all affected employees when there was an amendment to the Plan

that affected their benefits. (Galley Decl. ¶ 3).  Furthermore, Mr. Galley attests that he had

Sikora's hard drive opened and confirmed that plaintiff actually opened the email in question.

---

[7] As discussed above, plaintiff also argues that the Court cannot consider Mr. Peaslee's Declaration because he is an "interested witness."  For the reasons given above, this argument cannot be accepted.
[8] "I have no recollection of receiving, and I do not believe I ever received ... the email dated December 22, 2008 sent by John Galley and the attachment thereto."

(*Id.*).  Sikora admits receiving the summary of benefits for 2011 and Mr. Galley's August 2, 2011 email.  (Sikora Affidavit ¶19).[9]

Plaintiff has not raised an issue of fact as to the stated purpose of the Plan.

### 4.    *Eligibility to Participate is limited to executives whose incentive levels under the management incentive plan are at least 20% of salary.*

Plaintiff has denied this statement, which is supported by the deposition testimony of Greg Peaslee (at p. 74) and the Declaration of John Galley ¶ 5, as well as by the fact that, as shown in Plaintiff's Exhibit 1, at Tab B of Plaintiff's Appendix, no participant in the period covered by the Exhibit (2009 through 2011) had an incentive level of under 20%.

In denying this allegation, plaintiff makes two arguments.  First, he posits that certain benefits were available to Executive Class A, B or C employees "at a 10% Annual/10% long term or higher incentive level" pursuant to the Fourth Amendment to the Plan, mentioning an employee, Michael Riska, a Sr. Staff Associate, who allegedly was at a 10% level when he was approved to be a Participant on December 31, 2010.[10]  (Reply to Stafax ¶ 9A).  Plaintiff has simply misread the record with respect to Mr. Riska.  The record clearly shows that Mr. Riska had compensation in 2010 of $294,323 and that he was at a 20% incentive level, not a 10% level as contended by plaintiff.  (Plaintiff's Appendix, Tab B, Exh. 1, p. 4).[11]  Plaintiff's Exhibit 1 shows the executive incentive levels for payments made in 2007 through 2011 and demonstrates

---

[9] Statements in plaintiff's Brief suggest that the Plaintiff never knew about having to sign the post-retirement agreement as a condition to receiving payment of his benefits.  Not only does the Plan that is annexed to his Complaint and that he admits receiving state in no uncertain terms that benefits would not be paid until a post-retirement agreement is signed and performed (Plan § 4.01), but the December 22, 2008 email and both of the Benefits Summaries also make this clear.  The term "Post Retirement Service Agreement" is defined in Plan § 1.01 (t), as an agreement for one-year after retirement requiring substantial consulting services and refraining from working for a competitor.  So, plaintiff never had any reason to doubt that his resignation to work for Allegheny Health Network/Highmark would disqualify him from receiving benefits.

[10] Plaintiff's Reply states "effective January 1, 2010," but the participant listing in Exhibit 4H, which he cites, is dated December 31, 2010.

[11] There is only one Senior Staff Associate listed in  Exhibit 1 for a 2011 payment, which would have related to participation in 2010, so that necessarily would be Mr. Riska.

that no participant has had an incentive level lower than 20%. (Plaintiff's Appendix, Tax B Exh. 1).

Moreover, when Mr. Riska became a participant, he was declared to be "eligible for Executive 20/20 and 25/25 Incentive Class Supplemental Deferrals under the Plan." (Defendants' Appendix, Tab 2, Seventh Amendment, App. A, p. 3). In the Fourth Amendments to the Plan (See Defendants' Tab 2), the combined effect of the amendments to § 1.01(z) and §2.01 (d) is that *only* an executive at the 20% or 25% incentive level could be awarded an Executive 20/20 and 25/25 Incentive Class Supplemental Deferral. (*Id.*, Fourth Amendment, pp. 1-2). As against this evidence, plaintiff has not pointed to any evidence that tend to prove that Mr. Riska was at a 10% incentive level in 2010.[12]

Plaintiff also supports his denial of Defendant's Stafax ¶ 9 by arguing that a Fifth Amendment to § 2.01 of the Plan would permit the Committee to designate for Supplemental Deferral benefits any employee whose income exceeded the Social Security Contribution and Benefit Base of $97,500 in 2007 and $106,800 in 2010. (Reply to Stafax ¶ 9B). The Amendment in question pertains to what was originally § 2.01 (b), which was limited to the highest class of executive, class A, which in the later amendments became executives at the 30%/60% level. Furthermore, as a review of the Appendices to each of the Amendments made at and after the Fifth Amendment clearly show, the only Supplemental Deferrals ever made in any year were Executive 30/60 Incentive Class Supplemental Deferrals, Executive 20/20 and 25/25 Executive Supplemental Deferrals. As discussed above, under the Fourth Amendment to the Plan, one had to be an executive at the corresponding incentive level to be eligible for one of these deferrals.

---

[12] Plaintiff cited Plaintiff's Exhibit 9, which is a listing of the participants in the Management Incentive Plan and their levels of participation. However, there is no Senior Staff Associate listed whose compensation is even close to that of Mr. Riska. Furthermore, Exhibit 9 is a year-end 2011 document, unlike Exhibits 1 and 7, which address Plan payments made in 2011.

5. *Participation is limited to executives who are members of management. (Stafax ¶ 20)*

Plaintiff disputes this fact based upon two arguments.  First, the list of Participants paid in 2011 includes an employee with the title of Senior Consultant and another with the title of Senior Staff Associate.[13] Plaintiff offered no evidence that the duties performed by these two are not managerial.  Both of these employees were paid $253,996 and $294,323 in 2010 (*Id.*), and both individuals are participants in the Management Incentive Plan.  Moreover, each employees would clearly satisfy the "highly compensated employee" alternative.

Second, citing to Plaintiff's Exhibit 9, which lists participants in the *Management Incentive Plan*, not the Plan, plaintiff lists 7 job titles of employees whom plaintiff argues do not have managerial titles.  These are not participants in the Plan and it is difficult to see the relevance of this list to the issue of whether the Plan is limited to executives who are members of management, which is the fact at issue.  More to the point, one cannot infer from the titles that the employees do not have management duties.

Plaintiff has not created a fact issue as to whether the plan is limited to executives who are members of management.  At best, his response suggests that there are two highly compensated non-management participants, which is not material.

6. *Among the management employees, only the highest levels have been selected to Participate in the Plan. (Stafax ¶ 21)*

Plaintiff denies this, but offers mainly arguments, not evidence.  One "fact" cited by plaintiff is that only 10 of the 68 participants in the Plan in 2011 are listed on UPMC's web site as being among the "UPMC Leadership."  (Reply to Stafax ¶ 21 B).  Plaintiff cites his Exhibit 16, which is at Tab B of Plaintiff's Appendix.  There are only 12 executives listed in the

---

[13] Plaintiff says that there are two Senior Staff Associates, but there is only one.  (Plaintiff's Appendix, Tab 2, Exh. 1).

referenced section of Exhibit 16, 10 of whom were actually Plan participants. One of the 12 who is not a participant is Diane Holder, the CEO of the UPMC Health Plan, which plaintiff admits is not a tax-exempt entity and, therefore, not a participating employer. The other executive listed as part of UPMC Leadership on Exhibit 16, who was not a participant, is Tom McGough, currently UPMC's Chief Legal Officer. Mr. McGough was not employed by UPMC in 2010, so he is not listed among the employees who received 2011 Plan payments. However, his predecessor, Robert Cindrich, is shown as a participant receiving 2011 payments. (Plaintiff's App. Tab B, Exh. 7).

The upshot is that every one of the "UPMC Leadership" identified on the Web Site who was employed by a tax exempt entity was also a Plan participant. This defeats, not makes, plaintiff's point.

### 7. During the period 2007 to 2011, the highest percentage of the workforce to participate in the Plan was less than two-tenths of one percent. (Stafax ¶ 22-23)

Plaintiff has denied this allegation, which is supported by competent evidence. (Peaslee Decl. ¶ 17, Exh. 6). Plaintiff has not cited to any evidence that would create a fact issue over the truth of this allegation. Instead, he has advanced legal arguments about how one should measure the quantitative element of establishing a top hat plan.

First, plaintiff argues that "the numerator of the fraction is the number of employees that are eligible to participate," not the number of participants. (Reply to Stafax ¶ 22). As a legal proposition, this very argument was flatly rejected by the Court of Appeals in *Alexander v. Brigham and Women's Physicians Org*., 513 F.3d 37, 43-44 (1st Cir. 2008). There, the Court noted that all physicians were eligible to participate in the plan at issue and that all physicians comprised 37% of the workforce, but that only a fraction of those eligible succeed in becoming participants:

> The first issue raised by the appellant concerns the methodology used in determining whether a given group is "select." He argues that the statute envisions that the entire cohort of employees to whom a plan was offered—here, every full-time BSG surgeon who held a Harvard faculty appointment—comprises the relevant group. Taking this approach, he says that the plans here at issue were maintained for roughly 30% of the workforce (hardly a "select" group).

*Id*. at 43-44. The Court rejected this argument, holding that the Plan could logically be said to be "maintained" only for that group who actually participate, since it is their compensation that has been deferred and is being invested and held. *Id*. The Courts of Appeal when discussing the quantitative test typically compare the number of participants with the workforce as a whole, not potentially eligible but not selected employees with the workforce, as plaintiff advocates. *E.g., Pane v. RCA Corp.*, 868 F.2d 631, 637 (3d Cir. 1989) ("it provided severance compensation, a form of deferred compensation, to a select group of sixty-one management employees out of a work force exceeding 80,000 persons"); *Bakri v. Venture Mfg. Co*., 473 F.3d 677, 678 (6th Cir. 2007)(Defining the quantitative element as "the percentage of the total workforce *invited to join the plan* (quantitative)" [emphasis added]). Thus, plaintiff's "numerator argument" is unavailing as a matter of law.

Plaintiff's argument is also unavailing as a matter of fact. One can count, using Plaintiff's Exhibit 9, how many employees met the 20% or higher threshold of eligibility in 2011. (Plaintiff's Appendix, Tab B, Exh. 9) There were 61 of them.[14] So, using plaintiff's proposed numerator, fewer than two-tenths of one percent of the workforce were *eligible to participate* in the Plan during the period 2007 through 2011, which is clearly a "select group." Furthermore, even if one includes as eligible employees the managers at the 10%/10% incentive

---

[14] These are the number of employees at the relevant incentive levels as of year-end 2011, which would not correspond exactly to number of Plan participants receiving payments in 2011 (Plaintiff's Exhs. 1 and 7) or the number of participants as of year-end 2011 (Peaslee Decl. Exh. 6), but it is in the same neighborhood.

level, as contended for by plaintiff, Exhibit 9 shows that there are a total of 268 employees (including tax exempt and non-tax exempt, since he management incentive plan is not limited to tax exempts) who are participants in that plan at the 10%, , 15%, 20% or 30/60% incentive levels. That is less than one-half of one percent of the total employees at year-end 2011. This is still an obviously "select group" of managers.

Plaintiff has not shown that there is a dispute of material fact as to the quantitative element of a top hat plan.

8.   *The average income for all employees was approximately 10% of the average income of the Plan participants during the period 2007 to 2011. (Stafax 24-29)*

Plaintiff has denied this allegation and the underlying allegations supporting it, because of alleged "discrepancies with respect to 2011 Plan Participant income." (Reply to Stafax ¶¶ 24-29). This allegation will be addressed below. However, plaintiff also argues that Peaslee Decl. Exh. 5, which was used as part of the basis for the defendants' allegations, is a summary that cannot be used because the underlying information is not part of the record and was never made available to Sikora, citing Fed. R. Evid. 1006. Plaintiff is incorrect. The data summarized in Exhibit 5 is the same data as appears in the documents included in plaintiff's Appendix at Tab B, Plaintiff's Exh. 7.[15]   Defendants have also noticed that Exhibit 7 to Mr. Peaslee's Declaration, which sets forth the average pay for employees at the Related Entities, was inadvertently not attached to his Declaration as filed. This Exhibit was provided to the plaintiff in the form of Exhibit 2 to Defendants' Answers to Plaintiff's Discovery – Fifth Set, as acknowledged by plaintiff in his Reply to Stafax ¶ 29. It is now attached to this Reply Brief, labeled Exhibit 7.

---

[15] Plaintiff's Exhibit 1 does not include names, but it includes all of the compensation numbers that form the basis for the averages that appear in Peaslee Exh. 6, which substituted names, at plaintiff's request, for titles. Both documents were prepared as responses to interrogatories and served on plaintiff during discovery, as evidenced by the fact that part of Peaslee Exhibit 6 appears in plaintiff's Appendix as Plaintiff's Exhibit 7. Moreover, plaintiff never requested to see any "underlying information."

The so-called "discrepancies" that plaintiff has identified in the 2011 salary numbers are not discrepancies at all, but are attributable to plaintiff's prolonged inability to accept what he has often been told; to wit, that Plaintiff's Exhibit 9, which is in Tab B of Plaintiff's Appendix, is a listing of all of the participants in the Management Incentive Plan – it is not a listing of Participants in the Plan which is a defendant in this case. So, when plaintiff states that he found a Sr. Staff Associate who made $173,999.96 total compensation in 2011 (Reply to Stafax ¶28), he has identified, not a Plan Participant, but an employee who is receiving management incentive compensation. The plaintiff has found that person's title and compensation on Exhibit 9, not on Plaintiff's Exhibit 1, which lists the compensation of Plan Participants. The compensation of the Sr. Staff Associate identified on Exhibit 1, as discussed above, was $294,322.56.[16]

Plaintiff's Exhibit 9 was produced to plaintiff as Attachment 1 to Defendants' Answers to Plaintiff's 5th Discovery Request, which plaintiff has filed as Tab G to his Appendix. The Exhibit was responsive to Interrogatories 2, 3 and 4, which asked, for Plan Years 2008, 2009, 2010 and 2011, for the identity of "each and every employee of Employer who was at any time during such Plan Year an "executive employee at a 10% annual/10% long term or higher incentive level," and to set forth for each his or her job title and compensation, as defined in § 1.01 of the Plan. Plaintiff has filed in his Appendix only the part of the Exhibit that related to 2011. As is clear from the interrogatory pursuant to which the Exhibits were produced, these are not lists of Plan participants but lists of participants in the Management Incentive Plan. This was clearly explained to counsel for the Plaintiff at the deposition of Greg Peaslee. (Peaslee Dep. 95-102) (Exhibit 2 to this Brief).

---

[16] As stated before, this would be 2010 compensation because this listing shows Participants to whom a Plan payment was made in 2011. The Exhibit specifically states that the numbers are 2010 compensation. If plaintiff had elected to file the comparable document for the year 2010, there appears on that document a Sr. Staff Associate who is at incentive level 20% and whose compensation was $290,000. That is the Mr. Riska discussed above.

Plaintiff also purports to quote the W-2 income of the highest paid participants as reflected on a form 990 for fiscal year ending June 30, 2001, but does not explain how that relates to a purported "discrepancy" in the information reported in Peaslee Exhibit 6. Compensation, as defined in §1.01(h) of the Plan is not the same as W-2 compensation, because it excludes long-term incentive pay.

Plaintiff also argues, in reply to ¶ 29 of Defendants' Stafax, that:

> Defendants have not responded to numerous discovery requests concerning, and have not placed in the Record evidence establishing, the number of employees that were eligible to participate in the Plan (the Numerator) or the number of employees employed by the Employer (the denominator) from which statistics as to the compensation of eligible participants' as compared to all employees employed by the Employer can be derived.

(Reply to Stafax ¶ 29). Defendants have responded to all discovery requests propounded by the plaintiff and have responded as well to several motions to compel discovery. One cannot create an issue of fact by complaining about responses to discovery. Rule 56(d) provides the appropriate mechanism. However, defendants have provided the information as to who are the eligible employees – that information is in the Plan and the several Amendments to the Plan, as discussed above and in the plaintiff's Brief. It is further specified in Mr. Peaslee's deposition testimony and in the Declarations filed with the Motion for Summary Judgment and this Reply Brief. Eligible employees are those executives whose management incentive levels are at 20% or higher. In addition, defendants have provided the plaintiff with the titles, incentive target levels, base salary, annual incentive payments and Total Compensation (as defined in the Plan) for all participants in the Management Incentive Plan who are at a 10% or higher level covering the years 2008, 2009, 2010 and 2011, which are the years for which such data were requested. *See* Defendants Answer to Interrogatories 2, 3 and 4 of Plaintiff's Discovery –

Fifth Set, at Tab G of Plaintiff's Appendix.[17]  Plaintiff cannot claim that he has created an

issue of fact as to the relative compensation of Plan participants or even as to the eligible

executives by complaining about defendants' discovery responses.

In summary, the purported discrepancies in the compensation data arise from plaintiff's

misunderstanding of the documents, not from an inherent flaw in the data, as contended.

Plaintiff has not shown that there are any disputed facts as to the relative income of participants

*vis a vis* the workforce.

> **9. All participants have the ability to negotiate their employment terms and conditions, and that would include their incentive compensation level and their deferred compensation under the terms of the Plan. (Stafax ¶ 30)**

This fact was established in the testimony of Greg Peaslee.  Because of the linkage

between the benefits under the Plan and one's incentive compensation, it is clear that the ability

to discuss and negotiate the latter entails the ability to affect one's benefits under the Plan.

Plaintiff disputes this statement entirely on the ground that the defendants have not

produced any documents reflecting discussions or negotiations by participants of their pay and

benefits.  (Reply to Stafax ¶ 30).  Mr. Peaslee's explanation that executives can and do discuss

their compensation and are free to come to him, to Mr. Romoff or even to the Compensation

Committee is plausible.  It would be implausible to infer from defendants' inability to search and

produce documents evidencing such communications that they do not occur, which is what

plaintiff has argued.

Plaintiff has not created an issue of fact as to the ability of executives to discuss and

negotiate their compensation arrangements.

---

[17] Plaintiff did not file the Exhibits to the Answers, but this data for 2011 is attached to Plaintiff's Appendix, Tab B, Plaintiff's Exhibit 9. Defendant has attached the complete Exhibit to this Reply Brief as Exhibit 3.

**B.** **On the Undisputed Material Facts, Defendants are Entitled to Summary Judgment**

As fully discussed in defendants' opening brief, the statute requires that a top hat plan be maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees," which means, in the words of the Court of Appeals: "In number, the plan must cover relatively few employees. In character, the plan must cover only high level employees." *In re New Valley*, *supra,* 89 F.3d at 148. Plaintiff does not and cannot plausibly claim that either of these statutory elements have not been met by the UPMC Plan. Less than 2/10 of a percent of the employees are members of the Plan and the members of the Plan on average make ten times more than the average of the non-member employees. Under the case law cited in defendants' opening brief, this clearly qualifies the Plan under both of the elements. Indeed, there is no case of which defendants are aware in which a Plan so clearly met these requirements.

Plaintiff has devoted most of his brief to the argument that a plan cannot be a top hat plan unless the participants can influence the design or operation of the plan. The wellspring of this argument is a Department of Labor ("DOL") opinion letter, which plaintiff describes as follows: "The U.S. Department of Labor … has pronounced that in order to satisfy the qualitative element of the 'select group' top-hat plan requirement, it must be established that plan participants have the ability or bargaining power to affect or substantially influence, through negotiation or otherwise, the design and operation of the plan." (Opposition Brief at 10). This is an overstatement of the import of the cited Opinion Letter, which actually pronounced nothing about the standards to establish the "select group" element. In the words of the DOL, the issues discussed in the letter were: **"**With respect to the Plan, you have requested that the Department find that: (1) the Plan will not fail to be "unfunded" solely because the Plan permits employee-

participants to elect to have payment of a stated percentage of their compensation deferred under the Plan; and (2) 29 CFR 2510.3-102 does not apply to amounts of compensation subject to such deferral elections."  DOL Opinion letter 90-14A (5/8/90).  The "select group" test was not even at issue.

In an oft-quoted preamble to the DOL's discussion of the funding issue, the DOL purported, 17 years after enactment of ERISA, to describe Congress' purpose in adopting the top hat plan exception, stating that "Congress recognized that certain individuals , by virtue of their position or compensation level, have the ability to affect or substantially influence … the design and operation of their deferred compensation plan."  The letter does not cite any legislative history or other source for the determining Congressional intent.  Indeed, neither the Senate[18] nor the House[19] Report says anything more about the top hat provision than that it applies to top executives.  Plaintiff does not explain how surmise as to Congress' purpose in enacting the top hat plan provision can be used to engraft a not-statutory element onto the test for a top hat plan, especially since the DOL itself did not purport to be interpreting the "select group" aspect of the statutory provision, let alone "pronouncing" a new element for determining top hat status.

Plaintiff similarly misstates precedent in representing that the Court of Appeals for the Third Circuit has "uniformly held that the ability or bargaining power to affect or substantially influence … the design and operation of the plan is a required element of a 'top hat' plan." (Opposition Brief at 11).  The Court of Appeals for the Third Circuit has quoted from the Opinion Letter, but only in the context of stating the rationale for a top hat plan exemption, not as a part of the test for determining if a plan is top hat.  *In re the IT Group, Inc*., 448 F.3d 661, 664 (3d Cir. 2006); *Kemmerer v. ICI Americas, Inc.*, 70 F.3d 281, 288 (3d Cir. 1995); *Goldstein*

---

[18] S. Rep. No. 93-127 (April 18, 1973).  Excerpts of both Reports appear in Plaintiff's Appendix at Tab H.
[19] H. Rep. No. 93-533 (Oct. 2, 1973).

*v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir. 2001); *Fields v. Thompson Printing Co., Inc.*, 363 F.3d 259, 274 (3d Cir. 2004). In none of these cases has there even been an issue involving the "select group" part of the definition of a top hat plan. Certainly, there was never a "holding" that bargaining power is "a required element of a top hat plan."

Plaintiff's most glaring and obvious departure from reality, not meaning to take anything away from the two discussed above, is in his contention that the Court of Appeals for the First Circuit, in *Alexander v Brigham and Women's Physicians' Org.*, 513 F.3d 37 (1st Cir. 2008) "adopt[ed] the ability to negotiate as set forth in ERISA Op. Ltr. 90-14A as a required element of a top hat plan." (Opposition Brief at 12). The *Alexander* decision expressly repudiates, not supports, the plaintiff's position in the present case. While the Court did, as plaintiff notes, hold that not every member of the select group must have "bargaining power," it went further and addressed the issue of whether "bargaining power" is even an element of the test at all. In the words of the Court of Appeals:

> We add a coda. As said, the district court determined that the surgeons, as a group, enjoyed bargaining power. *See Alexander*, 467 F. Supp.2d at 147. Because neither party has either challenged that determination or questioned its necessity, we have assumed for argument's sake that collective bargaining power might conceivably be a prerequisite for a top-hat plan. We think it is wise, however, to note our grave doubts about the correctness of this assumption.
>
> The two main reasons underpinning ***our holding that there is no requirement of individual bargaining power to qualify for the top-hat provision***—(i) that neither the text nor the legislative history of the statute contains the slightest hint that Congress contemplated that courts would consider employees' ability to bargain over the terms of their deferred compensation plans and (ii) that the DOL opinion letter does not presume to interpret the statute— militate just as strongly against importing a requirement of collective bargaining power into the top-hat provision. Although Congress's rationale for fashioning the exemption was that the members of a "select group of management or highly compensated employees" could fend for themselves, the statute, by its terms, does not purport to require proof of power of any sort. In such circumstances, it would be highly unorthodox to convert a rationale (like the one set forth in the DOL opinion letter) into an independent statutory test.

513 F.3d at 48 (emphasis added).  The Court of Appeals described its "holding," as quoted above, as being that individual, not just group, bargaining power is not an element of the test for a top hat plan.  Earlier in the opinion, the Court stated its holding as follows:

> In the course of our analysis, we reject the appellant's claims (i) that the plans cater to more than a select group of highly compensated employees and (ii) that the applicability of the top-hat exemption hinges on an implicit requirement that affected employees possess *individual bargaining power.*

*Id.* at 39 (emphasis added).

How the plaintiff conceivably can say that the *Alexander* court "held" that bargaining power is a required element to establish a top hat plan is baffling.

Without discussing in detail the Courts of Appeal cases that plaintiff cites as "holding" that there is a "bargaining power" element to the top hat plan test, we will note that in none of those cases did a court disqualify a plan on the ground that the participants, individually or as a group, lacked the power to influence the design or operation of the plan.  For example, in *Gallione v. Flaherty*, 70 F.3d 724 (2d Cir. 1995), the court did not mention "bargaining power" in its discussion of the select group issue.  *Spacek v. The Maritime Ass'n*, 134 F.3d 283, 296 (5th Cir. 1998) did not even involve a top hat plan.  *Bakri v. Venture Mfg. Co.*, 473 F.3d 677 (6th Cir. 2007) involved a plan in which participation was not limited to high level management or even high level positions; it included secretarial/administrative positions and people with manager titles who supervised no one.  The court did not, therefore, discuss the ability of the participants to influence the design or operation of the plan. *Id.* at 680.  In *Duggan v. Hobbs*, 99 F.3d 307 (9th Cir. 1996) the plan at issue was a one-person severance agreement negotiated by the plaintiff's attorney.  The Court of Appeals held that the plaintiff had bargaining power because his attorney was able to negotiate the terms of the plan with the employer, a precedent of

questionable pedigree, since the DOL Opinion Letter spoke of employees "who, *by virtue of their position or compensation level*," have the ability to influence.  It does not speak of employees who are able to negotiate by virtue of having an attorney.  In *Holloman v. Mail-Well Corp.*, 443 F.3d 832 (11th Cir. 2006), there was no dispute about whether the plan was top hat and, therefore, no decision on that issue.  The Court did not cite the DOL Opinion Letter. Finally, in *Demery v. Extebank Deferred Comp. Plan (b),* 216 F. 3d 283 (2d Cir. 2000), the Court held that the plan at issue was a top hat plan.  The Court said that the "ability to negotiate is an important component of top hat plans," but held that the plaintiff introduced no evidence of members who attempted to negotiate the terms of the plan and were unsuccessful.  *Id*. at 289-90. Significantly, the court rejected an argument similar to one made in the present case by the plaintiff—that one can infer a lack of bargaining power from the fact that the participants did not have as good a plan as some other employees. *Id.* at 290.  The Court stated that such a disparity "shed[s] little light on plaintiff's bargaining power."

There are two district court cases that plaintiff has repeatedly cited on the point in controversy.  Neither case presented an occasion where the court had to decide whether a top hat plan finding requires that all or most participants be able to affect or influence plan design or operation.  *Guiragoss v. Khoury*, 444 F. Supp.2d 649, 661 (E.D. Va. 2006), involves an employer that had only four employees, three of whom were members of the plan.  In *Carrabba v. Randalls Food Markets, Inc*., 38 F. Supp.2d 468, 474 (N.D. Tex. 1999), the court considered a plan where all managers were included.  As described by the district court:

> All levels of management were represented by the participants in the plan during the years 1974 through 1983, starting with executive officers of the company, going down to division managers (who managed more than one store), to store directors (or store managers), to co-store directors (co-store managers), to assistant store directors (assistant store managers), and to managers of departments within the stores, managers in the warehousing operations, managers

in the executive office operations, and supervisors over various other business
functions.

38 F. Supp.2d at 474. The district court was able to conclude that there was no "select group"

without addressing the ability of the participants to negotiate the design or operation of the plan.

Thus, as stated above, no court has ever found that a plan was not a top hat plan because

of the lack of ability of the participants to influence the terms or operation of the plan. Nor has

any Court held that the ability to negotiate plan design or operation is an element of the test for a

top hat plan independent of the plan being maintained primarily for the benefit of a select group

of management or highly compensated employees.

Plaintiff argues that no participant is a member of the UPMC Board and only the Board

can amend the Plan. The statute does not speak of directors, but of management and highly

compensated employees. Plaintiff points out that the participants cannot vote for Directors. This

is because they are not shareholders or, in the case of non-stock corporations like UPMC,

members. The statute does not mention shareholders either. It speaks of management and

highly compensated employees. Plaintiff argues that no participant could affect the design of the

Plan. As Greg Peaslee aptly noted, when the Plan was designed, there were no participants.

(Peaslee Dep. at 26).

Plaintiff continues that the fact that some participants received all of the forms of

deferred compensation provided by the Plan, and others received less than all, demonstrates the

lack of bargaining power of the latter group.[20] This is the same argument that the court in

*Demery v. Extebank Deferred Comp. Plan (b),* 216 F.3d 283 (2d Cir. 2000), rejected, as

discussed *supra,* at page 19. This argument proves more than plaintiff wants to prove.

---

[20] Plaintiff argues: "It would only be logical that a participant having the ability to affect or substantially influence
the terms of their benefit plan would have the ability to unconditionally secure for himself or herself all of the
various forms of benefits available under the Plan." (Opposition Brief at 18).

Accepting plaintiff's premise that one's level of participation and relative compensation is a sign of bargaining power, then the handful of employees who, unlike the other 40,000-plus employees, have managed to secure for themselves participation in the Plan must have substantial bargaining power with respect to the operation of the plan. Their securing compensation many times higher than the mass of employees, including participation in the Management Incentive Plan, further underscores that their positions with the defendants give them the ability to influence or affect their compensation and, therefore, their participation in the Plan. Plaintiff seems to want to look only at the tiny triangle above him, instead of the massive quadrangle beneath.

Plaintiff contends that the lack of bargaining power of the participants is shown by the fact that they were not notified of amendments to the Plan. (Opposition Brief 20-21). This is factually incorrect. Plaintiff admits being provided with a benefits summary by email in August 2011 describing amendments to the Plan. He said he does not recall being informed about any other amendments. However he does not deny, but does not recall, getting the December 22, 2008 email and Plan summary and admits getting another email and Plan summary in August 2011. (Sikora Aff. ¶ 19). John Galley has stated that he sent summaries of all amendments that affected the participants to the participants, and attested that Sikora actually opened the December 22, 2008 notice. Hence, plaintiff's argument that his low station is evidenced by the lack of notice of Plan changes founders on the facts filed of record.

Plaintiff's next argument is that the Plan was over-inclusive – it "extended coverage beyond a select group of management or highly compensated employees." (Opposition Brief pp. 21-27). He predicates this argument on his allegation that "there is no evidence in the record

identifying by name … the pool of UPMC management employees that were eligible for selection by the Committee to be a participant in the Plan." (Opposition Brief at 24). This predicate is simply not correct. As noted earlier in this brief, both Mr. Peaslee's deposition testimony, the language of the Plan and now the Declaration of John Galley make it clear that the executives who were eligible to participate were those who were at the 20% level or higher in the Management Incentive Program.

Plaintiff has compiled from various sources a document that he calls "the Assembled Information" (Plaintiff's Exh. 18). Based upon this collage of unauthenticated material, he draws several conclusions which, albeit factually incorrect, are not sufficient to show that the Plan participants do not represent a select group of management or highly compensated employees. For example, plaintiff identifies employees with a title of President, Chief Operating Officer, and so forth who are not participants in the Plan. (Opposition Brief at 24). Nothing follows from this. As is disclosed on Plaintiff's Exhibit 9, there are entity Presidents who are not at a 20% or higher incentive level. It should not be surprising that the President of a small business unit may be a lower level job than a Vice President of a larger Unit. The incentive level represents UPMC management's evaluation of the jobs, which is more relevant than the plaintiff's untutored assessment based upon job titles.

Similarly, that there are job titles (two of them) that do not sound like management does not mean that these positions are not management or highly compensated employees. For example, the Senior Staff Associate, whom we discussed earlier, was paid $294,000 in 2010. Plaintiff also identifies a number of jobs (Opposition Brief at 25) that he contends have non-management titles, such as Faculty. However, plaintiff is not looking at a list of Plan

participants, but at a list of participants in the Management Incentive Plan. Again, plaintiff is demonstrating a significant misunderstanding of the information that he has been given.

Plaintiff's next argument is that defendants have not shown that an employee's high compensation is a basis for inclusion in the Plan. In this regard, plaintiff erroneously states that defendants have argued that the Participants are highly compensated because they come within the definition of Highly Compensated Employee in IRS Code § 414(q). (Opposition Brief at 26). This is incorrect. In fact, plaintiff cannot point to any place in defendant's Motion, Statement of Facts or Briefs where this Code Section was even cited by defendants.

Plaintiff's final argument is that defendants have not shown that the Plan meets the quantitative element of the "select group" requirement. (Opposition Brief at 28-31). This argument is based upon plaintiff's erroneous "numerator" theory discussed above. See pages 10-11 *supra.* Plaintiff also bases this argument on his contention that defendants have not disclosed which employees are eligible to participate, a contention that also has been discussed above and shown to be in error. The third erroneous basis for this contention is that defendants allegedly have not shown who the Participating Related Entities are. (Opposition Brief at 29). This contention has also been discussed above and shown to be incorrect. *See* pages 3-4, *supra.*

### Conclusion

Defendants respectfully submit that the issue of whether or not the Plan is maintained primarily for the benefit of a select group of management or highly compensated employees is not a close one. Less than two tenths of one percent of the workforce participates in the Plan and they are management employees whose compensation on average is ten times higher than the average compensation of the employees who are not participants. This Court should enter Summary Judgment in favor of the defendants on this issue.

Respectfully submitted,

_____s/John J. Myers_____

John J. Myers
Pa. ID 23596
Eckert Seamans Cherin & Mellott LLC
44th Floor, 600 Grant Street
Pittsburgh, PA 15219
412-566-5900
jmyers@eckertseamans.com

Attorneys for Defendants, UPMC and UPMC
Health System and Affiliates Non-Qualified
Supplemental Benefit Plan