IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL F. SIKORA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 2:12-cv-01860 |
| v. | ) |
| | ) Judge Mark R. Hornak |
| UPMC, a Pennsylvania non-stock | ) |
| non-profit corporation, a/k/a | ) |
| UPMC Health System, and the | ) |
| UPMC Health System and AFFILIATES | ) |
| NON-QUALIFIED SUPPLEMENTAL | ) |
| BENEFIT PLAN, | ) |
| | ) |
| Defendants. | ) |

**OPINION**

**Mark R. Hornak, United States District Judge**

The question presented in dueling motions for partial summary judgment is whether Defendant UPMC's Non-Qualified Supplemental Benefit Plan (the "Plan") is a "top hat" plan under 29 U.S.C. § 1101(a)(1), and thus exempt from the substantive provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq*.

The Court has reviewed those Motions and all briefs in support of and in opposition to them. ECF Nos. 53; 54; 57; 58; 61. The Court also heard from both parties at oral argument on December 1, 2015. Because the Court concludes that the Plan is unfunded and maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees, it is a top hat plan. Therefore, UPMC's motion for partial summary judgment, ECF No. 53, is granted and Sikora's cross-motion for partial summary judgment, ECF No. 57, is denied. This means that Counts I, II, and IV of the Complaint (ECF

No. 1) are dismissed with prejudice, and Count III—the breach of contract claim—will proceed further.

I. **FACTUAL BACKGROUND**

Paul Sikora is a former longtime UPMC employee, eventually rising to become "VP IT Transformation & IT Infrastructure Services." ECF No. 58, at 9, 11. He brought this action against UPMC alleging various ERISA and breach of contract claims, relating to the pension benefit plan in which he was enrolled. *See* ECF No. 1. Sikora was a participant in UPMC's Non-Qualified Supplemental Benefit Plan (the "Plan") beginning in 2008 and ending when he voluntarily terminated his employment with UPMC in 2011. *Id.* ¶¶ 3, 7, 10. As of his termination, Sikora was fully vested in the Plan and held an account balance of $59,369.90. *Id.* ¶¶ 13, 15.

The Plan is a "non-qualified deferred compensation plan" under Section 457(f) of the Internal Revenue Code. Defendant's Exhibit 2, Preamble. The Plan itself states that its purpose is to "enable key executives selected by the Committee to enhance their retirement security." *Id.* Its terms provide that it is intended to be unfunded and maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. *Id.* §§ 2.01, 7.03.

The Plan is operated and administered by the Plan Committee ("Committee"). *Id.* § 7.02. Gregory K. Peaslee, UPMC's Executive Vice President and Chief Administrative Officer, served as the Committee's delegate, making routine decisions and performing ministerial tasks. ECF No. 56, at 4 ¶ 9. Peaslee recommended to the Committee some employees who were eligible to participate, and eligibility for such consideration was limited to "management or highly compensated employee[s]." *Id.* at 6 ¶ 12; Defendant's Exhibit 2, § 2.01. In fact, the only executives eligible to participate were those whose management incentive targets are 20% or

more of their base salary. ECF No. 56, at 158. In the relevant 2007-2011 period (when Sikora participated), the number of participants was no higher than sixty-eight and their average compensation was about a half million dollars. *Id.* at 7–8.

Things apparently turned sour upon Sikora's departure from UPMC. Sikora applied for a lump sum distribution of his account balance and says he never received a written decision from the Committee. ECF No. 1, at 4 ¶ 18. He kept pursuing the distribution throughout 2012, eventually receiving a letter from Gregory Peaslee (acting as the authorized designee of the Committee) informing him that all rights and benefits allegedly due to Sikora had been forfeited because Sikora had not entered into a written Post Retirement Service Agreement. *Id.* ¶ 21. The Plan Committee maintained that the Plan is a "top hat" plan for purposes of ERISA and therefore exempt from the vesting and non-forfeiture provisions of that law. *Id.* ¶ 22. This lawsuit followed.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is material if it might affect the outcome of the suit under governing law." *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 317 (3d Cir. 2014).

Because these are cross-motions for summary judgment, the Court is constrained to view all evidence and draw all reasonable inferences in the light most favorable to the party opposing each motion. *See J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 925 (3d Cir. 2011). In other words, if viewing the evidence in the light most favorable to Sikora reveals that the Plan meets the elements of a "top hat" plan, UPMC should be granted summary judgment that it is such a plan. On the other hand, if viewing the evidence in the light most favorable to

3

UPMC reveals that the Plan fails to meet any element of a "top hat" plan, Sikora should be granted summary judgment that it is not a top hat plan.

## III. LEGAL ANALYSIS

The Congress enacted ERISA as a remedial statute designed in large part "to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated." *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 374 (1980) (internal citations omitted). Certain deferred compensation plans, however, are exempted from ERISA's substantive protections. 29 U.S.C. § 1101. Dubbed "top hat" plans, the exempted employee benefit schemes are (1) unfunded; and (2) maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Id.* § 1101(a)(1).

### A. Burden of Proof

The Court must initially determine who needs to prove what. UPMC initially accepted that it had the burden of proving that the Plan is a top hat plan. ECF No. 54, at 11 (*citing Solis v. Koresko*, 884 F. Supp. 2d 261, 283 (E.D. Pa. 2012)). Not surprisingly, Sikora accepted that UPMC had this burden. ECF No. 58, at 14. However, in its reply brief, UPMC cited *Pane v. RCA Corp.*, 868 F.2d 631, 637 (3d Cir. 1989) which held that "Section 401(a)(1) does not provide an exemption from liability under section 502(a) [the provision under which ERISA suits are brought]. It merely provides the legal standard by which . . . section 502(a) liability is to be determined." UPMC raised this new authority again at oral argument and Sikora was silent on the point. The Court concludes that Sikora bears the burden of showing that the Plan is *not* a top hat plan. As the Circuit explained in *Pane*, the top hat exemption is not an affirmative defense that must be pled, *id.*, rather that status serves as a complete bar to recovery under ERISA's substantive provisions. Therefore, to state a claim upon which relief can be granted under

4

ERISA, Sikora must show that ERISA itself allows for the requested relief. And because ERISA does not provide substantive protection for top hat Plan participants, it necessarily follows that a plaintiff needs to show the involved plan is not a top hat plan, that is, that they are entitled to the substantive protections of ERISA.

Allocating the burden in this way comports with standard pleading law. *See* Fed. R. Civ. P. 8 (a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("only a complaint that states a plausible claim for relief survives a motion to dismiss") (*citing Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 556 (2007)). Sikora is simply required, as the plaintiff, to demonstrate that the statute he is suing under entitles him to relief.[1]

### B. Unfunded

Plans that hold their assets in "Rabbi trusts" that are subject to the claims of general creditors and whose participants are not taxed on the deferred compensation when it is earned are unfunded plans. *In re IT Group, Inc.*, 448 F.3d 661, 668–69 (3d Cir. 2006). UPMC's Plan in this case holds its assets in just such a Rabbi trust administered by BNY Mellon. ECF No. 56, at 5 ¶ 10 (Declaration of Gregory K. Peaslee); *id.* at 91 (Ex. 4, Trust Agreement). The Plan's unfunded status is not in dispute. ECF No. 55, at 4 ¶ 17; ECF No. 60, at 7 ¶ 17. All parties, and the Court, agree that the Plan is unfunded.

### C. Select Group

In determining whether the Plan is "primarily maintained for the purpose of providing deferred compensation[2] for a select group of management or highly compensated employees," 29

---

[1] As set out in detail below, there is no genuine issue of material fact as to the Plan's top hat status, so even if UPMC bears the burden of proof, the Court's ultimate conclusion would be the same.

[2] Sikora does not dispute that the Plan was established to provide for deferred income. ECF No. 58, at 10.

5

U.S.C. § 1101, the Court must consider both quantitative and qualitative factors.[3] The Third Circuit has boiled this down into a pretty simple formula: "the plan must cover relatively few employees . . . [and] the plan must cover only high level employees." *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996).

Whether the Plan covers "relatively few employees" hinges on the percentage of the workforce participating in the Plan. *See Pane*, 868 F.2d at 637. UPMC argues that the percentage of its workforce participating in the Plan has never exceeded two-tenths of one percent. ECF No. 54, at 14. In support of that argument, UPMC points to Gregory Peaslee's Declaration[4] which shows how many employees were eligible to participate in 2011. There were sixty-eight. Further, the Declaration states that from 2007 through 2011 the number of Plan participants ranged from sixteen to sixty-eight. ECF No. 56, at 6 ¶ 16. During that time, the total number of UPMC employees ranged from 37,965 to 48,731. *Id.* at 7 ¶ 17. Thus, according to UPMC, the absolute highest percentage of employees participating in the Plan was .14%. *See id.*

Sikora says that's all wrong. First, Sikora argues that the right way to measure the "numerator" in this calculation is to look to the number of employees *eligible* to participate, rather than those who actually do. ECF No. 58, at 34. And without any record information on the number of employees eligible to participate, Sikora says, summary judgment cannot be granted.

---

[3] Some other circuits break those factors out to include (1) the percentage of the total workforce eligible to participate in the plan; (2) the nature of their employment duties; (3) the compensation disparity between top hat plan members and non-members; and (4) the language of the plan agreement itself. *See Alexander v. Brigham and Women's Physicians Org.*, 513 F.3d 37, 43–47 (1st Cir. 2008); *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007); *Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283, 288–90 (2d Cir. 2000).

[4] Mr. Peaslee's Declaration was unchallenged by Sikora as to the relevant facts that it states. And that is so not for lack of discovery. The first phase of discovery, as ordered by the Court on July 18, 2013, specifically dealt with whether the Plan is a top hat plan. That original 90-day discovery period was extended for an additional six weeks on October 1, 2013. Thereafter, the Court granted in part Sikora's first motion to compel discovery and heard argument on his second motion to compel discovery. Though that second motion was denied, the Court again extended the discovery period beyond July 2014. The Court also granted in part Sikora's *third* motion to compel discovery in December 2014 and granted Sikora's motion to take a Rule 30(b)(6) deposition in April 2015. It is fair to say that Sikora has had plenty of time and opportunity to uncover facts that would show that the Plan is not a top hat plan. No further discovery time or procedures for top hat status were requested by any party.

*Id.* That argument however, has been expressly rejected by other courts. *See Pane*, 868 F.2d at 637 (plan covered "a select group of sixty-one management employees out of a work force exceeding 80,000"); *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007) (the element is "the percentage of the total workforce invited to join the plan"). The Court concludes that the proper inquiry is what percentage of UPMC's total workforce participated in the Plan.[5]

Sikora next argues that the eligible group is much larger than UPMC admits. *See* ECF No. 58, at 29–32. But this argument relies on Plaintiff's Exhibit 9, which has nothing to do with the Plan at issue here. Rather, it is a list of participants in an unrelated Management Incentive Plan. *See* ECF No. 56, at 155–57. But even if that list was the correct input to the "numerator" in this equation, the total number of participants would be 268 and the overall percentage of UPMC's workforce participating would be less than .05%.

The question for the Court then becomes, is two-tenths of one percent (or one-half of one percent) sufficiently few? The answer is quite clear: yes it is. Courts all over the country have found that plans with a significantly higher percentage of employees qualified as "select." *See Alexander v. Brigham and Women's Physicians Org.*, 513 F.3d 37, 43–44 (1st Cir. 2008) (8.7% was select); *Belka v. Rowe Furniture Corp.*, 571 F. Supp. 1249, 1251 (D. Md. 1983) (4.6% was select); *Callan v. Merrill Lynch & Co., Inc.*, No. 09-566, 2010 WL 3452371, at *10 (S.D. Cal. Aug. 30, 2010) (plans that limit participation to 15% or less of the workforce are consistently

---

[5] Even buying Sikora's argument, the record as reviewed and stipulated at oral argument reveals that the "numerator" number would never have exceeded 10% of the UPMC workforce. Sikora also challenges the denominator calculation. ECF No. 58, at 28–29. That challenge has no factual basis. Sikora argues that there is no record evidence on the number of UPMC's employees as defined in the Plan document because of some alleged discrepancy relating to the number of UPMC tax-exempt affiliates. *Id.* But as Gregory Peaslee's Declaration explains: "the practice has been to consider [new tax-exempt entities] as Participating Related Entities." ECF No. 56, at 6 ¶ 13. That Declaration establishes uncontroverted evidence of the size of UPMC's overall workforce. Plaintiff cannot manufacture a factual dispute without pointing to some other evidence showing that the number is different or record evidence as to why the number is wrong.

treated as select). The infinitesimally small number of participants in this Plan means, by any measure (UPMC's or Sikora's), it was primarily maintained for a "select group."

The next step is whether this select group consisted of "high level employees." *In re New Valley*, 89 F.3d at 148. UPMC argues it does because participation is limited to management employees and that those management employees are highly paid.[6] UPMC notes that the Plan itself states that it exists to provide supplemental deferred compensation to "highly compensated key executives." Defendant's Exhibit 2, Preamble. Further the Plan limits participation to "key executives selected by the Committee," *id.* § 2.01, and the primary factors in selecting those key executives are their influence within the organization and their ability to impact its performance. ECF. No 56, at 6 ¶ 15. UPMC provided a comprehensive listing of the job titles of Plan participants and they include various presidents, vice presidents, and other chief and senior officials. ECF No. 54, at 7–8.

UPMC also argues that the compensation of these employees makes certain their "high level status." Eligibility to participate in the Plan is limited to those whose incentive levels under the separate management incentive plan are at least 20% of their salary (there were a total of sixty-one such eligible employees at the end of 2011). ECF No. 56, at 148; ECF No. 61-1, at 2 ¶ 5; ECF No. 58-4, at 60. During the relevant period, the average compensation of Plan participants was roughly $500,000 per year. ECF No. 56, at 8 ¶ 19. With the exception of one outlier,[7] the lowest compensation of a Plan participant was $202,707. *Id.* ¶ 18. Further, these compensation numbers do not account for substantial long-term incentive compensation

---

[6] This test is disjunctive, that is high level employees can be *either* management *or* highly compensated. *See* 29 U.S.C. § 1051(2) ("primarily for the purpose of providing deferred compensation for a select group of management *or* highly compensated employees) (emphasis added). The record here supports the conclusion that Plan participants are "high level employees" either way, viewed separately and also even if the test were conjunctive, i.e. the Plan participants are both management employees and highly compensated.

[7] CEO Jeffrey Romoff, who had only one month of qualified compensation in 2007. ECF No. 56, at 7 n.1.

8

payments that only these high-level employees also receive. *Id.* ¶ 20. And the high-level compensation is highlighted by the fact that the average compensation for all UPMC employees was about 10% of the average compensation of Plan participants. *Id.* ¶ 19.

Sikora advanced what he says are several problems with this state of affairs. Chief among them is that UPMC employees do not automatically become Plan participants upon achievement of a specified managerial status or compensation level. ECF No. 58, at 28. Plaintiff's Exhibit 18 ("Assembled Information"[8]) allegedly shows job titles of UPMC employees who were not selected to participate and because those titles are "equal to or greater than"[9] those of some Plan participants, UPMC is engaging in a "strategy of mislabeling or mischaracterizing middle or lower management employees eligible to participate." *Id.* at 30–32. Or so says Sikora. This line of reasoning really amounts to an argument that the Plan was *too* selective. But if certain employees are highly compensated and occupy an executive role at UPMC and still are not selected to participate in the Plan, that is evidence that the Plan is indeed *really* highly selective.

Sikora next argues that participation in the Plan is not based on compensation. *Id.* at 32. In support of this, Sikora provides "statistical observations" showing that (1) there were 3,868 employees (including more than 3,500 doctors) with a 2011 base salary greater than the lowest paid Plan participant and (2) the 2011 total compensation of the lowest Plan participant was a lot lower than that of the highest-compensated Plan participant. *Id.* The first observation simply weighs in favor of confirming the high selectivity of the Plan, and as UPMC highlighted at oral argument, physicians who were not otherwise in a high level management position were not considered for Plan inclusion. The second is really a *non sequitur*. It does not matter that the

---

[8] The accuracy and materiality of the "Assembled Information" is dubious because it appears to contain unauthenticated calculations by the Plaintiff with inputs from several different sources. *See* ECF No. 58-4, at 60. It is accepted here only to fully consider Plaintiff's arguments.

[9] At least according to Sikora, apparently applying his own, personal estimations of the rank order of job titles.

lowest paid participant made much less than the very highest paid participant when the lowest paid participant still made $208,480. *See id.* Moreover, as described above, the average compensation of Plan participants was over a half million dollars. From where the Court sits, by any measure those are some highly-compensated employees. And there is nothing in the law that requires "highly compensated" employees to be the "*highest* compensated" employees.

Sikora mounts his last stand based on UPMC's public website. *See id.* at 31. He argues that of the sixty-eight Plan participants in 2011, only ten (10) are among "UPMC Leadership" as listed on its website. *Id.* But fatal to Sikora's point is the fact that everyone identified as "UPMC Leadership" on the website and who was employed by a tax-exempt entity was a Plan participant. And beyond that, Sikora advances no authority for the proposition that ERISA case law requires Plan eligibility and website listings to be coterminous, nor any record basis to support an argument that the webpage is meant to be an exhaustive representation of UPMC's executive team.

Considering the record evidence in the light most favorable to Sikora, the Court concludes that the Plan covered only a *very* small number of high level, highly compensated management employees. These employees were all UPMC executives, are a tiny fraction of UPMC's total workforce (no matter how the workforce is computed), and are very handsomely compensated by any measure. Therefore, the second element of the top hat test is met, and the Plan is a top hat plan exempt from ERISA's substantive protections.

### D. <u>Bargaining Power</u>

Sikora vociferously argues for the Court's addition and application of another element to the top hat plan analysis: bargaining power. As explained below, his dogged approach to this top hat "element" (which is not found in ERISA or the Department of Labor's adopted Regulations)

10

is really more ostrich-like than illuminating.[10] Sikora's argument rests on an Opinion Letter from the Department of Labor. The Letter states, in part:

> It is the view of the Department that in providing relief for "top hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of [ERISA].[11]

According to Sikora, that snippet is the Department of Labor pronouncing that Plan participants must have the ability or bargaining power to affect or substantially influence the design and operation of the Plan for it be "top hat." ECF No. 58, at 16. Sikora further argues that the Department of Labor's "pronouncement" is entitled to judicial deference,[12] and that because Plan participants here lacked the requisite bargaining power, the Plan is not a top hat plan and is therefore subject to the substantive protections of ERISA. *Id.* at 15.

Sikora insists that "[t]he Third Circuit Court has on three (3) separate occasions over a span of eleven (11) years joined the other Circuit Courts . . . that have *uniformly held* that the ability or bargaining power to affect or substantially influence, through negotiation or otherwise, the design and operation of the plan is a *required element* of a 'top hat' plan." ECF No. 58, at 17 (emphasis added). Unfortunately for Sikora, not a single circuit court has held that.

---

[10] *See Gonzalez-Servin v. Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011) ("Not that ostriches *really* bury their heads in the sand [but] . . . [t]he ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist is as unprofessional as it is pointless.").

[11] U.S. Dep't of Labor, Office of Pension and Welfare Programs (E.R.I.S.A.), Opinion Letter 90-14A, 1990 WL 123933, at *1 (May 8, 1990).

[12] Under what is commonly known as "*Chevron* Step Zero," administrative interpretation of a particular statutory provision qualifies for deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law and that the agency interpretation claiming deference was promulgated in the exercise of that authority. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The 90-14A Opinion Letter was not, in fact, a rulemaking so is not entitled to *Chevron* deference. It may be entitled to deference so far as it has the "power to persuade," *see Skidmore v. Swift & Co.*, 323 U.S. 134 (1944); *Alexander*, 513 F.3d at 47, but this Court will follow all of the others on record in finding it unpersuasive on this point.

Let's begin with the Third Circuit cases that Sikora says hold that bargaining power is a "crucial element" of a top hat plan. *Id.* Sikora quotes our Circuit in *Kemmerer*: "Congress exempted top hat plans from ERISA's vesting requirements in large part because it recognized that high level executives retain sufficient bargaining power to negotiate particular terms and rights under the plan and therefore do no need ERISA's substantive rights and protections." *Kemmerer v. ICI Americas, Inc.*, 70 F.3d 281, 288 (3d Cir, 1995). In fact, whether the plan at issue in *Kemmerer* had top hat status was not at issue, so the court had no occasion to apply any factors at all in deciding whether the employer had breached its top hat plan. Next, Sikora quotes from *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir. 2001): "[Top hat] plans are intended to compensate only highly-paid executives, and the Department of Labor has expressed the view that such employees are in a strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees." Again, the Circuit did not apply the test as to whether the plan at issue had top hat status. The quoted statement—describing why top hat plans exist—came in the context of the court's decision that "top hat plans should be treated as unilateral contracts, and neither party's interpretation should be given precedence over the other's . . . ." *Id.* at 443. Finally, Sikora quotes a footnote from *In re IT Group*, 448 F.3d at 664 n.1: "The Department of Labor has explained that Congress exempted 'top hat' plans from ERISA's substantive protections because it believed that, unlike other employees, management and highly compensated employees have sufficient bargaining power to negotiate favorable deferred compensation plans and are capable of taking the risks attendant to such plans into account." Once again, the Circuit did not apply "bargaining power" as part of the top hat test. It quoted only from the Department of Labor Letter in describing top hat plans at a high level and when it came time to evaluate the plan at

issue, the court explicitly used the ERISA statutory definition, which says nothing about bargaining power. *Id.* at 665.

Sikora goes on to cite cases from other circuits that he declares "uniformly hold" that bargaining power is a "crucial element." ECF No. 58, at 18. Reading those cases demonstrates that they do no such thing. *See Carrabba v. Randalls Food Mkts., Inc.*, 38 F. Supp. 2d 468 (N.D. Tex. 1999) (explaining the rationale for top hat plans, but not applying bargaining power as an element); *Gallione v. Flaherty*, 70 F.3d 724 (2d Cir. 1995) (mentioning bargaining power in the context of the salutary purposes of ERISA but not applying it as part of the test); *Spacek v. The Maritime Ass'n I L A Pension Plan*, 134 F.3d 283 (5th Cir. 1998) (distinguishing other cases that actually involve top hat plans); *Bakri*, 473 F.3d 677 (mentioning bargaining power only as a reason top hat plans exist); *Holloman v. Mail-Well Corp.*, 443 F.3d 832 (11th Cir. 2006) (noting that all parties and the Court agree the plans at issue were top hat plans, therefore not applying any test); *Duggan v. Hobbs*, 99 F.3d 307, 310 (9th Cir. 1996) (quoting the Department of Labor letter as "the policy underlying the top-hat exception").

The case that Sikora cites that comes closest to the view he espouses is *Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283 (2d Cir. 2000). There, the Second Circuit examined the plaintiffs' argument that they lacked sufficient bargaining power, only to conclude that the record was silent on that point and that plaintiffs did not proffer any evidence suggesting an absence of bargaining power sufficient to raise a question of fact on the issue. *Id.* at 289–90. That brief discussion is far from the Second Circuit's central holding. It is a long stretch to conclude that the Second Circuit added bargaining power as a distinct and central ERISA element to the top hat evaluation. In fact, in the absence of any evidence whatsoever on

13

bargaining power, the Second Circuit had no problem finding that the plan at issue was a top hat plan as a matter of law. *Id.* at 288.

Sikora's most egregious misstatement of law is in his characterization of the First Circuit's decision in *Alexander*.[13] ECF No. 58, at 19. Sikora is adamant that that court "adopted such DOL [bargaining power] requirement." *Id.* He quotes from a section of the opinion titled "Statutory Purpose": "The origins of the top-hat plan provision lie in Congress's insight that high-echelon employees, unlike their rank-and-file counterparts, are capable of protecting their own pension interests. Presuming that employees of this stature can fend for themselves, Congress relaxed some of ERISA's prophylactic obligations." *Alexander,* 513 F.3d at 43 (internal citations omitted). What Sikora conveniently leaves out are that court's statements that it "declines the appellant's invitation to depart from the plain language of the statute and jerry-build onto it a requirement of individual bargaining power," *id.* at 47, and "our holding [is] that there is no requirement of individual bargaining power to qualify for the top-hat provision," *id.* at 48. Sikora then tries to draw a fine line by arguing that what the First Circuit actually did was decline to require *individual* bargaining power only. ECF No. 58, at 19. But the court's thoughts on the Department of Labor Letter from which this all stems is crystal clear:

> The DOL opinion letter speaks only to Congress's rationale for enacting the top-hat provision. It does not present itself as an interpretation of the provision's requirements, nor does it make any mention of the need for or propriety of demanding that employers demonstrate their employees' ability to negotiate the terms of deferred compensation.

*Alexander*, 513 F.3d at 47.

---

[13] A close second is Sikora's focus on "bargaining power." In actuality, the DOL Letter speaks to an employee exerting influence through "negotiation or *otherwise*." Even if the DOL Letter is to be given weight, Sikora neglects to address the "or otherwise" concept.

Undeterred by what the decisions of these other courts actually held and said, Sikora forged ahead at oral argument, vehemently maintaining—in the face of all reported judicial documentation to the contrary—that "bargaining power" is a distinct element of the "top hat" test. But obstinacy will not prevail over accuracy. It is plain that there has not been one federal court that has applied "bargaining power" as an element in determining whether a deferred compensation plan is a top hat plan that is exempt from ERISA coverage. This Court declines to be the first.[14]

And because the parties generated a great many words on the subject, the Court will address a few additional points. The Court agrees with the First Circuit's position vis-à-vis the Department of Labor Opinion Letter. Not only is that Letter not entitled to deference, it does not even purport to be what Sikora says it is. It is merely a description of the purposes that the Department of Labor thought Congress likely had in mind when enacting the top hat exemption. Further, even if the Court were to accept that the Letter adds bargaining power (or an equivalent means of workplace influence) as a distinct, trump card-level top hat element, the highly compensated employees and managers for whom these plans exist are *presumed* to have bargaining power "*by virtue* of their position[s] or compensation level[s]." Dep't of Labor Opinion Letter 90-14A, 1990 WL 123933, at *1 (emphasis added). So any actual bargaining power (or lack thereof) held by Plan participants here would be legally irrelevant.

Further still, there is nothing in the record to indicate that even if actual bargaining power/influence was relevant, that Plan participants failed to be able to exert it. Sikora argues that UPMC's admissions and the Plan Document itself establish that only the UPMC Board and

---

[14] A straightforward reading of the DOL Opinion Letter reveals that at best, its DOL author was recounting what is essentially a Congressional presumption—that highly compensated/management employees in a selective deferred compensation plan are presumed to be people who have enough bargaining power (or other means of influence) to allow for a plan's top hat treatment.

the Committee—not the participants—can affect or substantially influence the terms, design, or operation of the Plan. ECF No. 58, at 15. Therefore, Sikora says, participants lacked bargaining power and the Plan is not a top hat plan. But, as UPMC points out, the high-level executives who were plan participants could discuss their compensation with Mr. Peaslee, the CEO, or even with the Board. ECF No. 54, at 21. Mr. Peaslee himself is a Plan participant and he is the one who makes recommendations for all Plan amendments. *Id.*

Even more than that though, the Opinion Letter itself says that top hat plan participants are presumed to be able "to affect or substantially influence, through negotiation *or otherwise*" the design and operation of their plan. Dep't of Labor Opinion Letter 90-14A, 1990 WL 123933, at *1 (emphasis added). The Department of Labor thus recognized that top hat plan participants have other means, beside direct negotiation, to affect or influence their plans. So even if there was evidence here that Plan participants could not directly negotiate the terms or administration of the Plan, these high-level, very highly paid executives would still have a high degree of leverage in influencing the Plan. For example, they could threaten to bolt to a new job if they weren't happy with the terms or operation of the Plan as a component of their compensation. In any event, there is nothing in the record that leads the Court to conclude the Plan's participants had anything other than the presumed "power to influence" contemplated by the Congress and the Department of Labor.

\* \* \*

The Court has carefully considered all of the parties legal arguments and has read the record in the light most favorable to the non-moving party when evaluating each Motion. The Court concludes that there is no genuine issue of material fact that UPMC's Plan during the relevant period was unfunded and maintained primarily for a select group of management or

highly compensated employees.[15] The Plan is a "top hat" plan exempt from ERISA's substantive protections and therefore, UPMC is entitled to judgment as a matter of law on Counts I, II and IV.

A final word. The Court notes that its analysis of the issues and the arguments advanced by the parties was not made any easier by Sikora's obfuscation as to the state of the decisional law from other courts. His obvious misreading of those cases, and his follow along misstatements of ERISA case law, disrespect the Court, the parties, and the legal process, and hinder the sound administration of justice. After considering the record and the case law as it actually is, the Court is satisfied that the result here accords with the record, applicable precedent, and the statutory mandates of Congress.

## IV.     CONCLUSION

For the foregoing reasons, UPMC's motion for partial summary judgment is GRANTED and Sikora's cross-motion for partial summary judgment is DENIED.

An appropriate Order will issue.

s/ Mark R. Hornak
Mark R. Hornak
United States District Judge

Dated:  December 22, 2015

cc:     All counsel of record

---

[15] And here it appears that they were both, as set forth above.