IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAUL F. SIKORA,
    Plaintiff,

v.

No. 2:12-cv-01860

UPMC, a Pennsylvania non-stock non-profit
corporation a/k/a UPMC Health System, and
UPMC HEALTH SYSTEM AND
AFFILIATES NON-QUALIFIED
SUPPLEMENTAL BENEFITS PLAN,
    Defendants.

## OPINION

**Mark R. Hornak, United States District Judge**

Plaintiff Paul Sikora worked for UPMC Health System from 1983 until his retirement in December 2011 as the Vice President of Enterprise Transformation. Following his retirement, Sikora requested and was denied funds under a deferred-compensation retirement plan. Sikora filed this suit against Defendants UPMC and related entities (together, UPMC) alleging violations of the Employee Retirement Income Security Act (ERISA), 20 U.S.C. § 1001, *et seq.*, and breach of contract. On December 22, 2015, the Court granted partial summary judgment in favor of UPMC on Sikora's ERISA claims. The parties then filed the instant cross-motions for summary judgment on the last of Sikora's live claims, breach of contract, and the Court heard oral argument on November 17, 2016.

At the heart of the parties' dispute lies the question whether Sikora's failure to satisfy an express condition precedent to his eligibility for retirement benefits should be excused. For the reasons that follow, the Court concludes that it should not, and UPMC therefore did not breach the parties' contract when it refused to pay Sikora. UPMC's Motion will be granted, Sikora's will be denied, and summary judgment will be entered in favor of UPMC and against Sikora.

I.  **BACKGROUND**

UPMC administers a Non-Qualified Supplemental Benefit Plan (the Plan) under Section 457f) of the Internal Revenue Code. The Plan is what is known as a "top-hat" plan: an unfunded retirement plan maintained primarily to provide deferred compensation to a select group of management and other essential UPMC employees.[1] It is administered by the Plan Committee and delegates thereof, which, according to the Plan Document, have "final, binding, and conclusive" authority to make determinations regarding the distribution of Plan benefits. ECF No. 1-2 at 19.

In 2008, Sikora was notified that he had been selected as a participant in the Plan. At that time, he was given a copy of the Plan Document, which laid out the essential eligibility terms for receipt of retirement benefits. Section 4.01 of the Plan Document provided that:

> A Participant is eligible to receive his or her retirement benefit following: (i) the Participant's remaining employed at all times until his or her Normal Retirement Date, (ii) the Participant's entering in a Post Retirement Service Agreement with the Employer, and (iii) the Participant's satisfaction of his or her Post Retirement Service Agreement with the Employer.

ECF Nos. 1-2 at 14; 80 at 2; 86 at 2. Section 1.01(t) of the Plan defined a Post Retirement Service Agreement, or PRSA, as follows:

> the agreement entered into between the Employer and a Participant which sets forth that for one (1) year following the Participant's retirement, he or she will: (1) provide substantial consulting services to the Employer to, among other things, assist those who are taking on the Participant's responsibilities and (2) refrain from working for a competitor of the Employer or the Related Entities.

ECF Nos. 1-2 at 7-8; 79 at 3; 85 at 9-10.

---

[1] This Court previously concluded that UPMC's Plan is a "top hat" plan and set forth its reasoning in *Sikora v. UPMC*, 153 F. Supp. 3d 820, 830 (W.D. Pa. 2015).

2

In August 2011, four months before Sikora retired, a UPMC employee sent Sikora an email telling him that "[v]ested benefits are not paid until you: . . . "[e]nter into a post-retirement service agreement with UPMC; and [s]atisfy the requirements of the one-year post-retirement service agreement." ECF Nos. 80 at 3; 86 at 4. Despite receiving the Plan Document and at least one email about these eligibility requirements, however, Sikora did not sign the PRSA before retiring, nor did he request to see a copy of it. ECF Nos. 80 at 3; 86 at 4.

Things turned sour upon Sikora's departure from UPMC, by which time he had accrued a Plan account balance of $59,369.90. Sikora applied for a distribution of this account balance, but his request was denied, and his appeal of that denial was also denied. ECF No. 1-4 at 2-3. A UPMC administrator explained to Sikora in an April 2012 email that his first request for a distribution was denied because he did not meet the Plan's eligibility requirements: namely, he had not signed and complied with a PRSA as the Plan required. In the same email, the UPMC administrator offered Sikora additional time to read, review, and sign the PRSA before Sikora appealed the decision:

> I am not entirely sure why you did not get or ask for [the PRSA]. Nonetheless, I attach with this correspondence a [PRSA] for your review and consideration. In order to provide further support for your claim [for benefits] under the Plan, UPMC will accept a signed [PRSA] from you now. This means you need to consider whether to sign and return the [PRSA] and abide by its terms and conditions, as stated in the Plan. If you would like time to consider the Agreement and feel it would be beneficial to you to have a temporary suspension of the above time period for considering your request for appeal, let me know. If you decide to sign and return the [PRSA], you can choose to supplement your claim [for benefits] and request for appeal by providing a signed version of the [PRSA] to me as soon as you can. . . . If I do not receive a signed [PRSA] on or before May 10, 2012, we will proceed with the appeal process on the basis that there is no signed [PRSA].

ECF Nos. 58-1 at 9; 80 at 4; 86 at 7. Rather than take advantage of this opportunity to sign the PRSA, however, Sikora appealed the decision without doing so. Three months later, in a letter

3

dated July 23, 2012, Sikora was informed that his appeal was denied because of his failure to sign the PRSA. ECF No. 1-4 at 2-3. Sikora responded with this lawsuit, alleging that UPMC's failure to distribute his retirement benefits constitutes a breach of contract.

Sikora provides both a "past" and a "present" explanation for his failure to sign the PRSA. Sikora says he did not sign the PRSA before retiring because he did not know about it. He simply does not recall reading the portion of the Plan Document containing the PRSA requirement, nor does he remember seeing the portion of the email notice that mentioned the requirement. ECF No. 86 at 3-4. As for why he has still not signed a PRSA, Sikora says that it contains what he believes are "new," unbargained-for terms—terms that were not part of the written Plan Document and were not binding amendments to the Plan. Specifically, although the Plan Document provided that in order to qualify for benefits Sikora must refrain from working for a competitor of UPMC or its Related Entities, Sikora takes issue with the fact that the PRSA additionally states he shall not "at any point during or following his employment . . . divulge . . . [UPMC's] confidential information," that he shall not "directly or indirectly . . . establish[] or participate[] in" a competing enterprise "[f]or one (1) year," and that Sikora shall not "solicit[] any employees or consultants" of UPMC "[f]or one (1) year." ECF No. 1-5 at 1-2.

UPMC responds that the terms of the PRSA are not "new" at all. Instead, UPMC contends, the terms of the PRSA merely implement in greater detail the broadly-drafted forfeiture-for-competition provision contained within the original Plan Document. Therefore, according to UPMC, Sikora's failure to sign a PRSA compels the Court to grant summary judgment in its favor.

Sikora, on the other hand, asks the Court to excuse his failure to meet the PRSA precondition.

To this day, Sikora has not signed a PRSA in any form.

## II. **LEGAL STANDARD**

Summary judgment is appropriate where there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential of his or her case on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex*, 477 U.S. at 322.

Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment simply by reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). And the mere

existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

In cases such as this, where cross motions for summary judgment have been filed, each party essentially contends that no genuine issue of material fact exists from its particular point of view. The Court therefore considers each motion for summary judgment separately. *Home for Crippled Children v. Prudential Ins. Co.*, 590 F. Supp. 1490, 1495 (W.D.Pa. 1984). Each party bears the burden of establishing a lack of a genuine issue of material fact. *See id.* But the parties' contradictory claims do "not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives . . . determination [of] whether genuine issues of material fact exist." *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). Moreover, the standards under which a court grants or denies summary judgment do not change when considering cross motions. *Home for Crippled Children*, 590 F. Supp. at 1495.

### III. ANALYSIS

ERISA's coverage extends broadly to include all employee benefit plans. *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996). Top-hat plans for highly-paid executives, like UPMC's Plan, are subject to ERISA's enforcement provisions, *id.* at 149, and a plan participant may bring a civil action "to recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *see also Kemmerer v. ICI Americas, Inc.*, 70 F.3d 281, 286-87 (3d Cir. 1995).

Although top-hat plans are subject to ERISA's enforcement provisions, "[t]he dominant characteristic of the special top hat regime is the near-complete exemption of top hat plans from

6

ERISA's substantive requirements." *In re New Valley Corp.,* 89 F.3d at 148. Top-hat plans are exempt from ERISA's vesting, funding, fiduciary, and nonforfeitability provisions. *See* 29 U.S.C. §§ 1101(a), 1051, 1053; 1081(a)(3); *see also Goldstein v. Johnson & Johnson,* 251 F.3d 433, 442 (3d Cir. 2001); *In re New Valley Corp.,* 89 F.3d at 148-49; *Bryan v. Pep Boys-Manny, Moe and Jack,* No. 00-cv-01525, 2001 WL 752645, *4 (E.D. Pa. June 29, 2001). Top-hat plans are also exempt from ERISA's writing requirement; they may be written, or they may be partially or exclusively oral. *In re New Valley Corp.,* 89 F.3d at 149.

When asked to enforce a top-hat plan, a court treats it as a unilateral contract, and its interpretation is governed by the general principles of the federal common law of contract. *Goldstein,* 251 F.3d at 436, 443; *In re New Valley Corp.,* 89 F.3d at 150-51. An employee begins his or her performance of the contract by working under the terms of the plan. Once the employee satisfies all of the plan's requirements, the employer is then bound to perform, usually by providing whatever compensation or benefits it promised to the employee under the terms of the Plan. An employer is not bound to perform, however, until the employee has completed his or her performance as defined by the plan. *See In re New Valley Corp.,* 89 F.3d at 150-51; *Kemmerer,* 70 F.3d at 287. An employer is also not bound to perform if the employee fails to satisfy each of the binding conditions precedent to the receipt of benefits. *Hooven v. Exxon Mobil Corp.,* 465 F.3d 566, 575 (3d Cir. 2006); *see also See In re Lucent Death Benefits ERISA Litig.,* 541 F.3d 250, 256-57 (3d Cir. 2008). Indeed, it is axiomatic that the non-occurrence of a condition precedent, unless excused, relieves the obligation to perform contractual duties. *O'Leary v. Grace/Newark Hous. Ltd. P'ship,* 31 F. App'x 784, 786 (3d Cir. 2002) (citing Restatement 2d of Contracts § 224).

Regular ERISA plans are analogous to "trusts" for employees, and reviewing courts owe deference to the discretionary decisions of plan administrators just as the discretionary decisions of a trustee receive deference. *See, e.g., Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110-11 (1989); *Goldstein,* 252 F.3d at 435. Because a top-hat administrator has no fiduciary responsibilities, however, courts do not accord a deferential standard of review to a top-hat plan administrator's interpretation of its plan. *Goldstein,* 251 F.3d at 442-43. Interpretations of a top-hat plan are reviewed *de novo*, and "neither party's interpretation is entitled to any more 'deference' than the other party's" except as ordinary principals of contract interpretation otherwise dictate. *Id.* at 436, 442-43. In accordance with ordinary contract principles, we give full effect to provisions in a top-hat plan granting the plan administrator discretionary authority to interpret ambiguous plan terms. *Id.*; *see also Zebrowski v. Evonik Degussa Corp. Admin. Comm.,* 578 F. App'x 89, 93 (3d Cir. 2014), *cert. denied,* 135 S. Ct. 1734 (2015). A plan administrator's exercise of its discretion in interpreting an ambiguous plan term, therefore, is reviewed *de novo* for compliance with the covenant of good faith and fair dealing, which includes the duty to exercise discretion reasonably. *Goldstein,* 251 F.3d at 444; *Zebrowski,* 578 F. App'x at 93. In other words, if discretionary authority is granted to the plan administrator, "the question presented to the Court is not whether [the Committee's] interpretation offers the best reading of the contract; rather, given the discretion granted to the [Committee], the question is whether the interpretation offered by [the Committee] was reached in good faith." *Zebrowski,* 568 F. App'x at 95.

In this case, the Court need not determine whether the UPMC's denial of Sikora's benefits was an exercise of its discretionary authority triggering the good-faith standard of review, or whether a *de novo* standard—or some amalgamation of those standards—is

appropriate. The parties do not dispute that the Plan required Sikora to sign a PRSA as a condition precedent to his eligibility to receive benefits. Sikora himself calls the PRSA requirement a "precondition to receiving his retirement benefits."[2] ECF No. 85 at 10. Thus, in the absence of any ambiguity on the question of whether Sikora was required to sign the PRSA in order to become eligible to receive benefits under the Plan,[3] the dispositive question becomes whether Sikora has any legally cognizable excuse for his failure to sign a PRSA. After hearing oral argument, examining the language of UPMC's Plan, reviewing the record, and considering the parties' filings, the Court concludes that Sikora has no legally cognizable excuse for his failure to sign a PRSA. UPMC's decision not to distribute Sikora's Plan account balance, therefore, whether reviewed under a *de novo* standard or a more deferential standard, did not constitute a breach of the parties' contract.

Sikora makes a number of arguments for why he should not have to agree to the terms of the PRSA despite his acknowledgement that it amounts to a condition precedent to his eligibility

---

[2] The Court recognizes that construing a contractual term as a condition precedent is generally disfavored where such an interpretation would have the harsh result of working a forfeiture. *See, e.g., Castle v. Cohen,* 840 F.2d 173, 177 (3d Cir. 1988) ("Since the failure to comply with a condition precedent works a forfeiture, such conditions are disfavored."); Restatement 2d of Contracts, § 227, comment b ("When ... it is doubtful whether or not the agreement makes an event a condition of an obligor's duty, an interpretation is preferred that will reduce the risk of forfeiture"). Congress, however, purposely excluded top-hat plans from ERISA's built-in nonforfeitability protections. *See* 29 U.S.C. §§ 1051; 1053; *see also Ciccarelli v. Gichner Sys. Grp., Inc.,* 862 F. Supp. 1293, 1297 (M.D. Pa. 1994) (citing *United States v. Local 1804-1,* 812 F. Supp. 1303, 1332 (S.D.N.Y. 1993)). Nonetheless, Sikora conceded in his briefing (correctly, in the Court's view) that the Plan's requirement that he sign a PRSA is a "precondition" to his eligibility for retirement benefits. ECF No. 85 at 10.

[3] In addition to Sikora's concession, the Court has little difficulty independently concluding that the Plan plainly required Sikora to sign a PRSA as a condition to becoming eligible for benefits. When Sikora became a Plan participant, he was provided with a copy of the Plan Document. ECF Nos. 80 at 2; 86 at 2. The Plan Document provided that a participant must meet three requirements in order to be eligible to receive his or her retirement benefit: (1) remain employed until the Normal Retirement Date, (2) enter into a PRSA, and (3) satisfy the requirements of that PRSA. *Id.* It informed Sikora that the PRSA would contain at least two provisions: that he provide substantial consulting services to the Employer and that he refrain from working for a competitor of the Employer or the Related entities. ECF Nos. 79 at 3; 85 at 9-10. Sikora also received an email reminding him of the requirement that he sign a PRSA in August 2011—about four months prior to his retirement. ECF Nos. 80 at 3; 86 at 4. And although Sikora now takes issue with the terms of the PRSA itself, Sikora does not contend that the Plan's requirement that he sign a PRSA was ambiguous, nor has he presented any extrinsic evidence to that effect. Indeed, Sikora agrees that the PRSA requirement was a "precondition to receiving his retirement benefits." ECF No. 85 at 10.

for benefits. First, Sikora argues that he did not know that he was required to sign the PRSA because UPMC did not affirmatively provide him with notice of the requirement and did not give him a copy of the PRSA until April 10, 2012—about four months after he retired. ECF Nos. 80 at 4; 86 at 7. UPMC's failure to provide him with notice and a copy of the PRSA, Sikora argues, violated UPMC's fiduciary duty to him as a plan participant.

Sikora's fiduciary duty argument is devoid of merit. For one thing, top-hat plans are exempt from ERISA's fiduciary requirements. 29 U.S.C. §1101(a); *In re New Valley Corp.*, 89 F.3d at 148-49. Top-hat plan administrators are not fiduciaries, *Goldstein*, 251 F.3d at 443, and it is "well established . . . that there is no cause of action for breach of fiduciary duty involving a top hat plan." *Zebrowski*, 578 F. App'x at 96–97 (citing *Goldstein*, 251 F.3d at 443). For another, Sikora admits that the Plan Document and the August 2011 email contained language notifying him of the PRSA requirement. In addition, Sikora also cites no federal common law contract principle that would give rise to an affirmative duty on behalf of UPMC to in essence take Sikora by the hand and especially point out the PRSA requirement in the Plan Document to him, or to provide him with a copy of the PRSA without his requesting one. And even if such an affirmative duty did exist, Sikora's argument that UPMC breached its duty would be moot: the parties agree that when UPMC later provided Sikora with a copy of the PRSA and gave him additional time to read, consider, and sign it, he refused. *See* ECF Nos. 58-1 at 9; 80 at 4-5; 86 at 7. Therefore, absent record evidence that UPMC intentionally withheld or otherwise prevented Sikora from signing the PRSA—an argument Sikora does not make, and really could not make, given his admission that he did not even ask for a PRSA until after his retirement—there is no basis to conclude Sikora's late receipt of a copy of the PRSA caused his failure to sign it.

Next, Sikora argues that he should be excused from signing the PRSA because UPMC treated other Plan participants differently. Specifically, Sikora contends that UPMC disbursed retirement funds to three other retirees who did not sign PRSAs and whose employment agreements did not contain post-retirement terms that were as restrictive as the terms of the PRSA offered to Sikora.

Sikora's differential treatment claim also lacks merit. Even assuming Sikora's allegations are true, such differential treatment is not a basis for excusing Sikora's own failure to sign a PRSA. Sikora points to no federal common law contract principle which would support the notion that UPMC's waiver of a condition precedent with respect to some of its retirees requires it to waive that same condition for Sikora. UPMC might have found it unnecessary to collect PRSAs from other employees for a variety of reasons. Perhaps UPMC concluded, for example, that the other retirees had no access to confidential information, or that they posed no competitive risk. Sikora utterly fails to explain what legal difference it makes with respect to his own eligibility for benefits that UPMC elected not to collect PRSAs from certain other retirees.[4]

Sikora's last and perhaps best argument is that he should be excused from the PRSA condition because, according to him, UPMC operated a classic bait-and-switch scheme. UPMC induced Sikora's side of the bargain, he says, by promising him that the PRSA would say one thing, and then—years later, when Sikora received it—the terms of the PRSA turned out to say something else altogether.[5] UPMC's inclusion of these "new" terms in the PRSA, Sikora argues,

---

[4] Sikora makes no allegation, for example, that he was treated differently due to his race, religion, sex, national origin, or other such protected classification. Nor does he argue that he relied to his detriment on a misrepresentation of UPMC concerning whether he would have to sign a PRSA. *See, e.g., Sturch v. Elec. Joint Apprenticeship Training & Trust*, No. 93-cv-07498, 1996 WL 392157, *3-4 (N.D. Ill. July 11, 1996).

[5] Specifically, Sikora points out that the original Plan Document only informed him of two provisions that the PRSA would contain: that he must provide substantial consulting services to the Employer, and that he refrain from working for a competitor of the Employer or the Related entities. ECF Nos. 79 at 3; 85 at 9-10. The PRSA, Sikora complains, contains additional terms: that he shall not "at any point during or following his employment . . . divulge

11

amounts to a contractual flimflam: a unilateral modification of the terms of the parties' contract that moved the goalpost for Sikora once he had already begun performance. ECF No. 85 at 10-11, 15.

In support of his bait-and-switch argument, Sikora relies on the Tenth Circuit's decision in *Cirulis v. UNUM Corp.*, 321 F.3d 1010 (2003). There, a former employee filed suit against his former employer alleging that the employer's practice of conditioning the receipt of severance benefits on his signing a General Agreement and Release provided at the time of termination violated ERISA. *Id.* at 1011. The original severance plan documents did not describe with any precision the terms that would be included in the General Agreement and Release. *Id.* at 1011-12. Later, when presented to the former employee, the General Agreement and Release contained a non-solicitation provision that was not referenced in the severance benefit plan. *Id.* The former employee refused to sign the General Agreement and Release and sued instead. *Id.* at 1011.

The Tenth Circuit first inquired whether the severance plan document expressly conditioned payment of benefits on the employee's assent to a non-solicitation provision, concluding that it did not. *Id.* at 1014. The Court next considered whether the plan document provided any notice that the employee might later have to agree to a non-solicitation provision. *Id.* Concluding that it did not, the Court held that "[b]y failing to provide notice to employees that severance benefits would be conditioned on a non-solicitation provision, the plan administrator's conduct . . . contravenes ERISA's mandate that employee-welfare plans be written so as to provide employees with notice of their rights and obligations under the plan." *Id.* at 1014.

---

. . . [UPMC's] confidential information," that he shall not "directly or indirectly . . . establish[] or participate[] in" a competing enterprise "[f]or one (1) year," and that Sikora shall not "solicit[] any employees or consultants" of UPMC "[f]or one (1) year." ECF No. 1-5 at 1-2.

This Court has no quarrel with the overall contours of the Tenth Circuit's reasoning in *Cirulis*. Broadly speaking, it makes sense. To allow plan administrators to invent new conditions for benefit payments from whole cloth whenever and however they choose—including terms for which absolutely no notice is provided on the face of a benefit plan—would defeat one of the fundamental purposes of ERISA: to ensure that employers keep their promises to employees. *Id.* at 1015. And although top-hat plans are exempt from most of ERISA's substantive protections, including its fiduciary requirements, plan administrators do not thereby have a license to hoodwink their employees by inventing new terms and conditions for the purpose of denying them benefits. *See Kemmerer*, 70 F.3d at 288.

Considering the Tenth Circuit's reasoning from *Cirulis*, however, does not lead inexorably to the same outcome in this case. In *Cirulis*, the severance plan document at issue not only failed to explicitly list the non-solicitation provision, it provided absolutely no detail whatsoever about the General Agreement and Release that employees would be required to sign. The most descriptive portion stated only that the General Agreement and Release would "include[] important terms that the employee should consider before making the decision to sign it." *Cirulis*, 321 F.3d at 1014. As a result, the Tenth Circuit concluded that the plan gave the employee absolutely "*no notice* that . . . benefits would be conditioned on" a non-solicitation provision. *Id.* (emphasis in original).

Here, unlike in *Cirulis*, Sikora cannot be said to have had "no notice" of the PRSA provisions to which he would be bound. The Plan Document made clear that Sikora would have to sign a PRSA in order to be eligible to receive benefits. It also said the PRSA would provide that Sikora himself may not work for a competitor for one year and that he would provide consulting services to UPMC for that year. Sikora therefore had notice of the key terms of the

13

PRSA: he either was or should have been aware of the condition that he sign a PRSA, and he either was or should have been aware that the PRSA would contain covenants not to work for a competitor for one year and to provide consulting services to UPMC for that same year.

Moreover, the Plan at issue in this case—unlike the severance plan in *Cirulis*—is a top-hat plan. Congress exempted top-hat plans from many of ERISA's substantive protections in part because top-hat plans are presumed to "benefit only highly compensated executives" and "largely exist as devices to defer taxes." *Kemmerer*, 70 F.3d at 286. Participants in a top hat plan, like Sikora, are assumed to be high-level executives—financially sophisticated employees who possess significant bargaining power to understand and negotiate the particular terms and rights of their compensation packages. *See id.* at 288. Top-hat plans are thus exempt from ERISA's stringent reporting and disclosure requirements. *See* 29 U.S.C. §§ 1030, 1051(2); 29 C.F.R. § 2520.104-23; *In re New Valley Corp.*, 89 F.3d at 149. Instead, top-hat plans are subject to an alternative, minimal set of reporting provisions containing no mandate that administrators affirmatively disclose to employees the entire text of a plan absent a request to do so. *See* 29 U.S.C. §§ 1030; 1051(2); 29 C.F.R. § 2520.104-23; *In re New Valley Corp.*, 89 F.3d at 149.[6]

Here, Sikora could have requested to see the exact terms of the PRSA, and he was provided with enough notice of the PRSA's requirements that any interested employee would have done so—either going in or as the parties made their exit plans. But he did not.[7] The Court

---

[6] *See also Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 930-31 (3d Cir. 1985), *overruled on other grounds*, 7 F.3d 1110 (3d Cir. 1993) (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989)); *Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283, 290 (2d Cir. 2000) ("[A] top hat plan is deemed to have satisfied the reporting and disclosure requirements of ERISA, including the furnishing of a summary plan description and annual reports to plan beneficiaries, by filing a short statement with the Secretary of Labor and providing plan documents to the Secretary upon request.").

[7] Sikora does not recall reviewing the Plan's conditions for benefits eligibility, a fact which—although the Court credits it as true for purposes of resolving the instant motions—is somewhat in tension with Sikora's claim that UPMC should have included with more precision the exact terms of the PRSA in the original Plan Document. *See*

is therefore comfortable that the record here amply supports concluding that the language contained in the Plan Document provided Sikora with sufficient—even if not all-encompassing—notice of the PRSA terms by which he would be bound, including the that he would be required to refrain from soliciting UPMC employees to work for a competitor. Here's why.

The Court also concludes as a matter of contractual interpretation that the PRSA constitutes an implementation of the existing terms of the Plan as set forth in the Plan Document rather than an amendment—constructive or otherwise—to the substantive provisions of the Plan.[8] The specific terms with which Sikora now takes issue—that he shall not "at any point during or following his employment . . . divulge . . . [UPMC's] confidential information," that he shall not "directly or indirectly . . . establish[] or participate[] in" a competing enterprise "[f]or one (1) year," and that Sikora shall not "solicit[] any employees or consultants" of UPMC "[f]or one (1) year," ECF No. 1-5 at 1-2—do not substantially alter what the Court concludes was the parties' intent concerning Sikora's broadly-drafted obligation not to work for a competitor and to continue to serve the interests of UPMC for a year after he moved on. The PRSA's terms do not materially expand Sikora's contractually bargained-for duties in either scope or duration[9]—at least not for the reasons Sikora raises here.[10]

---

ECF Nos. 80 at 2; 86 at 3. Given Sikora's earlier ambivalence regarding his learning the terms of the PRSA, the Court is at a loss to see how such greater precision would have made a difference in this case.

[8] Interpretation of an ERISA plan is a question of law. *See Goldstein*, 251 F.3d at 441-48.

[9] In fact, the terms of the PRSA actually limit Sikora's Plan-described duties in some respects. For example, whereas the text of the Plan Document places no temporal limitation whatsoever on the forfeiture-for-competition provision, the implementing term in the PRSA actually limits Sikora's obligation not to work for a competitor to one year. And whereas the text of the Plan Document places no geographic limitation whatsoever on Sikora's agreement not to compete, the PRSA limits his obligation to a 120-mile radius around Pittsburgh, Pennsylvania.

[10] The Court notes, without concluding, that the PRSA's term purporting to require that Sikora not "indirectly . . . participat[e] in, financially . . . any enterprise which is engaged in" competition with UPMC is facially broader than the express provision as to non-competiton that Sikora was provided notice of in the Plan Document and the August

In this context, the promise not to lure employees or consultants away from a former employer during a finite non-competition period is part-and-parcel of, and inherent in, a covenant not to compete with that former employer and to serve that former employer as a consultant for that limited period. Unlike the situation in *Cirulis*, where the employee had "no notice" as to the scope and coverage of the subsequent agreement he would have to sign, it was quite plain here that—according to the terms even Sikora concedes were in the Plan—he owed a two-pronged duty of fealty to UPMC for one year after he departed. A promise not to lure away UPMC employees during that same timeframe is fully consistent with both of the duties Sikora had notice of: to not work for a competitor and to consult on behalf of UPMC. On the other hand, it would have been wholly inconsistent with those duties for him to have at the same time gone about the business of inducing his UPMC colleagues to jump ship.

Moreover, as an employee in Pennsylvania, Sikora was already under a separate and continuing legal fiduciary obligation not to disclose to a competitor UPMC's confidential business information acquired during and by virtue of his employment, and in such regards, the PRSA tendered to him did not definitively expand upon the obligations Sikora already had. *See, e.g.*, Pennsylvania's Uniform Trade Secrets Act, 12 Pa. Stat. § 5301, *et seq.*; *Moore v. Kulicke & Soffa Industries, Inc.*, 318 F.3d 561, 566-67 (3d Cir. 2003) (noting that, under Pennsylvania law, misappropriation of a trade secret may be shown by establishing harm as the result of a communication of a trade secret divulged pursuant to a confidential relationship); *Home Line Furniture Indus., Inc. v. Banner Retail Mktg., LLC*, 630 F. Supp. 2d 527, 542-43

---

2011 email. Those documents state that Sikora could not "work for" a competitor. The PRSA term, however, could be read to prohibit Sikora from, for example, owning a passive investment in another Pittsburgh medical facility. But Sikora does not complain about the breadth of the forfeiture-for-competition provision; instead, his argument centers on the PRSA's non-solicitation and confidentiality provisions. *See, e.g.*, ECF No. 85 at 8-12. Moreover, Sikora does not aver that he would have signed the PRSA but for the breadth of the PRSA's forfeiture-for-competition provision. The breadth of the PRSA's forfeiture-for-competition provision, therefore, did not prevent Sikora from satisfying the Plan's condition precedent that he sign a PRSA, nor does it in any way excuse his failure to do so.

(E.D. Pa. 2009) (explaining that, in Pennsylvania, an employee has an ongoing duty to maintain the confidentiality of his former employer's trade secrets unless the former employer gives express or implied consent for disclosure); *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 623-25 (1957) (finding that trade secrets of an employer may be considered confidential when shared with an employee in the course of employment and that they are not to be disclosed by that employee in subsequent rival employment).

In sum, because Sikora did not sign a PRSA as he knew he was required to do in order to become eligible for benefits, and because he has no legally cognizable excuse for his failure to do so, UPMC's decision not to distribute Sikora's Plan account balance did not constitute a breach of the parties' contract. Sikora's failure to satisfy what he concedes is a condition precedent to his eligibility for benefits without any legally cognizable excuse warrants summary judgment in favor of UPMC and against him.

## IV. CONCLUSION

UPMC's Motion for Summary Judgment will be granted, Sikora's will be denied, and summary judgment will be entered in favor of UPMC and against Sikora. An appropriate Order will be entered.

Mark R. Hornak
United States District Judge

Dated: January 10, 2017

cc: All counsel of record